**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

Southern District of New York

Case number (*If known*): _____ Chapter 15

☐ Check if this is an amended filing

Official Form 401

# Chapter 15 Petition for Recognition of a Foreign Proceeding    12/15

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write debtor's name and case number (if known).

| | | |
|---|---|---|
| 1. | **Debtor's name** | Grupo Isolux Corsán, S.A. |

**2. Debtor's unique identifier**

**For non-individual debtors:**

☐ Federal Employer Identification Number (EIN)  ___ ___ – ___ ___ ___ ___ ___ ___ ___

☑ Other  A-84173947                    . Describe identifier  Tax Identification         .

**For individual debtors:**

☐ Social Security number:  xxx – xx– ____ ____ ____ ____

☐ Individual Taxpayer Identification number (ITIN):  **9** xx – xx – ____ ____ ____ ____

☐ Other _____ . Describe identifier _____ .

**3. Name of foreign representative(s)**

Karla Pascarella

**4. Foreign proceeding in which appointment of the foreign representative(s) occurred**

Solicitud de Homologación (Representative appointed by Board of Directors)

**5. Nature of the foreign proceeding**

*Check one:*

☑ Foreign main proceeding
☐ Foreign nonmain proceeding
☐ Foreign main proceeding, or in the alternative foreign nonmain proceeding

**6. Evidence of the foreign proceeding**

☐ A certified copy, translated into English, of the decision commencing the foreign proceeding and appointing the foreign representative is attached.

☐ A certificate, translated into English, from the foreign court, affirming the existence of the foreign proceeding and of the appointment of the foreign representative, is attached.

☑ Other evidence of the existence of the foreign proceeding and of the appointment of the foreign representative is described below, and relevant documentation, translated into English, is attached.
See Attached Exhibits
_____

**7. Is this the only foreign proceeding with respect to the debtor known to the foreign representative(s)?**

☐ No. (Attach a statement identifying each country in which a foreign proceeding by, regarding, or against the debtor is pending.)
☑ Yes

| Debtor | Grupo Isolux Corsán, S.A. | Case number (if known) |
|---|---|---|
| | Name | |

**8. Others entitled to notice**

Attach a list containing the names and addresses of:

(i)    all persons or bodies authorized to administer foreign proceedings of the debtor,

(ii)   all parties to litigation pending in the United States in which the debtor is a party at the time of filing of this petition, and

(iii)  all entities against whom provisional relief is being sought under § 1519 of the Bankruptcy Code.

**9. Addresses**

**Country where the debtor has the center of its main interests:**

Spain

**Debtor's registered office:**

Calle Caballero Andante 8
Number    Street

P.O. Box

28021 Madrid
City          State/Province/Region    ZIP/Postal Code

Spain
Country

**Individual debtor's habitual residence:**

Number    Street

P.O. Box

City          State/Province/Region    ZIP/Postal Code

Country

**Address of foreign representative(s):**

1701 Directors Blvd., Ste. 810
Number    Street

P.O. Box

Austin, Texas                           78744
City          State/Province/Region    ZIP/Postal Code

United States
Country

**10. Debtor's website** (URL)

**11. Type of debtor**

*Check one:*

❑ Non-individual (*check one*):

   ❑ Corporation.  Attach a corporate ownership statement containing the information described in Fed. R. Bankr. P. 7007.1.

   ❑ Partnership

   ☑ Other.  Specify: _Sociedad Anónima_

❑ Individual

| Debtor | Grupo Isolux Corsán, S.A. | Case number (if known) |
|---|---|---|
| | Name | |

**12. Why is venue proper in this district?**

Check one:

☑ Debtor's principal place of business or principal assets in the United States are in this district.

☐ Debtor does not have a place of business or assets in the United States, but the following action or proceeding in a federal or state court is pending against the debtor in this district:

_____.

☐ If neither box is checked, venue is consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative, because:

_____.

**13. Signature of foreign representative(s)**

I request relief in accordance with chapter 15 of title 11, United States Code.

I am the foreign representative of a debtor in a foreign proceeding, the debtor is eligible for the relief sought in this petition, and I am authorized to file this petition.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct,

✖ /s/ Karla Pascarella
Signature of foreign representative

Karla Pascarella
Printed name

Executed on     07/29/2016
                MM  / DD / YYYY

✖ _____
Signature of foreign representative

_____
Printed name

Executed on     _____
                MM  / DD / YYYY

**14. Signature of attorney**

✖ /s/ Fredric Sosnick
Signature of Attorney for foreign representative

Date     07/29/2016
         MM    / DD / YYYY

Fredric Sosnick
Printed name

Shearman & Sterling LLP
Firm name

599 Lexington Avenue
Number       Street

New York                                    NY          10022
City                                        State       ZIP Code

(212) 848-4000                              fsosnick@shearman.com
Contact phone                               Email address

2472488                                     NY
Bar number                                  State

SHEARMAN & STERLING LLP
Fredric Sosnick
Stephen M. Blank
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000

SHEARMAN & STERLING (London) LLP
Solomon J. Noh
Kelly E. McDonald
9 Appold Street
London EC2A 2AP
United Kingdom
Telephone: +44 20 7655 5000

*Attorneys for the Spanish Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

| | | |
|---|---|---|
| **In re:** | : | **Chapter 15** |
| | : | |
| **GRUPO ISOLUX CORSÁN, S.A.,**[1] | : | **Case No. 16-_____ (__)** |
| | : | |
| **Debtor in a Foreign Proceeding.** | : | |
| | : | |

-------------------------------------------------------------- x

**CORPORATE OWNERSHIP STATEMENT**
**OF GRUPO ISOLUX CORSÁN, S.A. PURSUANT**
**TO BANKRUPTCY RULES 1007(a)(4) AND 7007.1 AND LOCAL RULE 1007-3**

As of July 29, 2016, the corporations listed below directly or indirectly own 10%

or more of the outstanding equity interests in the Debtor.

---

[1]    The last four digits of the Taxpayer Registration Number or Tax ID for Grupo Isolux Corsán, S.A. are 3947. The Debtor's executive headquarters is located at Calle Caballero Andante 8, 28021 Madrid, Spain.

| Corporation Name | Percentage Ownership |
|---|---|
| Construction Investments S.á.r.l. | 52.0226% |
| Hiscan Patrimonio, S.A.U | 23.8025% |
| Inversiones Corporativas, S.A. | 11.7371% |
| Cartera Perseidas, S.L. | 10.0147% |

**EXHIBITS**

**Solicitud de Homologación Judicial de Acuerdo de Refinanciación**
Disposición Adicional Cuarta de la Ley Concursal
Solicitantes: GRUPO ISOLUX CORSÁN, S.A., ISOLUX INGENIERÍA, S.A. CRSÁN CORVIAM CONSTRUCCIÓN, S.A., GRUPO ISOLUX CORSÁN CONCESIONES, S.A., ISOLUX CORSÁN INMOBILIARIA, S.A., ISOLUX CORSÁN SERVICIOS, S.A., ISOLUX ENERGY INVESTMENTS, S.L.U., INFINITA RENOVABLES, S.A.

## AL JUZGADO DE LO MERCANTIL DE MADRID QUE POR TURNO CORRESPONDA

D. RAMÓN RODRÍGUEZ NOGUEIRA, Procurador de los Tribunales y de las sociedades **GRUPO ISOLUX CORSÁN, S.A.** (en adelante, "**GIC**"), **ISOLUX INGENIERÍA, S.A.** (en adelante, "**IISA**"), **CORSÁN CORVIAM CONSTRUCCIÓN, S.A.** (en adelante, "**CCC**"), **GRUPO ISOLUX CORSÁN CONCESIONES, S.A.** (en adelante, "**GICC**"), **ISOLUX CORSÁN INMOBILIARIA, S.A.** (en adelante, "**ICI**"), **ISOLUX CORSÁN SERVICIOS, S.A.** (en adelante, "**ICS**"), **ISOLUX ENERGY INVESTMENTS, S.L.U.** ("**IEI**") e **INFINITA RENOVABLES, S.A.** (en adelante, "**Infinita**"), cuyos datos de identificación y domicilios figuran en el documento adjunto como **Documento nº 1**, según acredito mediante las respectivas escrituras de poder que, como **Documentos nº. 2(a), 2(b), 2(c), 2(d), 2(e), 2(f), 2(g) y 2(h)**, se acompañan para su unión a los autos por testimonio con devolución de los originales previo desglose; bajo la dirección letrada solidaria de los abogados del Ilustre Colegio de Abogados de Madrid, D. Ángel Alonso Hernández (ICAM nº 61.871) y D. Javier Rubio Sanz (ICAM nº 81.665), ante el Juzgado comparezco y, como mejor proceda en Derecho, **DIGO**:

**I.**       Que, con fecha 13 de julio de 2016, GIC, IISA, CCC, GICC, ICI, ICS, IEI, Infinita y otras sociedades de su grupo suscribieron, con diversos acreedores de pasivos financieros, un acuerdo de refinanciación elevado a público en esa misma fecha ante el Notario de Madrid, D. Fernando Molina Stranz, con el número 1.030 de su protocolo (en adelante, el acuerdo de refinanciación elevado a público incluyendo todos sus anexos, el "**Acuerdo de Refinanciación**"). Se acompaña, como **Documento nº 3**, copia del Acuerdo de Refinanciación.

**II.**       Que, por medio del presente escrito, GIC, IISA, CCC, GICC, ICI, ICS, IEI e Infinita formulan en tiempo y forma **SOLICITUD DE HOMOLOGACIÓN JUDICIAL DE ACUERDO DE REFINANCIACIÓN** de conformidad con lo dispuesto en la Disposición Adicional Cuarta de la Ley 22/2003, de 9 de julio, Ley Concursal (en adelante "**LC**" o la "**Ley Concursal**") en su redacción actual, con arreglo a las siguientes

**ALEGACIONES**

**PRIMERA.-**        **SOBRE LAS SOCIEDADES SOLICITANTES DE LA HOMOLOGACIÓN**

**1.        Identificación de las sociedades solicitantes de la homologación**

La solicitud de homologación del Acuerdo de Refinanciación es formulada por GIC, IISA, CCC, GICC, ICI, ICS, IEI e Infinita. Los datos de constitución y demás datos de identificación de las sociedades solicitantes de esta homologación constan en el Documento nº 1 adjunto.

GIC, IISA, CCC, GICC, ICI, ICS, IEI e Infinita, serán referidas, en adelante y de manera conjunta, como las "**Sociedades**".

Esta solicitud de homologación del Acuerdo de Refinanciación es efectuada por las Sociedades que son parte del Acuerdo de Refinanciación y que tienen sus domicilios sociales y sus centros de interés principales en España. La solicitud de homologación no se formula en relación con otras sociedades del Grupo Isolux Corsán (conforme se describe en el apartado 2 siguiente) que también son parte del Acuerdo de Refinanciación, pero que tienen su domicilio social fuera de España.

**2.        GIC es la sociedad dominante de un grupo de sociedades que incluye, entre otras sociedades, a IISA, CCC, GICC, ICI, ICS, IEI e Infinita.**

GIC controla, directa o indirectamente, a IISA, CCC, GICC, ICI, ICS, IEI e Infinita. Por tanto, de conformidad con lo previsto en el artículo 42 del Código de Comercio, **GIC es la sociedad dominante del grupo de sociedades en el que se integran el resto de Sociedades solicitantes de la homologación** (en adelante, el "**Grupo Isolux Corsán**" o el "**Grupo**").

Se acompaña como **Documento nº 4** un diagrama que muestra la posición y el control que ejerce GIC en relación con todas las Sociedades. Asimismo, se acompaña al presente escrito como **Documento nº 5** las cuentas consolidadas de GIC cerradas a 31 de diciembre de 2015 que consolidan, entre otras, a todas las Sociedades solicitantes de la homologación y, en consecuencia, acreditan que todas las Sociedades forman parte de un grupo de sociedades cuya sociedad dominante es GIC.

En el caso concreto de Infinita e IEI, destacamos asimismo que GIC es propietaria del 80,69705% y del 100% del capital social de dichas sociedades (en el caso de IEI, a través de

Power Investering B.V.), como lo demuestran las certificaciones que se aportan como **Documentos nº 6(a) y 6(b)** respectivamente.

### 3.    Sobre el Grupo Isolux Corsán y sus actividades

El Grupo Isolux Corsán es un **conglomerado empresarial de capital español** y de **referencia mundial especializado en la construcción y concesión de grandes infraestructuras** en las áreas de ingeniería, obra civil, medioambiente e instalaciones, **con más de 80 años de experiencia** y **presencia en más de 40 países** de cuatro continentes, contando con una **plantilla de alrededor de 6.000 profesionales.**

Grupo Isolux Corsán nace en 2004 como resultado de la unión entre dos grupos de sólida y reputada experiencia en las áreas de actividad del Grupo, Isolux Wat, fundada en el año 1933, y Grupo Corsán-Corviam, nacida en el año 1928.

Las actividades del Grupo se encuentran ampliamente diversificadas en **dos grandes ramas de negocio**: de una parte (i), el **negocio EPC** (por sus siglas en inglés "*Engineering Procurement and Construction*") y, de otra, (ii) el **negocio de concesiones**.

El **negocio EPC** del Grupo, cuenta con una cartera de negocio aproximada de 6.817 millones de euros, convirtiéndolo en uno de los primeros grupos europeos en este sector. Se encuentra centrado en la ingeniería y construcción de grandes infraestructuras, actividad que se desarrolla a su vez a través de tres amplias áreas de negocio: Infraestructuras (obra civil, edificación y medio ambiente), Energía (generación, oil & gas, energías renovables e industria) y T&D e Instalaciones (transmisión y distribución de electricidad, infraestructuras de transporte, mantenimiento y servicios, seguridad, telecomunicaciones y automatización y control).

La otra gran rama de negocio del Grupo, se centra en la **gestión integral de concesiones**, especialmente en las áreas de transporte de energía, promoción y explotación de centrales fotovoltaicas y gestión de aparcamientos.

El Grupo cuenta con la concesión de 6.811 kilómetros de líneas de trasmisión de alta tensión, opera instalaciones fotovoltaicas con más de 326 MW en operación (que generaron 421 GWh en 2014) y cuenta con más de 30.000 plazas de aparcamiento en 29 ciudades españolas, distribuidas en 57 parkings.

3

<u>**SEGUNDA.-**</u>          <u>**ANTECEDENTES FÁCTICOS RELEVANTES**</u>

**1.**          El negocio desarrollado por el Grupo (tanto el negocio EPC como, principalmente, el negocio de concesiones) es altamente intensivo en capital. Asimismo, es un negocio muy dependiente de herramientas de financiación de circulante (para hacer frente, entre otros, a pagos a proveedores a medida que se van realizando las obras) y de líneas de avales y otras líneas de garantía (necesarias no solo para acceder a contratos y mantener la cartera de negocio, sino particularmente para cobrar importes de clientes por adelantos de obra o ejecución de obra, etc.).

**2.**          Grupo Isolux Corsán tiene una estructura compleja con financiaciones diversas a distintos niveles. En la práctica, el Grupo ha venido funcionando en materia financiera como una unidad integrada, con financiaciones a distintos niveles de la estructura, pero de la que responden varias entidades del Grupo mediante un sistema garantías cruzadas y asunción de obligaciones con carácter solidario. Igualmente, desde un punto de vista de caja y de gestión de tesorería, el Grupo ha venido operando de manera integrada mediante un sistema centralización de tesorería ("*cash pooling*") entre las distintas sociedades que lo conforman.

**3.**          La crisis mundial que se inició en 2008 y que afectó de manera muy significativa a España ha tenido un impacto relevante en el sector de construcción de obra pública e infraestructuras, principal línea de negocio del Grupo. Durante estos años el Grupo ha venido haciendo frente a la crisis del sector mediante la internacionalización de su negocio y la diversificación de sus actividades.

Efectivamente, Grupo Isolux Corsán emprendió un proceso estratégico de internacionalización y diversificación de las actividades y mercados en los que opera (Grupo Isolux Corsán tiene actualmente una presencia relevante en mercados como México, Brasil, EEUU, India, etc.). Este proceso de internacionalización, junto con otros proyectos, requirieron la realización de importantes inversiones que fueron financiadas con deuda a nivel del Grupo derivando en un **significativo nivel de endeudamiento financiero del que responden de manera solidaria (por el sistema de garantías cruzadas o asunción de obligaciones con carácter solidario) varias sociedades del Grupo, incluyendo las Sociedades**.

**4.**          Entre otros múltiples instrumentos de financiación utilizados por el Grupo, Grupo Isolux Corsán Finance B.V., sociedad del Grupo constituida de conformidad con las

leyes de los Países Bajos ("**GICBV**"), realizó una emisión de bonos no garantizada *senior* al 6,625% por valor total de 850.000.000 euros con vencimiento en 2021 sujetos a las Leyes de Nueva York (en adelante, los bonos emitidos bajo la referida emisión, los "**Bonos**"). El único titular legal (*legal owner*) de los Bonos es Citivic Nominees Limited ("**Citivic**") quien, no obstante, actúa siguiendo las instrucciones de los beneficiarios de los intereses económicos (*beneficial owners*) de los Bonos (en adelante, los beneficiarios de los intereses económicos de los Bonos, los "**Bonistas**") remitidas a través de los sistemas de compensación.

Los Bonos cuentan con la garantía solidaria de GIC, IISA, CCC y GICC.

5.    **El significativo nivel de endeudamiento del Grupo, unido a ajustes económicos en los mercados en los que opera con impacto en el negocio de las Sociedades y en sus previsiones de ingresos, han resultado en un servicio de la deuda insostenible para el Grupo que afecta su capacidad de generación de caja**.

6.    Por otro lado, **durante los últimos meses, las Sociedades vieron significativamente reducidas sus herramientas de financiación de circulante y su acceso a líneas de avales y líneas de garantía similares** como consecuencia, principalmente, del efecto en el mercado de la solicitud de pre concurso (comunicación del artículo 5bis de la Ley Concursal) presentada por Abengoa, S.A., y la incertidumbre que ello trasladó al mercado respecto de otros operadores que intervienen en áreas de negocio coincidentes con las que desarrolla Abengoa.

Estas restricciones han impactado la operativa del Grupo dada la importancia de estos mecanismos de financiación para el negocio EPC y el negocio de concesiones. En el caso concreto, estas restricciones generaron graves tensiones de tesorería que han venido dificultando las operaciones diarias del Grupo (incluyendo la generación de caja en relación con proyectos en curso, así como el acceso a nuevos proyectos).

7.    **Teniendo en cuenta las tensiones de tesorería a las que ha tenido que hacer frente el Grupo Isolux Corsán durante los últimos meses,** las Sociedades y otras sociedades del Grupo iniciaron negociaciones con sus principales acreedores financieros con el objetivo de alcanzar un acuerdo de refinanciación en los términos previstos en la Disposición Adicional Cuarta de la Ley Concursal que les permitiera racionalizar la estructura del Grupo, restructurar su pasivo financiero para ajustarlo a la situación y a las perspectivas del Grupo y de la economía en general con el objetivo de alcanzar la viabilidad en el corto y

mediano plazo, y conseguir nuevos recursos para realizar pagos operativos y contar con la renovación de líneas de avales.

**8.**        A este respecto, las Sociedades designaron como asesores financieros a Houlihan Lokey (Europe) Limited ("**HL**") y a Rothschild, S.A. ("**Rothschild**").

Por su parte, las principales entidades financieras acreedoras del Grupo formaron un comité de coordinación (*Steering Committee*) (en adelante, conforme se define en el Acuerdo de Refinanciación, el "**Comité de Coordinación**") y diversos Bonistas que ostentan una participación relevante bajo los Bonos se organizaron en un Comité Ad-hoc (*Ad-hoc Committee*) (en adelante, conforme se define en el Acuerdo de Refinanciación, el "**Comité Ad-hoc**").

El auditor de GIC, sociedad dominante del Grupo al que pertenecen las Sociedades, así como del resto de Sociedades excepto IEI, es PricewaterhouseCoopers ("**PwC**" o el "**Auditor**").

En lo que toca a IEI (sociedad respecto de la que, como se dirá, no se solicita la extensión de los efectos del Acuerdo de Refinanciación a acreedores titulares de pasivos financieros que no hayan suscrito el mismo), debe mencionarse que PWC también ha preparado el certificado de mayorías correspondiente en su condición de auditor de la sociedad dominante GIC, encargado asimismo de la auditoría de las cuentas consolidadas. Así se ha decidido por razones evidentes de economía y eficiencia a la luz del conocimiento de la información contable y del grupo por PWC, como por otro lado ha sido ya el caso en otras homologaciones decretadas por los Juzgados de lo Mercantil, en las que en casos similares se ha aceptado el certificado del auditor de la sociedad dominante a estos efectos (así y entre otras, Auto del Juzgado de lo Mercantil de Murcia de 17 de julio de 2015 en el caso del Grupo Azor, Juzgado de lo Mercantil nº2 de Bilbao de 13 de febrero de 2015 respecto de Grupo Eroski, Juzgado de lo Mercantil nº2 de Sevilla de 6 de abril de 2016 para Grupo Abengoa, o Juzgado de lo Mercantil nº1 de Castellón de 1 de octubre de 2015 sobre el Grupo Onibesa).

**9.**        En el marco de las negociaciones de la refinanciación y con la finalidad de promover la estabilidad financiera y facilitar la negociación y firma del acuerdo de refinanciación GIC y otras sociedades del Grupo suscribieron (a) un contrato de cesión de derechos de crédito sin recurso con Banco Santander, S.A. y Caixabank, S.A. con fecha 10 de febrero de 2016; y (b) un contrato de factoring con recurso con Banco Santander, S.A. y

Caixabank, S.A. con fecha 18 de marzo de 2016 (según el mismo fue modificado el 8 de abril de 2016 y el 30 de junio de 2016 – en esta última novación, para dar entrada asimismo a Bankia, S.A.-) por importe conjunto de aproximadamente 124.800.000 euros para anticipar la liquidez urgente que dichas entidades comprometieron para apoyar la restructuración de los pasivos financieros del grupo. Asimismo, y con el mismo objeto, el 9 de mayo de 2016, algunas de las Sociedades y otras sociedades del Grupo suscribieron con algunas de las entidades financieras que forman parte del Comité de Coordinación un contrato de financiación sindicado por importe aproximado de 97.200.000 euros.

En adelante, los instrumentos financieros relacionados anteriormente, los "**Instrumentos de Financiación de Rescate**", todos ellos desembolsados para atender necesidades urgentes de liquidez del Grupo y los cuales constituyen nuevos ingresos de tesorería concedidos en el marco del Acuerdo de Refinanciación.

Igualmente, en el marco de las negociaciones de la refinanciación y con la finalidad de promover la estabilidad financiera y facilitar la negociación y firma del acuerdo de refinanciación, ciertas entidades financieras han suscrito los siguientes contratos marco para la emisión de avales y líneas de confirming: (a) contrato marco de mantenimiento de líneas de confirming y otros compromisos suscrito inicialmente el 19 de octubre de 2015 por GIC, GICC, ICI, IISA y CCC (como Sociedades) y un grupo de entidades financieras (entre las que se encontraban las entidades que conforman el Comité de Coordinación) (según el mismo fue modificado posteriormente en fechas 23 de octubre de 2015 y 10 de febrero de 2016); (b) un contrato de emisión de avales comprometidos adicionales suscrito con fecha 9 de mayo de 2016 por GIC, GICC, ICI, II y CCC (como Sociedades) y un grupo de entidades financieras (entre las que se encontraban las entidades que conforman el Comité de Coordinación); y (c) un nuevo contrato marco para la emisión de avales suscrito el 27 de julio de 2016 por GIC, GICC, ICI, II y CCC (como Sociedades) y un grupo de entidades financieras (entre las que se encontraban las entidades que conforman el Comité de Coordinación).

**10.**      El Grupo con el apoyo de sus asesores financieros (HL y Rothschild) ha desarrollado un plan de viabilidad que persigue la continuidad de la actividad del Grupo y, en particular, de las Sociedades en el corto y medio plazo (el "**Plan de Viabilidad**"). El Plan de Viabilidad consta incorporado al Acuerdo de Refinanciación que se ha acompañado como Documento nº 3.

El Plan de Viabilidad persigue la continuidad de las actividades del Grupo en el corto y medio plazo como consecuencia, entre otros, de la implementación de las siguientes medidas:

(i)     aportación de nuevo dinero (incluyendo los Instrumentos de Financiación de Rescate) que, junto con otras medidas de restructuración, permita al Grupo hacer frente a requerimientos de liquidez necesarios para la continuación de su actividad (incluyendo, la implementación de un plan de regularización de pagos a proveedores e inyecciones de capital para la reactivación de proyectos en curso);

(ii)    refinanciación de la deuda financiera del Grupo a fin de alcanzar un nivel de endeudamiento sostenible, reducir el servicio de la deuda, y disponer del tiempo necesario para vender activos no esenciales en condiciones adecuadas que permitan maximizar su valor y, por tanto, las ventas generen el flujo de caja suficiente (junto con el que se obtenga de la continuación de la operativa en condiciones de viabilidad) para hacer frente a las obligaciones financieras del Grupo tras la restructuración; y

(iii)   como parte de la refinanciación de la deuda financiera, racionalización de la estructura del Grupo, manteniendo en la medida de lo posible la deuda financiera a nivel de GIC, liberando al resto de Sociedades de estas obligaciones, con el objetivo de facilitar su operativa, el acceso a líneas de avales indispensables para el desarrollo del negocio del Grupo, y la venta de activos no esenciales ni estratégicos para contar con recursos adicionales a los generados por su actividad empresarial.

El Plan de Viabilidad prevé que las medidas de restructuración antes relacionadas, junto con medidas de reducción de gastos generales, permitirán al Grupo recuperar niveles de ingresos, EBITDA y flujo de caja operativo adecuados, así como maximizar el valor de los activos no esenciales de los que el Grupo prevé disponer y proceder a su venta, permitiendo a las Sociedades continuar con sus actividades.

**11.**     Con base en el Plan de Viabilidad, las Sociedades y, en general, el Grupo con el apoyo de sus asesores financieros, y los principales acreedores de pasivos financieros del Grupo diseñaron una propuesta de acuerdo de refinanciación que persigue la viabilidad del Grupo en el corto y medio plazo.

**12.**     Durante los últimos meses y de manera muy intensa durante las últimas semanas, el Grupo ha mantenido negociaciones con el Comité de Coordinación, el Comité Ad-hoc y otros acreedores titulares de pasivos financieros con el objetivo de alcanzar un

acuerdo de refinanciación.

El proceso de negociación del Acuerdo de Refinanciación se ha llevado a cabo de manera transparente, poniendo a disposición de todos los acreedores de pasivos financieros del Grupo (por diversas vías) información sobre el proceso y sobre los términos de las negociaciones, con miras a facilitar su participación.

Efectivamente, **durante las últimas semanas Grupo Isolux Corsán ha hecho ingentes esfuerzos y destinado cuantiosos recursos que permitieran a todos sus acreedores de pasivos financieros (tanto españoles como extranjeros) tener conocimiento del proceso, facilitarles información y, en general, promover su participación en el proceso de negociación del acuerdo de refinanciación**.

Asimismo, como se verá, los términos del Acuerdo de Refinanciación otorgan a todos los acreedores de pasivos financieros que así lo decidan, la posibilidad de participar en las líneas de financiación de dinero nuevo, así como la posibilidad de renovar o conceder nuevas líneas de avales al Grupo con los efectos que ello conlleva en los términos del Acuerdo de Refinanciación.

13. Tras muy intensas negociaciones, **las Sociedades, otras sociedades del Grupo Isolux Corsán, los principales accionistas de GIC y los acreedores de pasivos financieros que se relacionan en el Acuerdo de Refinanciación, lo suscribieron el 13 de julio de 2016**. El Acuerdo de Refinanciación quedó disponible desde esa fecha en la Notaria de D. Fernando Molina Stranz, a efectos de permitir que todos los acreedores de pasivos financieros que no lo hubieran suscrito inicialmente y que quisieran adherirse a éste en los mismo términos y con los mismos derechos que los otros acreedores de pasivos financieros, pudieran hacerlo hasta la fecha máxima de adhesión (que quedó fijada el 27 de julio de 2016).

De este modo, esta posibilidad de adhesión fue publicada en la web del Grupo, y los asesores financieros del Grupo remitieron una comunicación a los acreedores titulares de pasivos financieros, informándoles de la posibilidad de adherirse al Acuerdo de Refinanciación en los plazos expuestos (o no adherirse pero comunicar la aceptación de la conversión de parte de la deuda en acciones de GIC en los términos y plazos del Acuerdo de Refinanciación, como se expondrá con posterioridad), trasladándoles las instrucciones y forma de hacerlo, y ofreciéndoles cualesquiera ayuda que pudieran necesitar a tal objeto.

Asimismo, el Grupo puso en marcha un proceso formal de solicitud de instrucciones,

para que los Bonistas que así lo decidieran pudieran instruir por medio de los sistemas de compensación a Citivic, titular legal de los Bonos, que se adhiera al Acuerdo de Refinanciación en relación con los Bonos cuyos intereses económicos ostentan. A estos efectos se estableció un plazo hasta el 25 de julio de 2016[1] para que los Bonistas pudieran instruir a Citivic a través de los sistemas de compensación con el objetivo de facilitar su participación y su adhesión al Acuerdo de Refinanciación en los mismos términos que el resto de acreedores. Cabe destacar también que, como parte de este proceso de solicitud de instrucciones, se ha puesto a disposición de los Bonistas el Acuerdo de Refinanciación y múltiple información relevante en relación con el mismo.

El proceso antes descrito ha tenido como resultado que entre el 13 de julio de 2016 y el 27 de julio de 2016 (fecha límite para la adhesión de los acreedores al Acuerdo de Refinanciación) se hayan adherido al Acuerdo la gran mayoría de los acreedores de pasivos financieros del Grupo. Como se verá, **en relación con cada una de las Sociedades, han suscrito o se han adherido al Acuerdo de Refinanciación acreedores que representan más del 90% de su pasivo afectado**. Los acreedores que han suscrito o se han adherido al Acuerdo de Refinanciación han quedado relacionados en el mismo.

**14.**    De acuerdo con lo previsto en el Acuerdo de Refinanciación, GIC ha comunicado a las demás partes del Acuerdo de Refinanciación que se han obtenido las mayorías de acreedores allí previstas a efectos de la entrada en vigor del Acuerdo así como la obtención de la Financiación de Dinero Nuevo (según se define posteriormente), lo que supone la entrada en vigor del Acuerdo de Refinanciación.

Sin perjuicio de esta plena vigencia que ya tiene el Acuerdo de Refinanciación, en el mismo también se prevé la suscripción de ciertos documentos, acuerdos o instrumentos adicionales siguiendo los términos ya establecidos en el Acuerdo de Refinanciación, con el objetivo de implementar la refinanciación acordada (los "**Documentos de la Refinanciación**"), así como la realización de otras actuaciones de implementación (la "**Fecha de Implementación**"[2]). Como establece el Acuerdo de Refinanciación, la restructuración financiera debe quedar completamente implementada (incluyendo, entre otras, la

---

[1] Como consecuencia de la operativa de este tipo de procesos de solicitud de instrucciones en los mercados, necesariamente debía cerrarse el plazo de solicitud de instrucciones con una mínima anticipación, a fin de permitir la firma por Citivic de la escritura de adhesión del Acuerdo de Refinanciación ante Notario el 27 de julio.

[2] Denominada "Effective Date" en la versión inglesa del Acuerdo de Refinanciación.

homologación del presente Acuerdo de Refinanciación mediante el Auto previsto en el apartado 6 de la Disposición Adicional Cuarta y la firma de todos los Documentos de la Refinanciación) no más tarde del 31 de diciembre de 2016.

**15.** De forma paralela, conforme a lo previsto en el Acuerdo de Refinanciación, el 27 de julio de 2016, GICBV ha formulado una petición de suspensión de pagos ante el tribunal competente de los Países Bajos conforme a las leyes aplicables en dicho país y ha presentado una propuesta de convenio en los términos previstos en el Acuerdo de Refinanciación y que luego se expondrán, para de ese modo implementar la restructuración de su pasivo (fundamentalmente, la deuda asumida por GICBV con los Bonistas, que a su vez ha sido garantizada por algunas de las Sociedades).

TERCERA.-     EL ACUERDO DE REFINANCIACIÓN CUYA HOMOLOGACIÓN SE SOLICITA

**1.     Pasivo financiero afectado por el Acuerdo de Refinanciación**

El Acuerdo de Refinanciación tiene como objeto **refinanciar el pasivo financiero** de las Sociedades y, en general, del Grupo con la finalidad de racionalizar su estructura y contribuir a su viabilidad en el corto y medio plazo.

La deuda afectada por el Acuerdo de Refinanciación, que incluye todo el pasivo financiero de las Sociedades y como tal el pasivo financiero actual y el riesgo financiero contingente vivo, se detalla en los certificados adjuntos al Acuerdo de Refinanciación y que contienen la verificación y certificación de PwC sobre la suficiencia del pasivo exigido para la homologación del Acuerdo de Refinanciación en relación con cada una de las Sociedades solicitantes de la homologación (los "**Certificados del Auditor**") (la "**Deuda Afectada**"). Los documentos constitutivos de la Deuda Afectada original serán denominados, en adelante, los "**Documentos de la Deuda Afectada**".

Tal y como establece el apartado 1 tercer párrafo de la Disposición Adicional Cuarta de la Ley Concursal, a efectos del Acuerdo de Refinanciación se han considerado acreedores de pasivos financieros y, por tanto, afectados por el Acuerdo de Refinanciación, los titulares de cualquier endeudamiento financiero con independencia de que estén o no sometidos a supervisión financiera, sin incluir los acreedores por créditos laborales, los acreedores por operaciones comerciales y los acreedores de pasivos de derecho público.

11

**2.**     **Términos de la refinanciación bajo el Acuerdo de Refinanciación**

*2.1.*     *Introducción*

Como se ha expuesto en la ALEGACIÓN SEGUNDA de este escrito, desde un punto de vista financiero, así como de caja y gestión de tesorería, el Grupo ha venido actuando como una unidad integrada, mediante un sistema de centralización de tesorería y garantías cruzadas en relación con la práctica totalidad de la deuda financiera. Estas circunstancias y el elevado endeudamiento financiero del Grupo determinan que ninguna de las Sociedades pueda actualmente hacer frente por sí sola a toda su deuda financiera, lo que afecta a la operativa del Grupo. En este contexto, **el Acuerdo de Refinanciación tiene por objeto refinanciar el pasivo financiero de las principales entidades españolas del Grupo racionalizando a la vez su estructura a fin de facilitar la continuidad de las actividades del Grupo en su conjunto en el corto y medio plazo**.

Así, **en primer lugar**, **el Acuerdo de Refinanciación,** que incluye los términos de la refinanciación que se acompañan como Anexo 10 y forman parte del mismo (los "**Términos de la Refinanciación**"), **prevé la simplificación de la estructura de endeudamiento del Grupo, manteniendo el pasivo financiero refinanciado y sostenible únicamente a nivel de GIC, liberando al resto de las Sociedades de sus obligaciones en relación con la Deuda Afectada**.

A este respecto, destacamos que de acuerdo con los términos que rigen originalmente la Deuda Afectada, GIC es en la práctica totalidad de los casos obligada al pago de la deuda (ya sea como deudora principal, obligada solidaria o garante solidaria). Por tanto, GIC ya se encuentra, incluso antes de la restructuración, obligada al pago de esta Deuda Afectada. En aquellos casos puntuales en los que GIC no tiene esa condición de obligada (que además no son significativos teniendo en cuenta el importe de la correspondiente Deuda Afectada), el Acuerdo de Refinanciación prevé que los acreedores de pasivos financieros afectados puedan optar entre (i) la asunción por GIC de la correspondiente Deuda Afectada, que quedaría refinanciada en los mismos términos que los otros pasivos financieros de GIC, con liberación del resto de sociedades del Grupo, o (ii) una quita a nivel de la correspondiente Sociedad deudora del 95% de la Deuda Afectada y la conversión del 5% restante en préstamo participativo conforme a lo previsto en el art. 20 del Real Decreto-ley 7/1996, de 7 de junio,

de medidas urgentes de carácter fiscal y de fomento y liberalización de la actividad económico ("**RDL 7/1996**"), con el calendario de pagos que se indica más adelante.

Destacamos, asimismo, que tal y como se indica en el Plan de Viabilidad, **en caso de concurso de las Sociedades, la recuperación que los acreedores de pasivos financieros de las Sociedades podrían obtener sería muy cercana a cero**. Ello es así teniendo en cuenta las características del negocio desarrollado por el Grupo y, en particular, del negocio EPC. Las Sociedades no tienen activo fijo significativo ni suficiente para atender una parte relevante de la deuda que se haga exigible. En caso de concurso, las Sociedades no calificarían (dada su situación concursal) para acceder a nuevos proyectos, perderían contratos y les sería muy complejo concluir los proyectos en curso dado que no tendrían acceso a los recursos que requieren para completarlos, lo cual en la práctica implica que no podrían continuar con el negocio. Teniendo esto en cuenta, es muy probable que en caso de concurso de las Sociedades éste fuera un concurso con liquidación en el que las posibilidades de recuperación, por los motivos antes expuestos y teniendo en cuenta que en ese escenario se cristalizarían una serie de riesgos contingentes (señaladamente obligaciones contingentes bajo avales bancarios, contragarantías y otras obligaciones), así como la existencia de otros acreedores (por ejemplo, proveedores), serían muy limitadas.

A este respecto, resultan ilustrativas las conclusiones expuestas en los Anexos A.1 y A.2 del Plan de Viabilidad preparado por las Sociedades con el apoyo de sus asesores financieros (Anexo 13 del Acuerdo de Refinanciación), en el que se expone que el recobro potencial para un acreedor respecto de todas las Sociedades distintas de GIC (sin tener en cuenta el deterioro adicional que podría derivarse del proceso concursal y los gastos del mismo), sería cercano a cero (inferior al 1% en la mayoría de los casos y sin ser nunca superior al 2%). En el caso de Infinita, en donde se prevé un hipotético recurso superior, debe indicarse que el Acuerdo de Refinanciación no prevé una quita similar a la del resto de Sociedades distintas de GIC, sino otros términos de reestructuración, teniendo en cuenta su situación de forma que el recobro de los acreedores de Infinita venga determinado por el valor efectivo de sus activos.

Por tanto, **la quita íntegra de la Deuda Afectada (a nivel de algunas de las Sociedades), que pasa a ser debida (una vez refinanciada en los términos del Acuerdo de**

**Refinanciación) únicamente por GIC, no se aparta de la potencial recuperación que los acreedores de las Sociedades podrían obtener en caso de concurso de las Sociedades**.

Asimismo, más allá de lo expuesto, como se indica en el Plan de Viabilidad, la liberación de las Sociedades (distintas de GIC) de la Deuda Afectada facilitará la operativa del Grupo, el acceso por las Sociedades operativas a líneas de avales críticas para la continuidad del negocio, y la venta de activos no esenciales, lo que a su vez permitirá maximizar el valor de los activos y contribuir a la generación de caja por parte del Grupo, permitiendo a las Sociedades continuar con sus actividades.

**En segundo lugar**, el Acuerdo de Refinanciación prevé la refinanciación de la Deuda Afectada con el objetivo de alcanzar un nivel de endeudamiento sostenible, reducir el servicio de la deuda y disponer del tiempo necesario para generar el flujo de caja suficiente para hacer frente a las obligaciones financieras del Grupo tras la refinanciación.

A esos efectos, como se desarrollará con más detalle en los apartados siguientes, el Acuerdo de Refinanciación establece la conversión de la Deuda Afectada en nuevos instrumentos de deuda **de rango, vencimiento y características distintas de la Deuda Afectada original conforme a lo previsto en el apartado 3.b)4 de la Disposición Adicional Cuarta de la Ley Concursal**. Estos nuevos instrumentos de deuda distinguen entre "deuda sostenible" que se mantiene a nivel de GIC tras su refinanciación (Tramo B del Nuevo Préstamo y GIC y Nuevos Bonos B) y "deuda no sostenible" que es objeto de subordinación (conversión en préstamo participativo conforme a lo previsto en el art. 20 del RDL 7/1996) y potencial conversión parcial en capital de GIC (Tramo C del Nuevo Préstamo y GIC y Nuevos Bonos C).

En concreto, en relación con la "deuda no sostenible" el Acuerdo de Refinanciación prevé la necesaria conversión de parte de esta deuda en capital de GIC. De conformidad con el apartado 3. b) 3º i) de la Disposición Adicional Cuarta de la Ley Concursal, a los acreedores de pasivos financieros que no acepten la conversión en capital de GIC se les aplicará una quita equivalente al importe nominal de las acciones que les correspondería suscribir más la correspondiente prima de emisión.

En relación con lo anterior, cabe destacar que **el Acuerdo de Refinanciación da la posibilidad a los acreedores financieros que no quieren adherirse al mismo, de optar por la conversión en capital para el caso de que el Acuerdo de Refinanciación sea**

**homologado judicialmente como se interesa por medio del presente escrito, a efectos de que no se les aplique la quita equivalente**. Los acreedores de pasivos financieros no participantes o disidentes han tenido la posibilidad de ejercitar esta opción mediante manifestación ante Notario en el plazo previsto para las adhesiones al Acuerdo de Refinanciación (es decir, hasta el 27 de julio de 2016) sin que tal manifestación implique su adhesión al Acuerdo de Refinanciación, tal y como se les informó cuando se les comunicó la firma del Acuerdo de Refinanciación según se expuso. Del mismo modo, para el caso de Deuda Afectada contingente, los acreedores de pasivos financieros afectados podrán comunicar su opción por la conversión dentro de los 15 días hábiles tras la publicación del auto por el que se homologue el Acuerdo de Refinanciación en el Boletín Oficial del Estado, para el caso de que pudiera quedar cristalizada posteriormente a la fecha en la que se hayan emitido los Certificados del Auditor.

**En tercer lugar**, **el Acuerdo de Refinanciación prevé la inyección de dinero nuevo, y facilita el acceso a líneas de avales, ambos indispensables para la continuidad de las actividades del Grupo y para garantizar su viabilidad en el corto y medio plazo**. En concreto, el Acuerdo de Refinanciación prevé, además de los Instrumentos de Financiación de Rescate ya anticipados, instrumentos de nueva liquidez por importes de hasta 150.000.000 euros (denominada Tramo P.3 en el Acuerdo de Refinanciación) y de hasta 30.000.000 euros (denominada Tramo P.4 en el Acuerdo de Refinanciación) que otorgarán ciertos acreedores de pasivos financieros (en adelante, la "**Financiación de Dinero Nuevo**").

A este respecto, debe destacarse que (a) el 27 de julio de 2016, IEI (como Acreditada), Power Investering (como Garante) y un grupo de entidades financieras (entre las que se encontraban las entidades que conforman el Comité de Coordinación) y en el que Caixabank, actúa como Agente han suscrito un préstamo mercantil a plazo en Euros por importe de 150 millones de Euros que se desembolsarán una vez presentada esta solicitud de homologación judicial del Acuerdo de Refinanciación; que (b) en, o alrededor de, el 29 de julio de 2016 IEI (como Prestataria), Power Investering, B.V. (como Garante) y la Compañía Española de Financiación al Desarrollo, COFIDES, S.A. (como Prestamista) otorgarán un contrato de préstamo mercantil a plazo por importe de 7,9 millones de Euros (que se han desembolsado ya con carácter previo a este escrito), con cargo al Tramo P.4 anteriormente referido; así como que (c) con el mismo propósito, el 13 de julio de 2016, IEI (como Acreditada), Power Investering, B.V. (como Garante) y Caixabank, S.A. (como Entidad Financiera) ya

suscribieron un préstamo mercantil a plazo en Euros por importe de 8 millones de Euros, también con cargo al denominado Tramo P.4.

Tal y como se describe en el Plan de Viabilidad el acceso por el Grupo a esta financiación adicional es esencial para que las Sociedades puedan hacer frente a sus gastos operativos.

Por otro lado, los términos del Acuerdo de Refinanciación, prevén la renovación de las líneas de avales de las Sociedades operativas o la concesión de nuevas líneas de avales por parte de los acreedores participantes que así lo decidan. Atendiendo al carácter crítico del mantenimiento o concesión de nuevas líneas de avales para la continuidad del negocio, el Acuerdo de Refinanciación establece un marco adecuado para facilitar dicha renovación o concesión por parte de los acreedores financieros del Grupo, ampliando el crédito existente para las Sociedades. En concreto, el Acuerdo de Refinanciación regula los términos que serían aplicables en caso de que la Deuda Afectada contingente derivada de líneas de avales se materialice, distinguiendo entre aquellos casos en los que se haya procedido a la renovación de las líneas de avales (ampliando el crédito existente para las Sociedades) de aquellos casos en los que no se ha procedido a dicha renovación.

Como ya hemos indicado, cabe destacar que de acuerdo con los términos del Acuerdo de Refinanciación la participación en las líneas de financiación de dinero nuevo esta abierta a todos los acreedores de pasivos financieros. Del mismo modo, las entidades financieras tienen la posibilidad de renovar o conceder nuevas líneas de avales al Grupo, con los efectos que ello conlleva en los términos del Acuerdo de Refinanciación.

### 2.2   *Refinanciación del pasivo financiero a nivel de GIC*

Partiendo de lo expuesto en el apartado 2.1, **la refinanciación del pasivo financiero del Grupo en virtud del Acuerdo de Refinanciación se lleva a cabo a nivel de GIC mediante la conversión de la Deuda Afectada en nuevos instrumento financieros de naturaleza, rango, vencimiento y características distintas de la Deuda Afectada original (tal y como permite el apartado 3.b) 4º de la Disposición Adicional Cuarta de la Ley Concursal)** que tienen como deudora a GIC, centralizando de este modo el endeudamiento financiero del Grupo en la matriz, y entregados a cada acreedor proporcionalmente a la Deuda Afectada de su titularidad frente a las Sociedades a la fecha del Certificado del Auditor. Estos nuevos instrumentos de financiación contienen los términos necesarios para proceder a la

refinanciación de la Deuda Afectada de forma consistente con el Plan de Viabilidad, procurando no alterar condiciones como pueden ser la ley o la moneda de la obligación financiera original que ahora se convierte, sin perjuicio de que los distintos instrumentos contengan términos esenciales comunes a todos ellos.

Por este motivo, además de un nuevo instrumento sindicado de deuda (el "**Nuevo Préstamo GIC**") se ha previsto la emisión de nuevos bonos sujetos a la Ley del Estado de Nueva York ("**Nuevos Bonos**"), entregados a cada acreedor proporcionalmente a la Deuda Afectada de su titularidad a la fecha del Certificado del Auditor. Estos Nuevos Bonos serán los que se podrían entregar como consecuencia de la conversión de la Deuda Afectada original a los Bonistas y a los acreedores de Deuda Afectada denominada en dólares americanos ("**Acreedores USD**") o que tengan sus instrumentos de deuda regidos por la Ley de Nueva York. Tanto el Nuevo Préstamo GIC como los Nuevos Bonos tiene sustancialmente los mismo términos que son, por tanto, aplicables a todos los acreedores, pero manteniendo las características de la Deuda Afectada original en lo que toca a la moneda en la que están denominados o a la legislación aplicable.

Asimismo, en relación con aquellos acreedores de pasivos financieros que por motivos regulatorios o legales no puedan recibir ciertos instrumentos de deuda (por ejemplo, prestamos participativos bajo el artículo 20 del RDL 7/1996) o de capital en GIC, el Acuerdo de Refinanciación prevé ciertas alternativas que sin alterar los términos del acuerdo aplicables a todos los acreedores permiten superar las limitaciones regulatorias.

Sin ánimo de exhaustividad, el Nuevo Préstamo GIC y los Nuevos Bonos se han estructurado de la siguiente manera:

(i)    **Nuevo Préstamo GIC**, estructurado en tres tramos:

    (a) Tramo A, para refinanciar los Instrumentos de Financiación de Rescate y Financiación de Dinero Nuevo, con respecto de aquellos acreedores que anticiparon o facilitarán dicha financiación.

    (b) Tramo B por importe de la Deuda Afectada original calificada como "deuda sostenible" que será amortizada mediante un único pago a su vencimiento, transcurridos 60 meses y con un tipo de interés de Euribor 6-meses más 225 puntos básicos hasta el segundo aniversario, y Euribor 6-meses más 550 puntos básicos a partir de ese momento.

**(c)** Tramo C por importe de la Deuda Afectada original considerada "deuda no sostenible" que adoptará la forma de préstamo participativo (conforme al artículo 20 del RDL 7/1996 y como permite el apartado 3. b) 4º de la Disposición Adicional Cuarta de la Ley Concursal), con un tipo de interés de 0,25% si el EBITDA consolidado es superior a 500.000.000 euros hasta el tercer aniversario; y que será amortizado mediante un único pago a su vencimiento, transcurridos 60 meses, que podrá extenderse por un periodo adicional de cinco años de no haberse repagado a esa fecha.

Tal y como permite el apartado 3. b) 3 de la Disposición Adicional Cuarta de la Ley Concursal, una parte del Tramo C será obligatoriamente convertible en acciones de GIC. Aquellos acreedores que no se adhieran al Acuerdo de Refinanciación o no manifiesten dentro del plazo concedido al efecto su decisión de optar por la conversión en caso de homologación del Acuerdo de Refinanciación sufrirían una quita equivalente conforme a lo dispuesto en el apartado 3. b) 3 de la Disposición Adicional Cuarta de la Ley Concursal. Todos los acreedores de pasivos financieros han tenido la posibilidad de comunicar su opción dentro del plazo de adhesiones al Acuerdo de Refinanciación y, para aquellos con Deuda Afectada contingente, podrán hacerlo posteriormente al Auto de homologación dentro del plazo previsto a ese efecto.

**(ii)** **Nuevos Bonos**

Se emitirían Nuevos Bonos B y Nuevos Bonos C (en este último caso, ambos convertibles y no convertibles) con términos económicos y características similares a los del Tramo B y C del Nuevo Préstamo GIC, respectivamente.

Los Nuevos Bonos B serán amortizados mediante un único pago a su vencimiento, transcurridos 60 meses; y (ii) con un tipo de interés fijo del 3% hasta el segundo aniversario, que se incrementará a un 6% desde ese momento.

Los Nuevos Bonos C devengarán un tipo de interés del 0,25% si el EBITDA consolidado es superior a 500.000.000 euros hasta el tercer aniversario, y un tipo de interés fijo de un 1% más 0,25% si el EBITDA consolidado es superior a 500.000.000 euros a partir de ese momento; y se subordinarán a todos los acreedores de GIC (a excepción de los acreedores bajo el Tramo C del Nuevo Préstamo GIC, respecto del

que tendrán la misma prelación) y tendrán aquellas otras características necesarias para que estos instrumentos puedan considerarse préstamos participativos (de conformidad con el art. 20 del RDL 7/1996). Asimismo, serán amortizados mediante un único pago a su vencimiento, transcurridos 60 meses, que podrá ser extendido por un periodo adicional de cinco años si no se repagan en esa fecha.

En el caso de los Bonistas y los Acreedores USD, en atención a lo dispuesto en el apartado 3. b) 3° de la Disposición Adicional Cuarta de la Ley Concursal solo recibirán los Nuevos Bonos C necesariamente convertibles aquellos que se hubieran adherido al Acuerdo de Refinanciación o hubieran manifestado dentro del plazo concedido al efecto su decisión de optar por la conversión en caso de homologación del Acuerdo de Refinanciación. Los otros acreedores sufrirían una quita equivalente conforme a lo dispuesto en el apartado 3. b) 3 de la Disposición Adicional Cuarta de la Ley Concursal y no recibirán, por tanto, Nuevos Bonos C necesariamente convertibles. A estos efectos, como ya hemos indicado se ha puesto a disposición de los Bonistas y los Acreedores USD la información y los mecanismos necesarios para que pueda manifestar su opción dentro del plazo previsto para ello.

De forma simultánea a la emisión de los Nuevos Bonos, las obligaciones de GIC como garante personal bajo los Bonos, así como las obligaciones de las Sociedades frente a los Acreedores USD, quedarán canceladas.

Como hemos indicado en el apartado 15 de la Alegación Segunda, de forma coordinada se ha formulado una petición de suspensión de pagos de GICBV ante el tribunal competente de Holanda, con el objeto de que se reestructure su pasivo, se cancelen los Bonos por ella emitidos en los términos del convenio de acreedores que se prevé aprobar en dicho proceso con el apoyo de los Bonistas, que aceptan liberar a GICBV a cambio de la emisión de los Nuevos Bonos emitidos por GIC conforme al Acuerdo de Refinanciación.

Por último, sin perjuicio de lo anterior, para el eventual caso de que el Grupo vendiese todos sus activos, se acuerda que el importe de la Deuda Afectada que los acreedores titulares de pasivos financieros no puedan cobrarse sea objeto de quita equivalente por ese importe bajo el Acuerdo de Refinanciación, conforme a lo previsto en el apartado 3.b) 2° de la Disposición Adicional Cuarta de la Ley Concursal.

2.3      *Refinanciación de la Deuda Afectada a nivel de las otras Sociedades*

2.3.1    *IISA, CCC, GICC, ICI e ICS*

Como se ha expuesto en el apartado 2.1 de esta ALEGACIÓN TERCERA, en atención al Plan de Viabilidad, el Acuerdo de Refinanciación prevé la racionalización de la estructura del Grupo manteniendo en la medida de lo posible la deuda financiera a nivel de GIC, liberando al resto de Sociedades de sus obligaciones en relación con la Deuda Afectada, con el objetivo de facilitar su operativa, el acceso a líneas de avales indispensables para el desarrollo del negocio del Grupo, y la venta de activos no-esenciales.

En este contexto, tal y como permite el aparatado 3. b) 2º de la Disposición Adicional Cuarta de la Ley Concursal, el Acuerdo de Refinanciación establece una quita del 100% de la Deuda Afectada frente a IISA, CCC, GICC, ICI e ICS que este garantizada por GIC o de la que GIC sea solidariamente responsable. Como hemos indicado en la Alegación Tercera, el eventual recobro que se puede estimar no excede de forma relevante de la quita aquí propuesta, sin perjuicio además de que conservan su recurso frente a GIC reestructurado en los términos del Acuerdo de Refinanciación. Como consecuencia de esta quita, GIC será tras la refinanciación el único deudor de la Deuda Afectada que quedará refinanciada en los términos expuestos en el Acuerdo de Refinanciación y descritos en el apartado 2.2 anterior.

Los acreedores titulares de Deuda Afectada frente a IISA, CCC, GICC, ICI e ICS que no esté garantizada por GIC o de la que GIC no sea obligado solidario podrán elegir, ante Notario público dentro de un plazo de 15 días hábiles en Madrid desde que el auto que acuerde la homologación del Acuerdo de Refinanciación sea firme, entre:

(i)      la asunción por GIC de la Deuda Afectada (que quedará refinanciada en los términos expuestos en el Acuerdo de Refinanciación y descritos en el apartado 2.2 anterior) con liberación frente a la Sociedad deudora original, o

(ii)     una quita del 95% de la Deuda Afectada (tal y como permite el aparatado 3. b) 2º de la Disposición Adicional Cuarta de la Ley Concursal), con el 5% restante convertido en préstamos participativos (de conformidad con lo dispuesto en el art. 20 del RDL 7/1996 y como permite el apartado 3. b) 4º de la Disposición Adicional Cuarta de la Ley Concursal), que serán amortizados en un plazo de diez años, con un periodo de carencia de cinco años y según el siguiente calendario de amortización que se establece a continuación:

20

| Año | Porcentaje sobre el 5% restante de la Deuda Afectada sujeta a esta alternativa b), previa quita |
|---|---|
| Año 1 | 0% |
| Año 2 | 0% |
| Año 3 | 0% |
| Año 4 | 0% |
| Año 5 | 0% |
| Año 6 | 10% |
| Año 7 | 15% |
| Año 8 | 20% |
| Año 9 | 25% |
| Año 10 | 30% |

Los préstamos participativos devengarán un tipo de interés de un 1% anual en caso de que los beneficios anuales de la Sociedad en cuestión superen 50.000.000 Euros, y que serán recapitalizados para proceder a su pago a vencimiento.

La alternativa (ii) será considerada como la alternativa aplicable en caso de falta de elección por algún acreedor.

Como excepción a los términos previstos anteriormente, únicamente en el caso de IISA, CCC y GICC, el Acuerdo de Refinanciación establece que las nuevas líneas de avales concedidas por un acreedor a IISA, CCC o GICC tras la Fecha de Implementación, junto con cualesquiera otras líneas de avales concedidas, extendidas o sustituidas en favor de IISA, CCC o GICC por tal acreedor con fecha 1 de octubre de 2015, o en un momento posterior, será considerada como "**Nuevo Dinero de Avales**" concedido a IISA o CCC por el referido acreedor en el marco de la refinanciación. Cualquier Deuda Afectada que pueda cristalizarse como resultado del vencimiento o ejecución del Nuevo Dinero de Avales en cualquier momento posterior a la fecha de presentación del presente escrito será refinanciada por IISA, CCC o GICC en los mismos términos que los establecidos para el Tramo B del Nuevo Préstamo GIC. El mismo tratamiento será de aplicación a los acreedores que hayan prestado Dinero Nuevo de Avales en relación con otros avales otorgados con anterioridad al 1 de octubre de 2015, euro a euro y hasta el límite del Nuevo Dinero de Avales concedido a IISA o CCC por dichos acreedores.

### 2.3.2 *Infinita*

Infinita es una sociedad de proyecto que tiene como principales activos dos plantas de producción de biodiesel en España. Estos proyectos siempre han estado concebidos para su

venta. No obstante, se han visto seriamente afectados por los cambios regulatorios y en materia tarifaria a los que ha estado sujeto el sector de las energías renovables durante los últimos años.

En relación con esta Sociedad, el Acuerdo de Refinanciación prevé una espera de diez años a la Deuda Afectada, que será amortizada mediante un único pago a su vencimiento, de conformidad con lo dispuesto en el apartado 3.b) 1º de la Disposición Adicional Cuarta de la Ley Concursal. Ello con el objetivo de que la Sociedad cuente con plazo para maximizar el valor de sus activos y proceder a su venta en las mejores condiciones posibles.

Asimismo, el Acuerdo de Refinanciación prevé que si con anterioridad a la finalización de la espera de diez años, Infinita vendiese sus negocio o todos sus activos, y el precio total de la venta (neto de costes, impuestos y gastos) no fuese suficiente para la amortización de la totalidad de la Deuda Afectada, el déficit resultante será objeto de una quita bajo el Acuerdo de Refinanciación de conformidad con lo dispuesto en el apartado 3.b) 2º de la Disposición Adicional Cuarta de la Ley Concursal.

### 2.3.3    *IEI*

En el caso de IEI, el Acuerdo de Refinanciación no prevé que se extienda los efectos de la refinanciación acordada a acreedores disidentes o no participantes. No obstante, la homologación se solicita también en relación con esta Sociedad dado que, en atención a los términos del Acuerdo de Refinanciación y a los Documentos de la Refinanciación, ha concedido y concederá ciertas garantías para garantizar el dinero nuevo que se ha inyectado o se inyecte al Grupo como parte del Acuerdo, por lo que se insta la homologación a efectos de la protección contra acciones rescisorias en aplicación de los apartados 1 y 13 de la Disposición Adicional Cuarta de la Ley Concursal, disponiéndose en todo caso de las mayorías previstas en la Disposición Adicional Cuarta de la Ley Concursal a tal objeto, como se acredita mediante el Certificado del Auditor de IEI.

### 2.4    *Endeudamiento financiero debido a sociedades del Grupo*

Sin perjuicio de lo expuesto hasta el momento, el Acuerdo de Refinanciación prevé también el tratamiento del endeudamiento financiero debido por las Sociedades a otras sociedades del Grupo. Como se ha expuesto, hasta la fecha las Sociedades han venido funcionado como una unidad integrada tanto en relación con las financiaciones como en materia de caja y tesorería (mediante un sistema de *cash pooling*). Esta operativa ha generado

diversos pasivos financieros intragrupo que deben, por tanto, también ser objeto de refinanciación como parte del Acuerdo de Refinanciación.

A este respecto, el Acuerdo de Refinanciación prevé una quita del 100% a todo el endeudamiento financiero debido por las Sociedades a cualquier otra sociedad del Grupo. La quita aplicada en relación con la deuda financiera frente a otras sociedades del Grupo tiene en cuenta que en caso de declaración de concurso, estos pasivos financieros tendrían la consideración de deuda subordinada a la deuda titularidad del resto de acreedores ordinarios en aplicación del artículo 92.5º LC. Como resulta evidente, la posibilidad de recobro de estos préstamos es inexistente, dado que conforme se ha expuesto en la Alegación Tercera, los escenarios de recuperación con arreglo a sus activos no permite incluso que la deuda ordinaria obtenga repago.

**CUARTA.-      PROCEDENCIA DE LA HOMOLOGACIÓN JUDICIAL DEL ACUERDO DE REFINANCIACIÓN Y DE LA EXTENSIÓN DE EFECTOS. CONCURRENCIA DE REQUISITOS**

El apartado 1 de la Disposición Adicional Cuarta de la Ley Concursal establece los requisitos que deben cumplir los acuerdos de refinanciación para poder ser objeto de homologación judicial:

> "*podrán homologarse judicialmente el acuerdo de refinanciación que habiendo sido **suscrito por acreedores que al menos el 51 por ciento de los pasivos financieros**, reúna en el momento de su adopción, las condiciones previstas en la **letra a) y en los números 2.º y 3.º de la letra b) del apartado 1 artículo 71 bis**"*.

A continuación, nos referimos a cada uno de los requisitos y acreditamos debidamente su cumplimiento:

**1.      Cumplimiento de la mayoría exigida para solicitar la homologación del Acuerdo de Refinanciación**

La Disposición Adicional Cuarta de la Ley Concursal exige, para la homologación judicial, que el acuerdo de refinanciación haya sido suscrito por acreedores que representen al menos el 51% de los pasivos financieros.

Los Certificados del Auditor incorporados al Acuerdo de Refinanciación acreditan la superación de ese límite.

Por tanto, se cumple el requisito de la mayoría previsto en el apartado 1 de la Disposición Adicional Cuarta, así como el requisito del apartado 1. b) 2º del artículo 71 bis de la Ley Concursal al haberse emitido los Certificados del Auditor.

**2.    El contenido del Acuerdo de Refinanciación se ajusta a los requisitos legales**

El apartado 1.a) del artículo 71 bis de la Ley Concursal establece que:

"*No serán rescindibles los **acuerdos de refinanciación** alcanzados por el deudor, así como los negocios, actos y pagos, cualquiera que sea la naturaleza y la forma en que se hubieren realizado, y las garantías constituidas en ejecución de los mismos, cuando: (**a**) En virtud de éstos **se proceda, al menos, a la ampliación significativa del crédito disponible o a la modificación o extinción de sus obligaciones**, bien mediante prórroga de su plazo de vencimiento o el establecimiento de otras contraídas en sustitución de aquéllas, siempre que **respondan a un plan de viabilidad que permita la continuidad de la actividad profesional** o empresarial **en el corto y medio plazo**".*

En el caso que nos ocupa, sobre la base de lo expuesto en la ALEGACIÓN TERCERA de este escrito, el Acuerdo de Refinanciación implica, entre otros:

(i)    **La ampliación del crédito disponible a las Sociedades** dado que se acuerda la puesta a disposición de las Sociedades de nuevos ingresos de tesorería por importe máximo de 372.000.000 euros (i.e. Instrumentos de Financiación de Rescate y Financiación de Dinero Nuevo), que de acuerdo con lo previsto en el Acuerdo de Refinanciación puede llegar a incrementarse hasta un importe aproximado de hasta 452.000.000 euros.

(ii)    **La modificación de los términos aplicables a la Deuda Afectada mediante su conversión en nuevos instrumentos que permitirán ajustar el pasivo financiero de las Sociedades a la situación y las perspectivas actuales del Grupo en los términos del Plan de Viabilidad**, incluyendo, entre otros:

(a)    La subordinación de una parte sustancial de la Deuda Afectada que quedará convertida en préstamo participativo sujeto a los términos el artículo 20 del RDL 7/1996 (Tramo C del Nuevo Préstamo GIC y Nuevos Bonos C) y que además será parcialmente objeto de conversión en capital social de GIC en los términos previstos en el Acuerdo de Refinanciación.

(b)    La modificación, en términos más beneficiosos para las Sociedades solicitantes de la homologación, de los términos económicos aplicables a la Deuda Afectada. En particular, los términos aplicables al Tramo C del Nuevo Préstamo GIC y Nuevos

Bonos C conllevan una reducción sustancial de los tipos de interés aplicables a la Deuda Afectada.

(c) El aplazamiento en el pago de la Deuda Afectada tras la refinanciación (amortización a vencimiento fijado en 60 meses tras la Fecha de Implementación, extensible en el caso del Tramo C del Nuevo Préstamo GIC y de los Nuevos Bonos C por un plazo adicional de cinco años).

Asimismo, como se ha indicado, el Acuerdo de Refinanciación se ha estructurado sobre la base del Plan de Viabilidad de las Sociedades y el Grupo, elaborado por éste con el apoyo de sus asesores financieros, cuyo objetivo en línea con lo establecido en la Ley Concursal es perseguir la viabilidad y la continuidad de la actividad empresarial de las Sociedades en el corto y medio plazo. El Plan de Viabilidad consta incorporado al Acuerdo de Refinanciación que se ha aportado como Documento nº 3.

Por lo expuesto, el Acuerdo de Refinanciación cumple el requisito previsto en el apartado 1. a) del artículo 71 bis de la Ley Concursal.

### 3.    Formalización del Acuerdo de Refinanciación en instrumento público

Tanto el Acuerdo de Refinanciación como los documentos que justifican su contenido y que acreditan el cumplimiento de los requisitos legales establecidos en letra a) y en los números 2º y 3º de la letra b) del apartado 1 artículo 71 bis de la Ley Concursal han sido formalizados en instrumento público. En concreto, como se ha indicado, el Acuerdo de Refinanciación ha sido elevado a público ante el Notario de Madrid, D. Fernando Molina Stranz, el 13 de julio de 2016, con el número 1.030 de su protocolo.

El Acuerdo de Refinanciación, que incorpora los documentos que exige la Ley, formalizado en instrumento público se ha aportado como Documento nº 3.

Por tanto expuesto, se cumple el requisito previsto en el apartado 1. b) 3º del artículo 71 bis de la Ley Concursal.

### 4.    Cumplimiento de los requisitos específicos a efectos de la extensión de efectos del Acuerdo de Refinanciación a los acreedores no participantes

Cuando en virtud de la homologación el deudor pretenda extender los efectos del acuerdo de refinanciación a acreedores titulares de pasivos financieros que no hayan suscrito el acuerdo de refinanciación o que hayan mostrado su disconformidad, deberán concurrir,

asimismo, las mayorías de pasivo a que se refiere el apartado 3 de la Disposición Adicional Cuarta de la Ley Concursal siempre que los créditos de los referidos acreedores no cuenten con garantía real.

En el caso que nos ocupa, la Deuda Afectada que ostentan los acreedores participantes o disidentes no cuenta con garantía real y, por tanto, son de aplicación las mayorías previstas en el apartado 3 de la Disposición Adicional Cuarta que dispone:

"*A los acreedores de pasivos financieros que no hayan suscrito el acuerdo de refinanciación o que hayan mostrado su disconformidad al mismo y cuyos créditos no gocen de garantía real o por la parte de los créditos que exceda del valor de la garantía real, se les extenderán, por la homologación judicial, los siguientes efectos acordados en el acuerdo de refinanciación*:

*a) Si el acuerdo ha sido suscrito por acreedores que representen al menos el 60 por ciento del pasivo financiero, las esperas, ya sean de principal, de intereses o de cualquier otra cantidad adeudada, con un plazo no superior a cinco años, o la conversión de deuda en préstamos participativos durante el mismo plazo.*

*b) Si el acuerdo ha sido suscrito por acreedores que representen al menos el 75 por ciento del pasivo financiero, las siguientes medidas:*

*1.º Las esperas con un plazo de cinco años o más, pero en ningún caso superior a diez.*

*2.º Las quitas.*

*3.º La conversión de deuda en acciones o participaciones de la sociedad deudora. En este caso:*

*i) Los acreedores que no hayan suscrito el acuerdo de refinanciación o que hayan mostrado su disconformidad al mismo podrán optar entre la conversión de deuda en capital o una quita equivalente al importe del nominal de las acciones o participaciones que les correspondería suscribir o asumir y, en su caso, de la correspondiente prima de emisión o de asunción. A falta de indicación expresa, se entenderá que los citados acreedores optan por la referida quita.*

*ii) El acuerdo de aumento de capital del deudor necesario para la capitalización de créditos deberá adoptarse por la mayoría prevista, respectivamente, para las sociedades de responsabilidad limitada y anónimas en los artículos 198 y 201.1 del Texto Refundido de la Ley de Sociedades de Capital, aprobado por Real Decreto Legislativo 1/2010, de 2 de julio. A efectos del artículo 301.1 del citado Texto Refundido de la Ley de Sociedades de Capital, se entenderá que los pasivos financieros son líquidos, están vencidos y son exigibles.*

*4.º La conversión de deuda en préstamos participativos por un plazo de cinco años o más, pero en ningún caso superior a diez, en obligaciones convertibles o préstamos subordinados, en préstamos con intereses capitalizables o en cualquier otro instrumento financiero de rango, vencimiento o características distintas de la deuda original.*

26

*5.º La cesión de bienes o derechos a los acreedores en pago de la totalidad o parte de la deuda."*

En el presente caso, conforme a lo expuesto en la ALEGACIÓN TERCERA, los efectos que se pretende imponer a los acreedores disidentes o no participantes incluyen la espera y la conversión de deuda en instrumentos de naturaleza, rango, vencimiento y características distintas de la Deuda Afectada original. Asimismo, se prevé la conversión de deuda en acciones y quitas a nivel de ciertas Sociedades. En consecuencia, estos efectos se encuentran entre los previstos en el letra b) del apartado tercero de la citada Disposición Adicional Cuarta de La Ley Concursal, siendo de aplicación la mayoría del 75% del pasivo financiero de las Sociedades.

Los Certificados del Auditor que se han incorporado al Acuerdo de Refinanciación acreditan la superación del anterior porcentaje. Por tanto, se cumple el requisito de la mayoría previsto en el apartado 3 de la Disposición Adicional Cuarta a efectos de la extensión de efectos del Acuerdo de Refinanciación a los acreedores no participantes o disidentes.

Finalmente, cabe indicar que no se prevé en el Acuerdo de Refinanciación efecto alguno con relación a aquellos acreedores con garantía real por el importe resultante del valor de su garantía. A tal objeto, respecto de acreedores con garantía hipotecaria, las Sociedades han solicitado tasaciones actualizadas a sociedades de tasación homologadas e inscritas en el Banco de España conforme a lo previsto en el apartado 2b) de la Disposición Adicional Cuarta de la Ley Concursal y, salvo alguna excepción, en todos los casos el valor de la garantía es superior al de la deuda garantizada. En el caso en el que el valor de la garantía es inferior a la deuda garantizada, se ha considerado a efectos del cómputo de las mayorías como deuda no garantizada exclusivamente el déficit resultante de la tasación y la aplicación de lo previsto en la Disposición Adicional Cuarta de la Ley Concursal.

QUINTO.-        EFECTOS DE LA HOMOLOGACIÓN JUDICIAL. EXTENSIÓN DE EFECTOS A ACREEDORES DE PASIVOS FINANCIEROS DISIDENTES O NO PARTICIPANTES

Como establece la Disposición Adicional Cuarta de la Ley Concursal, el Juez otorgará la homologación siempre que concurran los requisitos antes expuestos, y declarará la extensión de sus efectos cuando concurran además las mayorías de arrastre que se han citado.

1.        **Efecto general: no rescindibilidad del Acuerdo de Refinanciación**

El apartado 13 de la Disposición Adicional Cuarta establece que los acuerdos de refinanciación homologados judicialmente no podrán ser objeto de acciones de rescisión.

2.        **Efecto adicional: extensión de efectos**

Si bien el Acuerdo de Refinanciación ha sido suscrito por la gran mayoría de acreedores de pasivos financieros de las Sociedades, durante este tiempo no ha sido posible obtener el consentimiento de todos estos.

Dada la existencia de acreedores no participantes o disidentes y teniendo en cuenta que la aplicación de ciertas medidas previstas en el Acuerdo de Refinanciación a éstos es necesaria a efectos del cumplimiento del Plan de Viabilidad, en virtud del presente escrito las Sociedades solicitan la homologación del Acuerdo de Refinanciación y la extensión de efectos a dichos acreedores.

La homologación judicial del Acuerdo de Refinanciación y la extensión de sus efectos a los acreedores no participantes o disidentes permitirá el desarrollo del Plan de Viabilidad y, por tanto, la continuidad de la actividad empresarial de las Sociedades con los evidentes beneficios que ello conlleva para el tráfico económico. Como hemos visto, las Sociedades conforman un grupo de referencia internacional involucrado en importantes proyectos EPC y de gestión de concesiones e infraestructuras, que es viable en la medida que se restructure su pasivo financiero para ajustarlo a la situación y a las perspectivas actuales del Grupo.

3.        **Paralización de ejecuciones**

De acuerdo con el apartado 5 tercer párrafo de la Disposición Adicional Cuarta, examinada la solicitud de homologación el Juez dictará providencia admitiéndola a trámite y "*declarará la paralización de las ejecuciones singulares hasta que se acuerde la homologación*".

Interesa a esta parte que el Juzgado ordene la paralización de ejecuciones en los términos antes expuestos.

<u>**SEXTO.-**</u>        <u>**ASPECTOS PROCESALES**</u>

**1.        Capacidad y legitimación**

Por aplicación del apartado quinto, segundo párrafo, de la Disposición Adicional Cuarta de la Ley Concursal, las Sociedades están legitimadas para solicitar la homologación del Acuerdo de Refinanciación.

Mis representadas ostentan capacidad para ser parte en el presente proceso en virtud del artículo 6.1.3º de la Ley 1/2000, de Enjuiciamiento Civil ("**LEC**"), aplicable al presente procedimiento según la Disposición Final Quinta de la Ley Concursal.

**2.        Representación procesal y defensa técnica**

Las Sociedades están representadas por el Procurador que suscribe y defendidas por los Letrados cuyos datos identificativos constan en el encabezamiento del presente escrito.

**3.        Jurisdicción y competencia**

El apartado quinto de la Disposición Adicional Cuarta de la Ley Concursal, primer párrafo, dispone que la competencia para conocer de la homologación corresponderá al Juzgado de lo Mercantil que, en su caso, fuera competente para conocer del concurso de acreedores.

El artículo 10.1 LC atribuye la competencia para declarar y tramitar el concurso al Juez de lo Mercantil en cuyo territorio tenga el deudor el "*centro de sus intereses principales*". A continuación, el mismo precepto establece que "*en caso de deudor persona jurídica, se presume que el centro de sus intereses principales se halla en el lugar del domicilio social*".

El domicilio social de todas las Sociedades, con excepción de Infinita, está en Madrid, lugar en el que asimismo se halla el centro de sus intereses principales. El domicilio social de Infinita se halla en Vigo.

Sin perjuicio de ello, como se ha expuesto en la ALEGACIÓN PRIMERA, las Sociedades forman parte de un grupo de sociedades cuya sociedad dominante es GIC que tiene, al igual que todas las demás Sociedades con excepción de Infinita, su domicilio y centro de intereses principales en Madrid.

En atención a lo expuesto, **dado que la solicitud de homologación ha sido practicada conjuntamente por las Sociedades incluyendo a GIC (sociedad dominante), el Juzgado**

**competente para conocer de esta solicitud conjunta sería, según dispone el artículo 25.4
LC, en todo caso, el Juzgado de lo Mercantil de Madrid al ser el competente en relación
con GIC en su condición de sociedad dominante del grupo**.

### 4. Clases de juicio y normas procesales

La presente solicitud habrá de iniciar el procedimiento regulado en los apartados quinto
y siguientes de la Disposición Adicional Cuarta de la Ley Concursal. Las normas procesales
por las que se regirá la presente solicitud serán las allí previstas.

Por lo expuesto, al Juzgado

SUPLICO que tenga por presentada, en nombre y representación de cada una de las
siguientes Sociedades GRUPO ISOLUX CORSÁN, S.A., ISOLUX INGENIERÍA, S.A., CORSÁN
CORVIAM CONSTRUCCIÓN, S.A., GRUPO ISOLUX CORSÁN CONCESIONES, S.A., ISOLUX CORSÁN
INMOBILIARIA, S.A., ISOLUX CORSÁN SERVICIOS, S.A., ISOLUX ENERGY INVESTMENTS, S.L.U., e
INFINITA RENOVABLES, S.A., solicitud de homologación judicial del Acuerdo de
Refinanciación respecto de cada una de ellas suscrito en fecha 13 de julio de 2016 junto con
los documentos que la acompañan y, en su virtud:

1. **Admita a trámite** la solicitud de homologación del Acuerdo de Refinanciación y
   **acuerde** la paralización de ejecuciones singulares respecto de cada una de las
   Sociedades hasta que se acuerde la homologación ex ap.5º DA4ª LC, tercer párrafo;

2. **Ordene** la publicación en el Registro Público Concursal de la providencia de admisión
   a trámite de la solicitud de homologación del Acuerdo de Refinanciación por medio de
   anuncio que contenga el detalle requerido al efecto en ap.5 DA4ª, tercer párrafo;

3. **Acuerde**, mediante trámite de urgencia en el plazo de quince días, la homologación del
   Acuerdo de Refinanciación, **declarando** que el Acuerdo de Refinanciación no podrá ser
   objeto de acciones de rescisión ex ap.1º y 13º DA4ª LC.

4. **Acuerde** la extensión a los acreedores de pasivos financieros de **GRUPO ISOLUX
   CORSÁN, S.A.** que no hayan suscrito o se hayan opuesto al Acuerdo de Refinanciación
   de los efectos que se refieren a continuación**, ex ap.3 DA4ª LC b):

   4.1 **Respecto de los acreedores titulares de Deuda Afectada que no sean Bonistas o
   Acreedores USD**: la conversión de la Deuda Afectada y debida por GIC, ya sea (i)

directamente; (ii) a través de garantías; o (iii) por asunción de deuda bajo alguno de los restantes términos del Acuerdo de Refinanciación; en un nuevo instrumento de deuda, sindicado de acuerdo con los principios establecidos en los Anexos 10 y 14 del Acuerdo de Refinanciación, ocupando GIC la posición de deudora bajo el mismo, con los nuevos términos y el nuevo paquete de garantías establecido en los Términos de Refinanciación que se acompañan al Acuerdo de Refinanciación (el "**Nuevo Préstamo GIC**") ex ap. 3.b) 4º DA4ªLC, estructurado en los siguientes Tramos para cada acreedor bajo el Nuevo Préstamo GIC, proporcionalmente cada uno de dichos Tramos de acuerdo con la Deuda Afectada de cada acreedor calculada a la fecha del Certificado del Auditor:

(a)  Tramo A, para refinanciar y regular la Deuda Afectada que resulte de la financiación adicional facilitada a GIC a fin de atender las necesidades urgentes de liquidez de las Sociedades durante el periodo de negociación e implementación de la refinanciación (i.e., Instrumentos de Financiación de Rescate y Financiación de Dinero Nuevo), exclusivamente respecto de aquellos acreedores que facilitaron o facilitarán dichos Instrumentos de Financiación de Rescate y Financiación de Dinero Nuevo, hasta un importe total de 372.000.000 euros, que de acuerdo con lo previsto en el Acuerdo de Refinanciación se podría llegar a incrementar hasta 452.000.000 Euros.

(b)  Tramo B en el importe que corresponda en atención a lo pactado en el Acuerdo de Refinanciación, (i) que será amortizado mediante un único pago a su vencimiento, transcurridos 60 meses desde la Fecha de Implementación; y (ii) con un tipo de interés de Euribor 6-meses más 225 puntos básicos hasta en el segundo aniversario desde la Fecha de Implementación o, y Euribor 6-meses más 550 puntos básicos a partir de ese momento; a repartir entre cada uno de los acreedores de este Tramo B del Nuevo Préstamo GIC proporcionalmente de acuerdo con su respectiva participación en la Deuda Afectada a la fecha de los Certificados del Auditor, e incrementado en su caso por el porcentaje que corresponda a cada acreedor en concepto de Comisión por Pronta Adhesión en los términos del Acuerdo de Refinanciación.

Incrementado a su vez para cada acreedor, proporcionalmente según le corresponda atendiendo a la proporción recibida por el resto de acreedores (con el ajuste que corresponda en función de la Comisión por Pronta Adhesión) a la fecha del Certificado del Auditor en los términos del Acuerdo de Refinanciación, en el importe adicional que sea necesario para refinanciar cualquier Deuda Afectada (i) derivada de cualquier Importe Deficitario o Reclamación Contingente, BF no Prorrogada o Reclamación de Avales Prorrogada Refinanciada (según se definen en el anexo 10 del Acuerdo de Refinanciación) que en su caso devenga cristalizada y debida de acuerdo con los Documentos de la Deuda Afectada tras la fecha de entrada en vigor del Acuerdo de Refinanciación (la "**Deuda Cristalizada**"); o (ii) que sea asumida por GIC con respecto de las nuevas/antiguas líneas de avales de IISA, CCC o las filiales del negocio EPC, hasta los límites establecidos a estos efectos en el Acuerdo de Refinanciación (en la medida en que estas sociedades no sean capaces de refinanciar esta Deuda Afectada).

(c) Tramo C en el importe que corresponda en atención a lo pactado en el Acuerdo de Refinanciación; (i) en forma de préstamo participativo (conforme a lo previsto en el art. 20 del RDL 7/1996), con un tipo de interés de 0,25% si el EBITDA consolidado es superior a 500.000.000 euros hasta el tercer aniversario desde la Fecha de Implementación, y un tipo de interés fijo de un 1% más 0,25% si el EBITDA consolidado es superior a 500.000.000 euros a partir de ese momento; y (ii) que será amortizado mediante un único pago a su vencimiento, transcurridos 60 meses desde la Fecha de Implementación, que podrá extenderse por un periodo adicional de cinco años de no haberse repagado a esa fecha (los "**Términos Plazo e Interés Participativo C**"), proporcionalmente para cada acreedor bajo el Nuevo Préstamo GIC de acuerdo con su respectiva participación en la Deuda Afectada a la fecha de los Certificados del Auditor.

El Instituto de Crédito Oficial y otros acreedores que no puedan recibir este préstamo participativo o acciones de GIC por restricciones legales o regulatorias, recibirán un préstamo subordinado en las mismas condiciones económicas y rango que el préstamo participativo referido más arriba

(incluyendo interés, amortización y rango), en las condiciones establecidas en los Términos de Refinanciación.

Este Tramo C será asimismo incrementando en el importe adicional que sea necesario para refinanciar aquella Deuda Cristalizada que no hubiera sido incluida en el Tramo B, proporcionalmente según corresponda a cada acreedor atendiendo a la proporción recibida por el resto de acreedores (con el ajuste que corresponda en función de la Comisión por Pronta Adhesión) a la fecha del Certificado del Auditor en los términos del Acuerdo de Refinanciación.

Parte del Tramo C, en el importe acordado en el Acuerdo de Refinanciación, será obligatoriamente convertible en acciones de GIC, de conformidad con el Acuerdo de Refinanciación y los Términos de Refinanciación, de modo que los acreedores (junto con los Bonistas y los Acreedores USD bajo los Nuevos Bonos C obligatoriamente convertibles) que expresamente acepten tal conversión alcancen el porcentaje de capital de GIC acordado en los Términos de Refinanciación.

A aquellos acreedores que no ejecuten el Acuerdo de Refinanciación, y que no hayan notificado al Notario que otorgó el Acuerdo de Refinanciación antes del fin del periodo otorgado para la adhesión al mismo su voluntad de convertir de conformidad con el Acuerdo de Refinanciación, les será aplicable una quita sobre la Deuda Afectada equivalente al compromiso especifico asignado a dichos acreedores en la parte convertible del Tramo C, ex ap.3.b)3° DA4ª LC ("**Quita por No Conversión**").

Aquellos acreedores titulares de Deuda Afectada contingente deberán notificar al Notario autorizante del Acuerdo de Refinanciación si aceptan esta conversión en acciones de GIC, en la forma indicada en el Acuerdo de Refinanciación, dentro de un plazo de 15 días hábiles tras la publicación del auto que acuerde la homologación del Acuerdo de Refinanciación en el Boletín Oficial del Estado. Si no expresasen su voluntad de proceder con la referida conversión de conformidad con el Acuerdo de Refinanciación, les será aplicable la Quita por No Conversión.

4.2 **Respecto de los acreedores titulares de Deuda Afectada que sean Bonistas o Acreedores USD**: la conversión de su Deuda Afectada en diversos instrumentos de bono sujetos a las Leyes de Nueva York emitidos por GIC bajo el ap. 3.b) 4º DA4ª LC, en el importe que corresponda en atención a lo pactado en el Acuerdo de Refinanciación en euros (o su equivalente en dólares americanos, al tipo de cambio indicado en el Acuerdo de Refinanciación, para cubrir las suscripciones de los Acreedores USD), respectivamente, con las nuevas características, régimen y paquete de garantías establecidos en los Términos de Refinanciación que se acompañan al Acuerdo de Refinanciación (los "**Nuevos Bonos**"). A resultas de la entrega de los Nuevos Bonos, las obligaciones de GIC frente a los Bonistas en concepto de garantía personal de los Bonos, así como frente a los Acreedores USD (aquellos distintos de los Bonistas que tuvieran deuda denominada en dólares), quedarán canceladas.

Los Nuevos Bonos se estructurarán del siguiente modo, proporcionalmente cada uno de ellos de acuerdo con la Deuda Afectada de cada acreedor calculada a la fecha del Certificado del Auditor:

(a) Dos Nuevos Bonos B:

(a)1.    uno en dólares americanos para los Acreedores USD, por un importe necesario para cubrir las solicitudes de suscripción por los Acreedores USD;

(a)2.    otro en euros para los Bonistas, en el importe que corresponda en atención a lo pactado en el Acuerdo de Refinanciación;

ambos (i) serán amortizados mediante un único pago a su vencimiento, transcurridos 60 meses desde la Fecha de Implementación; y (ii) con un tipo de interés fijo del 3% hasta el segundo aniversario desde la Fecha de Implementación, que se incrementará a un 6% desde ese momento.

(b) Dos Nuevos Bonos C, no convertibles en acciones de GIC:

(b)1.    uno en dólares americanos, para los Acreedores USD por un importe necesario para cubrir las solicitudes de suscripción de los Acreedores USD;

34

(b)2.    otro en euros, para los Bonistas en el importe que corresponda en atención a lo pactado en el Acuerdo de Refinanciación.

(c)    Dos Nuevos Bonos C, obligatoriamente convertibles en acciones de GIC de conformidad con el Acuerdo de Refinanciación y los Términos de Refinanciación, que serán entregados exclusivamente en relación con aquellos Acreedores USD y Bonistas que hayan suscrito el Acuerdo de Refinanciación sin reserva alguna respecto de la conversión de acciones o, de no haberlo suscrito, hayan notificado a GIC mediante Notario público su intención de recibir estos instrumentos antes del fin del periodo otorgado para la adhesión al Acuerdo de Refinanciación y en la forma indicada en el mismo:

(c)1.    uno en dólares americanos, por importe necesario para cubrir las solicitudes de suscripción de los Acreedores USD;

(c)2.    otro en euros para los Bonistas, en el importe que corresponda en atención a lo pactado en el Acuerdo de Refinanciación;

Los Bonistas y los Acreedores USD bajo estos Nuevos Bonos C, obligatoriamente convertibles en acciones de GIC, junto con los acreedores bajo el Nuevo Préstamo GIC que expresamente acepten dicha conversión, asumirán el porcentaje de capital de GIC acordado en los Términos de Refinanciación.

Todos los Nuevos Bonos C se emitirán en los Términos Plazo e Interés Participativo C.

Los Nuevos Bonos en euros estarán representados a través de uno o varios títulos globales nominativos y se registrarán de nombre de la entidad que actúe como titular legal (*legal owner*) de estos (el "**Titular Legal de los Bonos**"), todo ello sin perjuicio de que se reconocerá un interés económico a los Bonistas en los Nuevos Bonos en euros, según corresponda conforme a lo anterior.

Los Nuevos Bonos en dólares estadounidenses estarán igualmente representados a través de uno o varios títulos globales nominativos y también se registrarán a nombre del Titular Legal de los Bonos, todo ello sin perjuicio de que se reconocerá

un interés económico a los Acreedores USD en los Nuevos Bonos en dólares estadounidenses, según corresponda conforme a lo anterior.

4.3 Si, tras la Fecha de Implementación, el Grupo vendiese todos sus activos, y el total agregado del precio de venta (neto de costes, impuestos y gastos) no es suficiente para amortizar la totalidad de la Deuda Afectada bajo el Nuevo Préstamo GIC y los Nuevos Bonos, el importe de la Deuda Afectada que los acreedores titulares de pasivos financieros no pueden cobrarse será objeto de quita equivalente a ese importe bajo el Acuerdo de Refinanciación DA4º3.b)2º LC.

4.4 Una quita del 100% respecto de todo el endeudamiento financiero debido por GIC a cualquier otra compañía del Grupo.

4.5 Con independencia de que los acreedores sean o no firmantes del Acuerdo de Refinanciación, mantendrán todos sus derechos y recurso contra aquellas sociedades del Grupo firmantes del Acuerdo de Refinanciación distintas de las Sociedades (esto es, Isolux de México, S.A. de C.V., Isolux Projetos e Instalaçoes, Ltda, Isolux Projetos Investimentos e Participaçoes, Ltda, Isolux Corsan LLC e Isolux Corsan India Engineering and Construction Pvt. Ltd.) bajo cualquier garantía o bajo cualquier instrumento de responsabilidad solidaria, otorgados o asumidos por las mencionadas sociedades de conformidad con los Documentos de la Deuda Afectada.

**5.  Acuerde la extensión a los acreedores de pasivos financieros de ISOLUX INGENIERÍA, S.A. que no hayan suscrito o se hayan opuesto al Acuerdo de Refinanciación de los efectos que se refieren a continuación,** ex ap.3 DA4ª LC b).

Una quita del 100% de la Deuda Afectada titularidad de los acreedores frente a IISA (i) que esté garantizada por GIC (incluyendo, a efectos aclaratorios, la Deuda Afectada bajo la garantía solidaria de los Bonos otorgada por IISA); o (ii) en la que GIC sea solidariamente responsable junto con IISA.

Respecto de aquellos acreedores que sean titulares de Deuda Afectada y que no se encuentren comprendidos en el párrafo anterior, podrán elegir ante Notario público entre dos alternativas, a las que deberán optar dentro de un plazo de 15 días hábiles en

Madrid desde que el auto que acuerde la homologación del Acuerdo de Refinanciación sea firme:

(a)   asunción por GIC de la Deuda Afectada titularidad de aquellos acreedores, que (i) recibirán el mismo tratamiento que el resto de acreedores de GIC; y (ii) que, consecuentemente, renunciarán y condonarán su Deuda Afectada frente a IISA (*asunción liberatoria*); o

(b)   quita del 95% de la Deuda Afectada titularidad de estos acreedores frente a IISA, ex ap. 3.b) 2º DA4º LC. El 5% restante sería convertido en préstamos participativos (art. 20 del RDL 7/1996), ex ap. 3.b) DA4ª LC, que serán amortizados por IISA en un plazo de diez años, con un periodo de carencia de cinco años y según el siguiente calendario de amortización, empezando desde la fecha en que el auto que acuerde la homologación del Acuerdo de Refinanciación devenga firme:

| Año | Porcentaje sobre el 5% restante de la Deuda Afectada sujeta a esta alternativa b), previa quita |
|---|---|
| Año 1 | 0% |
| Año 2 | 0% |
| Año 3 | 0% |
| Año 4 | 0% |
| Año 5 | 0% |
| Año 6 | 10% |
| Año 7 | 15% |
| Año 8 | 20% |
| Año 9 | 25% |
| Año 10 | 30% |

Los préstamos participativos devengarán un tipo de interés de un 1% anual en caso de que los beneficios de IISA superen los 50.000.000 euros por año, que serán recapitalizados a su vencimiento.

La alternativa (b) será considerada como la alternativa aplicable en caso de falta de elección por parte de algún acreedor.

Lo aquí dispuesto aplicará a cualquier Deuda Afectada contingente que, de acuerdo los respectivos Documentos de la Deuda Afectada, devenga cristalizada y debida en cualquier momento posterior a la fecha de presentación del presente escrito.

Como excepción, cualquier nueva línea de avales concedida por un acreedor a IISA tras la Fecha de Implementación, junto con cualesquiera otras líneas de avales concedidas,

extendidas o sustituidas en favor de IISA por tal acreedor con fecha 1 de octubre de 2015, o en un momento posterior, será considerada como "Nuevo Dinero de Avales" concedido a IISA por el referido acreedor en el marco de la refinanciación. Cualquier Deuda Afectada que pueda surgir como resultado del vencimiento o ejecución de estas líneas de avales en cualquier momento posterior a la fecha de presentación del presente escrito será refinanciada por IISA en los mismos términos que los establecidos para el Tramo B del Nuevo Préstamo GIC. El mismo tratamiento será de aplicación a los acreedores en relación con otros avales otorgados con anterioridad al 1 de octubre de 2015, euro a euro y hasta el límite del Nuevo Dinero de Avales concedido a IISA por dichos acreedores.

Por último, una quita del 100% respecto de todo el endeudamiento financiero debido por IISA a cualquier otra compañía del Grupo.

6.  **Acuerde** la extensión a los acreedores de pasivos financieros de CORSÁN CORVIAM CONSTRUCCIÓN, S.A. que no hayan suscrito o se hayan opuesto al Acuerdo de Refinanciación de los efectos que se refieren a continuación**, ex ap.3 DA4ª LC b).

Una quita del 100% de la Deuda Afectada titularidad de los acreedores frente a CCC (i) que esté garantizada por GIC (incluyendo, a efectos aclaratorios, la Deuda Afectada bajo la garantía solidaria de los Bonos otorgada por CCC); o (ii) en la que GIC sea solidariamente responsable junto con CCC.

Respecto de aquellos acreedores que sean titulares de Deuda Afectada y que no se encuentren comprendidos en el párrafo anterior**, podrán elegir entre dos alternativas, a las que deberán optar dentro de un plazo de 15 días hábiles en Madrid desde que el auto que acuerde la homologación del Acuerdo de Refinanciación sea firme:

(a)  asunción por GIC de la Deuda Afectada titularidad de aquellos acreedores, que (i) recibirán el mismo tratamiento que el resto de acreedores de GIC; y (ii) que, consecuentemente, renunciarán y condonarán su Deuda Afectada frente a CCC (*asunción liberatoria*); o

(b)  quita del 95% de la Deuda Afectada titularidad de estos acreedores frente a CCC, ex ap. 3.b) 2º DA4ª LC. El 5% restante sería convertido en préstamos participativos (art. 20 del RDL 7/1996), ex ap. 3.b) 4º DA4ª LC, que serán amortizados por CCC en un plazo de diez años, con un periodo de carencia de

cinco años y según el siguiente calendario de amortización, empezando desde la fecha en que el auto que acuerde la homologación del Acuerdo de Refinanciación devenga firme:

| Año | Porcentaje sobre el 5% restante de la Deuda Afectada sujeta a esta alternativa b), previa quita |
|---|---|
| Año 1 | 0% |
| Año 2 | 0% |
| Año 3 | 0% |
| Año 4 | 0% |
| Año 5 | 0% |
| Año 6 | 10% |
| Año 7 | 15% |
| Año 8 | 20% |
| Año 9 | 25% |
| Año 10 | 30% |

Los préstamos participativos devengarán un tipo de interés de un 1% anual en caso de que los beneficios de CCC superen los 50.000.000 euros por año, que serán recapitalizados a su vencimiento.

La alternativa (b) será considerada como la alternativa aplicable en caso de falta de elección por parte de algún acreedor.

Lo aquí dispuesto aplicará a cualquier Deuda Afectada que, de acuerdo los respectivos Documentos de la Deuda Afectada, devenga cristalizada y debida en cualquier momento posterior a la fecha de presentación del presente escrito.

Como excepción, cualquier nueva línea de avales concedida por un acreedor a CCC tras la Fecha de Implementación, junto con cualesquiera otras líneas de avales concedidas, extendidas o sustituidas en favor de CCC por tal acreedor con fecha 1 de octubre de 2015, o en un momento posterior, será considerada como "Nuevo Dinero de Avales" concedido a CCC por el referido acreedor en el marco de la refinanciación. Cualquier Deuda Afectada que pueda surgir como resultado del vencimiento o ejecución de estas líneas de avales en cualquier momento posterior a la fecha de presentación del presente escrito será refinanciada por CCC en los mismos términos que los establecidos para el Tramo B del Nuevo Préstamo GIC. El mismo tratamiento será de aplicación a los acreedores en relación con otros avales otorgados con anterioridad al 1 de octubre de 2015, euro a euro y hasta el límite del Nuevo Dinero de Avales concedido a CCC por dichos acreedores.

39

Por último, una quita del 100% respecto de todo el endeudamiento financiero debido por CCC a cualquier otra compañía del Grupo.

7.   **Acuerde** la extensión a los acreedores de pasivos financieros de GRUPO ISOLUX CORSÁN CONCESIONES, S.A. que no hayan suscrito o se hayan opuesto al Acuerdo de Refinanciación de los efectos que se refieren a continuación**,** ex ap.3 DA4ª LC b).

Una quita del 100% de la Deuda Afectada titularidad de los acreedores frente a GICC (i) que esté garantizada por GIC (incluyendo, a efectos aclaratorios, la Deuda Afectada bajo la garantía solidaria de los Bonos otorgada por GICC); o (ii) en la que GIC sea solidariamente responsable junto con GICC.

Respecto de aquellos acreedores que sean titulares de Deuda Afectada y que no se encuentren comprendidos en el párrafo anterior, podrán elegir entre dos alternativas, a las que deberán optar dentro de un plazo de 15 días hábiles en Madrid desde que el auto que acuerde la homologación del Acuerdo de Refinanciación sea firme:

(a)   asunción por GIC de la Deuda Afectada titularidad de aquellos acreedores, que (i) recibirán el mismo tratamiento que el resto de acreedores de GIC; y (ii) que, consecuentemente, renunciarán y condonarán su Deuda Afectada frente a GICC (*asunción liberatoria*); o

(b)   quita del 95% de la Deuda Afectada titularidad de estos acreedores frente a GICC, ex ap. 3.b) 2º DA4ª LC. El 5% restante sería convertido en préstamos participativos (art. 20 del RDL 7/1996), ex ap.  3.b) 4º DA4ª LC, que serán amortizados por GICC en un plazo de diez años, con un periodo de carencia de cinco años y según el siguiente calendario de amortización, empezando desde la fecha en que el auto que acuerde la homologación del Acuerdo de Refinanciación devenga firme:

| Año | Porcentaje sobre el 5% restante de la Deuda Afectada sujeta a esta alternativa b), previa quita |
|---|---|
| Año 1 | 0% |
| Año 2 | 0% |
| Año 3 | 0% |
| Año 4 | 0% |
| Año 5 | 0% |
| Año 6 | 10% |
| Año 7 | 15% |
| Año 8 | 20% |

| Año | Porcentaje sobre el 5% restante de la Deuda Afectada sujeta a esta alternativa b), previa quita |
|-----|--------------------------------------------------------------------------------------------------|
| Año 9 | 25% |
| Año 10 | 30% |

Los préstamos participativos devengarán un tipo de interés de un 1% anual en caso de que los beneficios de GICC superen los 50.000.000 euros por año, que serán recapitalizados a su vencimiento.

La alternativa (b) será considerada como la alternativa aplicable en caso de falta de elección por parte de algún acreedor.

Lo aquí dispuesto aplicará a cualquier Deuda Afectada que, de acuerdo los respectivos Documentos de la Deuda Afectada, este cristalizada y sea debida en cualquier momento posterior a la fecha de presentación del presente escrito.

Por último, una quita del 100% respecto de todo el endeudamiento financiero debido por GICC a cualquier otra compañía del Grupo.

8. **Acuerde** la extensión a los acreedores de pasivos financieros de ISOLUX CORSÁN INMOBILIARIA, S.A. que no hayan suscrito o se hayan opuesto al Acuerdo de Refinanciación de los efectos que se refieren a continuación**, ex ap.3 DA4ª LC b).

Una quita del 100% de la Deuda Afectada titularidad de los acreedores frente a ICI (i) que esté garantizada por GIC; o (ii) en la que GIC sea solidariamente responsable junto con ICI.

Respecto de aquellos acreedores que sean titulares de Deuda Afectada y que no se encuentren comprendidos en el párrafo anterior, podrán elegir entre dos alternativas, a las que deberán optar dentro de un plazo de 15 días hábiles en Madrid desde que el auto que acuerde la homologación del Acuerdo de Refinanciación sea firme:

(a) asunción por GIC de la Deuda Afectada titularidad de aquellos acreedores, que (i) recibirán el mismo tratamiento que el resto de acreedores de GIC; y (ii) que, consecuentemente, renunciarán y condonarán su Deuda Afectada frente a ICI (*asunción liberatoria*); o

(b) quita del 95% de la Deuda Afectada titularidad de estos acreedores frente a ICI, ex ap. 3.b) 2º DA4ª LC. El 5% restante sería convertido en préstamos participativos (art. 20 del RDL 7/1996), ex ap. 3.b) 4º DA4ª LC, que serán

amortizados por ICI en un plazo de diez años, con un periodo de carencia de cinco años y según el siguiente calendario de amortización, empezando desde la fecha en que el auto que acuerde la homologación del Acuerdo de Refinanciación devenga firme:

| Año | Porcentaje sobre el 5% restante de la Deuda Afectada sujeta a esta alternativa b), previa quita |
|---|---|
| Año 1 | 0% |
| Año 2 | 0% |
| Año 3 | 0% |
| Año 4 | 0% |
| Año 5 | 0% |
| Año 6 | 10% |
| Año 7 | 15% |
| Año 8 | 20% |
| Año 9 | 25% |
| Año 10 | 30% |

Los préstamos participativos devengarán un tipo de interés de un 1% anual en caso de que los beneficios de ICI superen los 50.000.000 euros por año, que serán recapitalizados a su vencimiento.

La alternativa (b) será considerada como la alternativa aplicable en caso de falta de elección por parte de algún acreedor.

Lo aquí dispuesto aplicará a cualquier Deuda Afectada que, de acuerdo los respectivos Documentos de la Deuda Afectada, este cristalizada y sea debida en cualquier momento posterior a la fecha de presentación del presente escrito.

Por último, una quita del 100% respecto de todo el endeudamiento financiero debido por ICI a cualquier otra compañía del Grupo.

9. **Acuerde** la extensión a los acreedores de pasivos financieros de ISOLUX CORSÁN SERVICIOS, S.A. que no hayan suscrito o se hayan opuesto al Acuerdo de Refinanciación de los efectos que se refieren a continuación**, ex ap.3 DA4ª LC b).

Una quita del 100% de la Deuda Afectada titularidad de los acreedores frente a ICS (i) que esté garantizada por GIC; o (ii) en la que GIC sea solidariamente responsable junto con ICS.

Respecto de aquellos acreedores que sean titulares de Deuda Afectada y que no se encuentren comprendidos en el párrafo anterior, podrán elegir entre dos alternativas, a

las que deberán optar dentro de un plazo de 15 días hábiles en Madrid desde que el auto que acuerde la homologación del Acuerdo de Refinanciación sea firme:

(a)    asunción por GIC de la Deuda Afectada titularidad de aquellos acreedores, que (i) recibirán el mismo tratamiento que el resto de acreedores de GIC; y (ii) que, consecuentemente, renunciarán y condonarán su Deuda Afectada frente a ICS (*asunción liberatoria*); o

(b)    quita del 95% de la Deuda Afectada titularidad de estos acreedores frente a ICS, ex ap. 3.b) 2º DA4ª LC. El 5% restante sería convertido en préstamos participativos (art. 20 del RDL 7/1996), ex ap. 3.b) 4º DA4ª LC, que serán amortizados por ICS en un plazo de diez años, con un periodo de carencia de cinco años y según el siguiente calendario de amortización, empezando desde la fecha en que el auto que acuerde la homologación del Acuerdo de Refinanciación devenga firme:

| Año | Porcentaje sobre el 5% restante de la Deuda Afectada sujeta a esta alternativa b), previa quita |
|---|---|
| Año 1 | 0% |
| Año 2 | 0% |
| Año 3 | 0% |
| Año 4 | 0% |
| Año 5 | 0% |
| Año 6 | 10% |
| Año 7 | 15% |
| Año 8 | 20% |
| Año 9 | 25% |
| Año 10 | 30% |

Los préstamos participativos devengarán un tipo de interés de un 1% anual en caso de que los beneficios de ICS superen los 50.000.000 euros por año, que serán recapitalizados a su vencimiento.

La alternativa (b) será considerada como la alternativa aplicable en caso de falta de elección por parte de algún acreedor.

Lo aquí dispuesto aplicará a cualquier Deuda Afectada que, de acuerdo los respectivos Documentos de la Deuda Afectada, este cristalizada y sea debida en cualquier momento posterior a la fecha de presentación del presente escrito.

Por último, una quita del 100% respecto de todo el endeudamiento financiero debido por ICS a cualquier otra compañía del Grupo.

10. **Acuerde** la extensión a los acreedores de pasivos financieros de INFINITA RENOVABLES, S.A. que no hayan suscrito o se hayan opuesto al Acuerdo de Refinanciación de los efectos que se refieren a continuación**,** ex ap.3 DA4ª LC b).

Una espera de diez años se aplicará a la Deuda Afectada, que será amortizada mediante un único pago a su vencimiento ex ap. 3.b) 1º DA4ª LC.

Si con anterioridad a la finalización de la espera referida en el punto anterior, Infinita vendiese sus negocio o todos sus activos, y el precio total de la venta (neto de costes, impuestos y gastos) no es suficiente para la amortización de la totalidad de la Deuda Afectada, el déficit resultante será objeto de quita por ese importe bajo el Acuerdo de Refinanciación ex ap. 3.b) 2º DA4º LC.

Por último, una quita del 100% respecto de todo el endeudamiento financiero debido por Infinita a cualquier otra compañía del Grupo.

11. **Acuerde**, mediante trámite de urgencia en el plazo de quince días, **la homologación del Acuerdo de Refinanciación** suscrito por ISOLUX ENERGY INVESTMENTS, S.L.U., y la mayoría de sus acreedores titulares de pasivos financieros a los efectos que establece la DA4º LC, **declarando que el Acuerdo de Refinanciación no podrá ser objeto de acciones de rescisión** ex ap.1º y 13º DA4ª LC.

12. **Acuerde** ordenar a Citivic Nominees Limited, en su condición de titular legal (*legal owner*) bajo los Bonos, que tome razón de la cancelación de las garantías personales o cualquier otra obligación asumida por Grupo Isolux Corsán, S.A., Isolux Ingeniería, S.A., Corsán Corviam, Construcción, S.A y Grupo Isolux Corsán Concesiones, S.A. bajo los Bonos a resultas de la extensión de efectos del Acuerdo de Refinanciación que se acuerde en los términos solicitados en los apartados 4 a 7 anteriores, ambos inclusive.

13. **Decrete** la cancelación de todos embargos que eventualmente se hubiesen practicado en los procedimientos de ejecución de deudas de las Sociedades afectadas por el Acuerdo de Refinanciación; y

14. **Publique** la resolución que acuerde la homologación del Acuerdo de Refinanciación mediante anuncio insertado en el Registro Público Concursal y en el Boletín Oficial del Estado por medio de extracto con el contenido del apartado sexto de la Disposición Adicional Cuarta de la Ley Concursal, segundo párrafo.

Es Justicia que pido, en Madrid, a 28 de julio de 2016.

*       *       *

**OTROSÍ DIGO PRIMERO**, que esta representación ha intentado cumplir minuciosa y fielmente con los requisitos exigidos en la LC y en la LEC que puedan ser aplicables, tanto en el fondo como en la forma, poniéndose de manifiesto y haciendo expreso ofrecimiento esta parte de su voluntad para subsanar cualquier defecto en el que se pudiera haber incurrido, incluyendo la aportación de cualesquiera documento adicional este Juzgado considere necesario a tal fin, conforme a lo dispuesto por el artículo 243.3 y 4 de la LOPJ, el artículo 231 LEC y demás preceptos que resulten de aplicación.

En su virtud, al Juzgado

**SUPLICO**, tenga por efectuada la anterior manifestación a los efectos de lo dispuesto en los artículos 243.3 y 4 de la LOPJ, 231 LEC y demás que resulten de aplicación y que a estos efectos se otorgue en su caso un plazo de subsanación.

**OTROSÍ DIGO SEGUNDO** que, sin perjuicio de que, de acuerdo con lo previsto en el artículo 5 del Real Decreto 1065/2015, de 27 de noviembre, este escrito de solicitud de concurso voluntario ha sido presentado por medios telemáticos, se hace constar que mi mandante (a) depositará asimismo los documentos que acompañan en copia electrónica mediante CD, que quedará depositado ante este Juzgado en la misma fecha de presentación de este escrito; y (b) aportará en Decanato copia impresa del mismo y de todos sus adjuntos; por si ello fuere de utilidad para el Juzgado designado para conocer de este escrito, y eventualmente para el caso de que toda la documentación no pueda ser aportada mediante la plataforma LexNet debido a su tamaño, según lo estipulado en la normativa mencionada más arriba.

En su virtud, al Juzgado

**SUPLICO**, tenga por efectuada la anterior manifestación a los efectos oportunos.

Es Justicia que respetuosamente, reitero, en el lugar y fecha indicados *ut supra*.

**OTROSÍ DIGO TERCERO** que mi mandante se compromete a aportar los documentos originales que se adjuntan por medio de este escrito, durante el plazo de tres (3) días hábiles

45

desde que este escrito haya sido turnado al Juzgado de lo Mercantil de Madrid que corresponda.

En su virtud, al Juzgado

**SUPLICO**, tenga por efectuada la anterior manifestación a los efectos oportunos.

Es Justicia que respetuosamente, reitero, en el lugar y fecha indicados *ut supra*.

_____          _____

Letrado: Angel Alonso Hernández                    Procurador: Ramón Rodríguez Nogueira
Col. del I.C.A.M. nº 61.047
URÍA MENÉNDEZ ABOGADOS, S.L.P

_____

Letrado: Javier Rubio Sanz
Col. del I.C.A.M. nº 81.665
URÍA MENÉNDEZ ABOGADOS, S.L.P.

Application for Court Homologation of Refinancing Agreement
Fourth Additional Provision to the Bankruptcy Law
Requesting parties: GRUPO ISOLUX CORSÁN, S.A., ISOLUX INGENIERÍA, S.A. CRSÁN CORVIAM CONSTRUCCIÓN, S.A.,
GRUPO ISOLUX CORSÁN CONCESIONES, S.A., ISOLUX CORSÁN INMOBILIARIA, S.A., ISOLUX CORSÁN SERVICIOS, S.A.,
ISOLUX ENERGY INVESTMENTS, S.L.U., INFINITA RENOVABLES, S.A.

## TO THE DUTY COMMERCIAL COURT OF MADRID

MR. RAMÓN RODRÍGUEZ NOGUEIRA, Attorney for the following companies: **GRUPO ISOLUX CORSÁN, S.A.** (hereinafter "**GIC**"), **ISOLUX INGENIERÍA, S.A.** (hereinafter "**IISA**"), **CORSÁN CORVIAM CONSTRUCCIÓN, S.A.** (hereinafter "**CCC**"), **GRUPO ISOLUX CORSÁN CONCESIONES, S.A.** (hereinafter "**GICC**"), **ISOLUX CORSÁN INMOBILIARIA, S.A.** (hereinafter "**ICI**"), **ISOLUX CORSÁN SERVICIOS, S.A.** (hereinafter "**ICS**"), **ISOLUX ENERGY INVESTMENTS, S.L.U.** ("**IEI**") and **INFINITA RENOVABLES, S.A.** (hereinafter "**Infinita**"), whose identification and domicile details are contained in the document enclosed as **Document no. 1**, which I accredit via the respective powers of attorney which are enclosed as **Document nos. 2(a), 2(b), 2(c), 2(d), 2(e), 2(f), 2(g) and 2(h)** herewith for incorporation as evidence into the proceedings, with return of the originals following itemization; under the joint legal counsel of the attorneys of the Ilustre Colegio de Abogados de Madrid [Bar Association of Madrid — ICAM], Mr. Ángel Alonso Hernández (ICAM no. 61,871) and Mr. Javier Rubio Sanz (ICAM no. 81,665), appear before the Court and pursuant to the Law, **DO HEREBY STATE THAT**:

**I.**        On July 13, 2016, GIC, IISA, CCC, GICC, ICI, ICS, IEI, Infinita and other companies of their group signed a refinancing agreement with various creditors holding financial liabilities which was notarized as a public document on that same date before Notary Public of Madrid Mr. Fernando Molina Stranz, under number 1,030 in his register (the refinancing agreement notarized as a public document including all of its appendices shall hereinafter be referred to as the "**Refinancing Agreement**"). A copy of the Refinancing Agreement is enclosed as **Document no. 3**.

**II.**        Via the present pleading, GIC, IISA, CCC, GICC, ICI, ICS, IEI and Infinita hereby formulate a timely and valid **APPLICATION FOR COURT HOMOLOGATION OF THE REFINANCING AGREEMENT** pursuant to the provisions set forth in the Fourth Additional Provision to Law 22/2003 of July 9, Ley Concursal [Bankruptcy Law] (hereinafter "**BL**" or the "**Bankruptcy Law**") in its current version, pursuant to the following

**PLEADINGS**

<u>**ONE**</u>.      <u>ON THE COMPANIES APPLYING FOR THE HOMOLOGATION</u>

**1.      Identification of the companies applying for the homologation**

The application for homologation of the Refinancing Agreement has been formulated by GIC, IISA, CCC, GICC, ICI, ICS, IEI and Infinita. Details of the incorporation and other identification details of the companies applying for this homologation are contained in the enclosed Document no. 1.

GIC, IISA, CCC, GICC, ICI, ICS, IEI and Infinita shall hereinafter be jointly referred to as the "**Companies**".

This application for homologation of the Refinancing Agreement has been made by the Companies that are party to the Refinancing Agreement and whose corporate domiciles and principal centers of business are located in Spain. The application for homologation is not formulated in connection with other companies of the Isolux Corsán Group (as described in section 2 below) which are also party to the Refinancing Agreement, but which have their corporate domiciles outside of Spain.

**2.      GIC is the parent company of a group of companies that, among other companies, includes IISA, CCC, GICC, ICI, ICS, IEI and Infinita.**

GIC either directly or indirectly controls IISA, CCC, GICC, ICI, ICS, IEI and Infinita. Consequently, pursuant to the provisions set forth in article 42 of the Commercial Code, **GIC is the parent company of a group of companies of which the remaining Companies applying for the homologation form a part** (hereinafter the "**Isolux Corsán Group**" or the "**Group**").

Enclosed as <u>**Document no. 4**</u> is a diagram showing the position and oversight exercised by GIC in connection with all of the Companies. Also enclosed with the present pleading as <u>**Document no. 5**</u> are the consolidated accounts of GIC as at December 31, 2015, which among others consolidate all of the Companies applying for the homologation and which consequently accredit the fact that all of the Companies form part of a corporate group whose parent company is GIC.

In the specific case of Infinita and IEI, we would also underscore that GIC is owner of 80.69705% and 100% of the stock capital of those companies (in the case of IEI, via Power

Investering B.V.), as demonstrated by the homologations enclosed as **Document no. 6(a) and 6(b)** respectively.

3.       **Regarding the Isolux Corsán Group and its activities**

The Isolux Corsán Group is a **Spanish-owned commercial conglomerate** with a **worldwide reputation specializing in the construction and concession of major infrastructure projects** in the fields of engineering, civil engineering, the environment and installations, **with over 80 years of experience** and **a presence in over 40 countries** on four continents, and with a **professional staff of approximately 6,000 professionals.**

Isolux Corsán Group was created in 2004 as a result of the merger between two groups with a solid and reputable trajectory in the Group's fields of activity, Isolux Wat, founded in 1933, and Grupo Corsán-Corviam, founded in 1928.

The activities of the Group are broadly diversified into **two significant business branches**: on the one hand (i) the **EPC business** (Engineering Procurement and Construction), and (ii) the **concession business** on the other.

The Group's **EPC business** has a business portfolio worth approximately 6.817 billion euros, making it one of the largest European groups in this sector. It is focused on engineering and the construction of major infrastructure, which activity it carries out via three broad business areas: Infrastructure (civil engineering, construction and the environment), Energy (power generation, oil & gas, renewable energy and industry) and T&D and Installations (transmission and distribution of electricity, transport infrastructure, maintenance and services, security, telecommunications and automation, and oversight).

The other significant business branch of the Group is focused on the **integrated management of concessions**, especially in the areas of energy transportation, the promotion and exploitation of photovoltaic power stations, and the management of parking lots and structures.

The Group has 6,811 kilometers of high-voltage power lines under concession, operates photovoltaic installations with an operating capacity of 326 MW (which generated 421 GWh in 2014) and has over 30,000 parking spaces in 29 Spanish cities, distributed across 57 parking lots and structures.

**TWO.**     **RELEVANT FACTUAL BACKGROUND**

1.      The business carried out by the Group (both the EPC business and above all the concession business) is highly capital intensive. In addition, it is a business that is heavily dependent on financing instruments (in order to meet payments to providers as and when works projects are completed, among others) and guaranteed lines of credit and other secured lines of credit (necessary not only to win contracts and maintain its business portfolio, but also and especially to collect advance payments from clients for work and performance guarantees, etc.).

2.      Isolux Corsán Group has a complex structure with a variety of financing at different levels. In practice, the Group has from a financial standpoint been operating as an integrated unit, with financing at various levels of its structure, but responsibility for which is held by various entities in the Group via a cross-guarantee system and joint and several assumption of obligations. Similarly, from a cash and treasury management perspective, the Group has been operating in an integrated manner via a cash pooling system between the various companies of which it is composed.

3.      The financial crisis which began in 2008 and which had a very serious effect on Spain has had a significant impact on the public works and infrastructure construction sector, which is the Group's principal line of business. During these years the group has addressed the crisis in this sector by internationalizing its business and diversifying its activities.

Indeed, Isolux Corsán Group has undertaken a strategic process of internationalization and diversification of its activities in the markets in which it operates (Isolux Corsán Group currently has a significant presence in such markets as Mexico, Brazil, the US, India, etc.). This process of internationalization, together with other projects, required significant investment to be made which was financed via Group-level debt resulting in a **significant level of financial debt for which various companies in the Group, including the Companies, are jointly and severally responsible (via the system of cross-guarantees or joint and several assumption of obligations)**.

4.      Among many other financing instruments used by the Group, Isolux Corsán Group Finance B.V., a member company of the Group incorporated under the laws of the Netherlands ("**GICBV**"), issued an unsecured senior bond at 6.625% with a total value of 850,000,000 euros maturing in 2021 subject to the Laws of New York (the bonds forming

part of the aforementioned issue shall hereinafter be referred to as the "**Bonds**"). The sole legal owner of the Bonds is Citivic Nominees Limited ("**Citivic**") which, nonetheless, acts in accordance with the instructions of the beneficial owners of the financial interests of Bonds (the beneficial owners of the financial interests of the Bonds shall hereinafter be referred to as the "**Bondholders**") remitted via the compensation systems.

The Bonds are jointly and severally guaranteed by GIC, IISA, CCC and GICC.

5.      **Together with economic alterations in the markets in which it operates and which have impacted the Companies' business and their anticipated revenue, the significant level of indebtedness of the Group has resulted in an unsustainable level of debt servicing for the Group which affects its capacity to generate cash**.

6.      In addition, **during the last few months the Companies have seen a significant reduction in their cash financing instruments and in their access to guaranteed lines of credit and similar secured lines of credit**, largely as a consequence of the effect on the market of the filing for pre-bankruptcy proceedings (communication in article 5 bis of the Bankruptcy Law) submitted by Abengoa, S.A., and the uncertainty this has transmitted to the market with respect to other operators involved in business areas matching those engaged in by Abengoa.

These restrictions have affected the operations of the Group in view of the importance of these financing mechanisms for the EPC business and the concessions business. In the instant case, these restrictions have caused severe cash flow problems that have been obstructing the day-to-day operations of the Group (including the generation of cash flow in connection with ongoing projects, as well as access to new projects).

7.      **In view of the cash flow problems the Isolux Corsán Group has been required to address over the last few months,** the Companies and other companies of the Group began negotiations with its main financial creditors with the aim of reaching a refinancing agreement under the terms set forth in the Fourth Additional Provision to the Bankruptcy Law which would allow them to streamline the structure of the Group, restructure its financial liabilities in line with the position and outlook of the Group and the economy in general with the aim of securing short- and medium-term viability, and obtaining new funds to make operating payments and renew lines of credit.

8.      Accordingly, the Companies appointed Houlihan Lokey (Europe) Limited

("**HL**") and Rothschild, S.A. ("**Rothschild**") as financial advisors.

In addition, the main financial credit entities of the Group formed a steering committee (hereinafter the "**Steering Committee**" as defined in the Refinancing Agreement), while various Bondholders having a significant share of the Bonds organized themselves into an Ad hoc Committee (hereinafter the "**Ad hoc Committee**" as defined in the Refinancing Agreement).

The auditor of GIC, the parent company of the Group to which the Companies belong, together with the remaining Companies with the exception of IEI, is PricewaterhouseCoopers ("**PwC**" or the "**Auditor**").

With respect to IEI (a company for which, as shall be explained, no extension of the effects of the Refinancing Agreement is being requested for those creditors of financial liabilities that have not signed the latter), it should be stated that PWC has also prepared the corresponding majority certificate in its capacity as auditor of the parent company GIC, and was also responsible for auditing the consolidated accounts. This decision has been made for obvious financial and efficiency reasons in light of investigation of the accounting information and of the group by PWC, and as has already been the case in other homologations decreed by the Commercial Courts, in which the auditor's certificate of the parent company has been accepted for these effects in similar cases (among others, the Decree of the Commercial Court of Murcia of July 17, 2015, in the case of the Azor Group, that of Commercial Court no. 2 of Bilbao of February 13, 2015, with respect to the Eroski Group, that of Commercial Court no. 2 of Seville of April 6, 2016, for the Abengoa Group, or that of Commercial Court no. 1 of Castellón on October 1, 2015, for the Onibesa Group).

9.      In the context of the refinancing negotiations and with the aim of promoting financial stability and facilitating the negotiation and signing of the refinancing agreement, GIC and other companies of the Group signed (a) an agreement for the assignment of credit rights without recourse with Banco Santander, S.A. and Caixabank, S.A. on February 10, 2016; and (b) a factoring agreement with recourse with Banco Santander, S.A. and Caixabank, S.A. on March 18, 2016 (as amended on April 8, 2016, and June 30, 2016, the latter novation to admit the entry of Bankia, S.A.) for a joint amount of approximately 124,800,000 euros in order to meet urgent liquidity requirements, and to which the aforementioned entities committed themselves in order to support the restructuring of the

financial liabilities of the group. In addition, and with the same purpose, on May 9, 2016, some of the Companies and other companies of the Group signed a syndicated financing agreement with some of the financial entities that form part of the Steering Committee for an approximate amount of 97,200,000 euros.

The aforementioned financing instruments, hereinafter the "**Rescue Financing Instruments**", were all disbursed to address the urgent liquidity needs of the Group and constitute new cash revenues granted in the context of the Refinancing Agreement.

Similarly, in the context of the refinancing negotiations and for the purpose of promoting financial stability and facilitating the negotiation and signing of the refinancing agreement, certain financial entities have signed the following framework agreements for the issue of confirming guarantees and lines of credit: (a) framework agreement for the maintenance of confirming lines of credit and other commitments initially signed on October 19, 2015, by GIC, GICC, ICI, IISA and CCC (as Companies) and a group of financial entities (among which were the entities constituting the Steering Committee) (as subsequently amended on October 23, 2015, and February 10, 2016); (b) an agreement for the issue of additional security guarantees signed on May 9, 2016, by GIC, GICC, ICI, II and CCC (as Companies) and a group of financial entities (among which were the entities constituting the Steering Committee); and (c) a new framework agreement for the issue of lines of credit signed on July 27, 2016, by GIC, GICC, ICI, II and CCC (as Companies) and a group of financial entities (among which were the entities constituting the Steering Committee).

**10.**    With the support of its financial advisors (HL and Rothschild), the Group has developed a viability plan that aims to secure the continued activity of the Group and particularly that of the Companies over the short and medium term (the "**Viability Plan**"). The Viability Plan is incorporated in the Refinancing Agreement which is enclosed as Document no. 3.

The Viability Plan aims to secure the continuity of the activities of the Group over the short and medium term as a consequence, among other things, of the implementation of the following measures:

(i)    contribution of new money (including the Rescue Financing Instruments) which, together with other restructuring measures, allows the Group to meet the liquidity requirements necessary to continue its activities (including the implementation of a

payment regularization plan to providers and injections of capital to reactivate ongoing projects);

(ii)     refinancing of the financial debt of the Group in order to reach a sustainable level of indebtedness, reduce servicing of the debt, and gain the necessary time to sell nonessential assets under appropriate conditions that allow the value to be maximized and consequently for the sales to generate sufficient cash flow (together with what is earned from a continuation of operations under viable conditions) in order to meet the Group's financial obligations after the restructuring; and

(iii)    as part of the refinancing of the financial debt, a streamlining of the structure of the Group, where possible maintaining the financial debt at GIC level, thereby releasing the remaining Companies from these obligations, with the aim of facilitating their operations, access to indispensable lines of credit in order to develop the business of the Group, and the sale of nonessential and nonstrategic assets in order to dispose of resources in addition to those generated by its corporate activity.

The Viability Plan provides that the aforementioned restructuring measures, together with measures for reducing general expenses, will allow the Group to recover adequate income levels, EBITDA and operating cash flow, as well as maximizing the value of those nonessential assets the Group anticipates disposing of and proceeding with the sale of these, thereby permitting the Companies to continue with their activities.

11.     On the basis of the Viability Plan, the Companies and the Group at large, with the support of their financial advisors and the principal creditors of the financial liabilities of the Group, have designed a proposed refinancing agreement that aims to secure the viability of the Group over the short and medium-term.

12.     Over the last few months and with particular intensity over the last few weeks, the Group has been in negotiation with the Steering Committee, the Ad hoc Committee and other creditors of financial liabilities with the aim of reaching a refinancing agreement.

The process of negotiating the Refinancing Agreement has been carried out in a transparent manner, making information on the process and on the terms of the negotiations available (by various means) to all of the creditors of the Group's financial liabilities with the aim of facilitating their participation.

Indeed, **during the last few weeks Isolux Corsán Group has made huge efforts and allocated significant resources to allow all creditors of financial liabilities (both in Spain and abroad) to be informed about the process, to provide them with information and generally promote their participation in the process of negotiating the refinancing agreement**.

In addition, and as will be seen below, the terms of the Refinancing Agreement give the opportunity to all creditors of financial liabilities who accept it to participate in the lines of financing of new money, together with the possibility of renewing or granting new guaranteed lines of credit to the Group with the implications set forth to this effect in the terms of the Refinancing Agreement.

13.     After intense negotiations, **the Companies, other companies of the Isolux Corsán Group, the principal shareholders of GIC and the creditors of financial liabilities listed in the Refinancing Agreement, signed the latter on July 13, 2016**. The Refinancing Agreement was from that date available at the Notary Public of Mr. Fernando Molina Stranz in order to allow all those creditors of financial liabilities who had not initially signed it and who wished to adhere to the latter under the same terms and with the same rights as the other creditors of financial liabilities to do so until the adherence deadline (which was set for July 27, 2016).

Accordingly, this adherence opportunity was published on the Group's website, and the financial advisors of the Group issued a communication to the creditors of financial liabilities informing them of the opportunity to adhere to the Refinancing Agreement within the aforementioned period (or not adhere, but communicate their acceptance of the conversion of part of the debt into GIC stock under the terms and within the periods set forth in the Refinancing Agreement, as explained below), providing them with the instructions and means of doing so, and offering them any assistance they might need for that purpose.

In addition, the Group initiated a formal process of requesting instructions so that those Bondholders who so decided could instruct Citivic, the legal holder of the Bonds, by means of the compensation systems to adhere to the Refinancing Agreement in connection with the Bonds whose financial interests they held. Accordingly, a period until July 25, 2016,[1] was

---

[1] As a consequence of the impact of this type of instruction request process on the markets, it was necessary to close the period for requesting instructions with a minimum amount of notice in order to allow the

granted for the Bondholders to instruct Citivic via the compensation systems with the aim of facilitating their participation and adherence to the Refinancing Agreement under the same terms as the remaining creditors. It should also be emphasized that as part of this process of requesting instructions, the Refinancing Agreement and large amounts of relevant information in connection with the latter have been made available to the Bondholders.

The result of the aforementioned process has been that between July 13, 2016, and July 27, 2016 (the deadline for adherence to the Refinancing Agreement by the creditors), a significant majority of the creditors of financial liabilities of the Group have adhered to the Agreement. As will be seen, **creditors representing over 90% of its affected liabilities have subscribed or adhered to the Refinancing Agreement in connection with each of the Companies**. Those creditors who have subscribed or adhered to the Refinancing Agreement have been listed in the latter.

14.     Pursuant to the provisions set forth in the Refinancing Agreement, GIC has informed the other parties to the Refinancing Agreement that the creditor majorities set forth therein for the purposes of the entry into force of the Agreement together with obtaining the Financing of New Funds (as defined below) have been obtained, which implies the entry into force of the Refinancing Agreement.

Without prejudice to the full force and effect that the Refinancing Agreement now has, the latter also provides for the signing of certain additional documents, agreements or instruments following the terms already set forth in the Refinancing Agreement, with the aim of implementing the agreed refinancing (the "**Refinancing Documents**"), together with the completion of other implementation measures (the "**Implementation Date**"[2]). As set forth in the Refinancing Agreement, the financial restructuring must be completely implemented (including, among other things, the homologation of the present Refinancing Agreement via the Decree provided for in section 6 of the Fourth Additional Provision and the signing of all of the Refinancing Documents) no later than December 31, 2016.

15.     Concurrently, pursuant to the provisions set forth in the Refinancing Agreement, on July 27, 2016, GICBV filed a request for suspension of payments before the competent court in the Netherlands pursuant to the laws applicable in that country, and has

---

signing by Citivic of the document of adherence with the Refinancing Agreement before the Notary Public on July 27.

[2] Referred to as the "Effective Date" in the English version of the Refinancing Agreement.

submitted a proposed agreement under the terms set forth in the Financing Agreement and which shall be described below, thereby implementing the restructuring of its liabilities (essentially, the debt assumed by GICBV with its Bondholders, which for its part has been guaranteed by some of the Companies).

**THREE. THE REFINANCING AGREEMENT WHOSE HOMOLOGATION IS BEING APPLIED FOR**

**1.      Financial liabilities affected by the Refinancing Agreement**

The Refinancing Agreement has the aim of **refinancing the financial liabilities** of the Companies and, in general, those of the Group, with the aim of streamlining its structure and contributing to its viability over the short and medium term.

The debt affected by the Refinancing Agreement, which includes all of the financial liabilities of the Companies and consequently the current financial liabilities and the current contingent financial risk, are described in the certificates enclosed with the Refinancing Agreement and contain the verification and homologation by PwC as to the sufficiency of the liabilities demanded for the homologation of the Refinancing Agreement in connection with each of the Companies applying for the homologation (the "**Auditor's Certificates**") (the "**Affected Debt**"). The documents constituting the original Affected Debt shall hereinafter be referred to as the "**Affected Debt Documents**".

As set forth in section 1, paragraph three of the Fourth Additional Provision to the Bankruptcy Law, for the purposes of the Refinancing Agreement the creditors of the financial liabilities, and consequently those affected by the Refinancing Agreement, are considered to be those holders of any financial indebtedness regardless of whether or not they are subject to financial oversight, not including creditors of labor credits, creditors of commercial operations, and creditors of public law liabilities.

**2.      Terms of the refinancing under the Refinancing Agreement**

*2.1.    Introduction*

As set forth in the SECOND PLEADING of this document, from a financial point of view and also from a cash and treasury management point of view, the Group has acted as an integrated entity via a treasury centralization system with cross guarantees in connection with practically all of its financial debt. These circumstances and the significant financial

indebtedness of the Group mean that none of the Companies can currently service its entire financial debt on its own, all of which affects the operations of the Group. In this context, **the Refinancing Agreement has the aim of refinancing the financial liabilities of the main Spanish entities of the Group, while at the same time streamlining its structure in order to facilitate the continuity of the Group's activities as a whole over the short and medium term**.

Therefore, **in first place**, **the Refinancing Agreement**, which includes the terms of the refinancing enclosed as Appendix 10 and which forms part of the latter (the "**Terms of the Refinancing**"), **provides for the homologation of the indebtedness structure of the Group, keeping the refinanced and sustainable financial liabilities solely at GIC level, thereby releasing the remaining Companies from their obligations in connection with the Affected Debt**.

In this respect, we would emphasize that in accordance with the terms that originally governed the Affected Debt, GIC in practice represents the entirety of the cases having a debt payment obligation (either as principal debtor, joint and several obligor, or joint and several guarantor). Consequently, even before the restructuring GIC was in the position of being obliged to pay this Affected Debt. In those specific cases in which GIC does not have this status as obligor (which are in any case not significant in view of the amount of the corresponding Affected Debt), the Refinancing Agreement provides that the affected creditors of financial liabilities can opt between (i) the assumption by GIC of the corresponding Affected Debt, which would be refinanced under the same terms as GIC's other financial liabilities, releasing the remaining companies of the Group, or (ii) a debt cancellation at the level of the corresponding debtor Company of 95% of the Affected Debt and conversion of the remaining 5% to a participation loan pursuant to the provisions set forth in art. 20 of Royal Decree Law 7/1996 of June 7, on urgent measures of a tax nature and to promote and liberalize economic activity ("**RDL 7/1996**"), with the payment schedule indicated below.

We would also emphasize that, as stated in the Viability Plan, **in the case of the bankruptcy of the Companies, any recovery that the creditors of financial liabilities of the Companies could expect to obtain would be very close to zero**. This is the case bearing in mind the characteristics of the business carried out by the Group and in particular of the EPC business. The Companies have no significant fixed assets sufficient to meet a significant

part of any debt that is enforceable. In the event of bankruptcy, the Companies would not qualify (given their bankruptcy status) to access new projects, would lose contracts and it would be extremely difficult for them to complete ongoing projects given that they would not have access to the funds required by them to complete them, which in practice means that they could not remain in business. Bearing this in mind, it is highly likely that in the event of the Companies declaring bankruptcy this would be a bankruptcy with liquidation in which the chances of recovery would be very limited for the reasons set forth above and bearing in mind that in such a scenario a series of contingent risks would come into effect (specifically contingent obligations under bank guarantees, countersecurities and other obligations), together with the existence of other creditors (such as providers).

In this respect, the conclusions set forth in Appendices A.1 and A.2 of the Viability Plan prepared by the Companies with the support of their financial advisors (Appendix 13 to the Refinancing Agreement) are instructive, given that they state that the potential recovery for a creditor with respect to all of the Companies other than GIC (not taking into consideration the additional impairment that could result from the bankruptcy process and expenses of the latter), would be close to zero (less than 1% in most cases and never in excess of 2%). In the case of Infinita, for which a higher hypothetical resource is anticipated, it should be stated that the Refinancing Agreement makes no provision for a debt cancellation similar to that of the remaining Companies other than GIC, but other restructuring terms in view of its situation, meaning that any recovery by creditors of Infinita would be determined by the effective value of their assets.

Consequently, **the full cancellation of the Affected Debt (at the level of some of the companies) which would then be owed solely by GIC (once it has been refinanced under the terms of the Refinancing Agreement) does not run counter to the potential recovery that could be obtained by the creditors of the Companies in the event of the bankruptcy of the Companies**.

In addition, aside from the foregoing, as stated in the Viability Plan, releasing the Companies (other than GIC) from the Affected Debt would facilitate Group operations, access by the operating Companies to lines of credit critical for the continuity of the business, and the sale of nonessential assets, which for its part would maximize the value of the assets and contribute to generating cash by the Group, thereby allowing the Companies to continue with

13

their activities.

**In second place**, the Refinancing Agreement provides for the refinancing of the Affected Debt with the aim of reaching a sustainable level of indebtedness, reducing service of the debt and gaining the time necessary to generate sufficient cash flow to meet the financial obligations of the Group after the refinancing.

For these effects, as described in greater detail in the following sections, the Refinancing Agreement provides for the conversion of the Affected Debt into new debt instruments **with a priority, maturity and features distinct from the original Affected Debt pursuant to the provisions set forth in section 3. b) 4 of the Fourth Additional Provision to the Bankruptcy Law**. These new debt instruments distinguish between the "sustainable debt" kept at GIC level after refinancing (Tranche B of the New Loan and GIC and New B Bonds) and the "unsustainable debt" that is subject to subordination (conversion to participation loan pursuant to the provisions set forth in art. 20 of RDL 7/1996) and potential partial conversion into GIC capital (Tranche C of the New Loan and GIC and New C Bonds).

Specifically, with respect to the "unsustainable debt", the Refinancing Agreement provides for the necessary conversion of part of this debt into GIC capital. Pursuant to section 3. b) 3 i) of the Fourth Additional Provision to the Bankruptcy Law, those creditors of financial liabilities who do not accept the conversion to GIC capital shall be subject to application of a debt cancellation equivalent to the normal amount of the shares they are would be required to subscribe plus the corresponding issue premium.

In connection with the foregoing, it should be emphasized that **the Refinancing Agreement gives those financial creditors who do not wish to adhere to the latter the option of capital conversion in the event that the Refinancing Agreement is judicially homologized as intended via the present pleading, in order that the equivalent debt cancellation shall not apply to them**. Those nonparticipating or dissenting creditors of financial liabilities have had the opportunity of exercising this option via declaration before a Notary Public within the period provided for adherence to the Refinancing Agreement (in other words, until July 27, 2016) without such a declaration implying their adherence to the Refinancing Agreement, of which they were informed when they were notified of the signing of the Refinancing Agreement, as stated. Similarly, in the case of contingent Affected Debt,

the creditors of affected financial liabilities can communicate their option to convert within 15 working days of the publication of the decree certifying the Refinancing Agreement in the Boletín Oficial del Estado [Official Gazette of the State], in the event of it being confirmed subsequent to the date on which the Auditor's Certificates are issued.

**In third place**, **the Refinancing Agreement provides for the injection of new money, and facilitates access to lines of credit, both of which are indispensable for the continuity of the Group's activities and to ensure its viability in the short and medium term**. Specifically, in addition to the Rescue Financing Instruments mentioned above, the Refinancing Agreement makes provision for new liquidity instruments in amounts of up to 150,000,000 euros (referred to as Tranche P.3 in the Refinancing Agreement) and up to 30,000,000 euros (referred to as Tranche P.4 in the Refinancing Agreement) to be granted to certain creditors of financial liabilities (hereinafter the "**Financing of New Funds**").

In this respect, it should be underscored that (a) on July 27, 2016, IEI (as Borrower), Power Investering (as Guarantor) and a group of financial entities (among which were the entities constituting the Steering Committee) and in which Caixabank, acting as Agent, has signed a commercial loan by installments in euros in the amount of 150 million euros which shall be disbursed once this application for judicial homologation of the Refinancing Agreement has been submitted; that (b) on or around January 29, 2016, IEI (as Borrower), Power Investering, B.V. (as Guarantor) and Compañía Española de Financiación al Desarrollo, COFIDES, S.A. (as Lender) granted a commercial loan agreement by installments in the amount of 7.9 million euros (which had already been disbursed prior to this pleading), to be funded from the aforementioned Tranche P.4; and that (c) for the same purpose, on July 13, 2016, IEI (as Borrower), Power Investering, B.V. (as Guarantor) and Caixabank, S.A. (as Financial Entity) have already signed a commercial loan by installments in the amount of 8 million euros, which is also funded against the aforementioned Tranche P.4.

As described in the Viability Plan, access by the Group to this additional financing is essential for the Companies to continue meeting their operating expenses.

In addition, the terms of the Refinancing Agreement provide for the renewal of the lines of credit of the operating Companies or the concession of new lines of credit by the participating creditors who so elect. In view of the critical importance of the maintenance or concession of new lines of credit to the continuity of the business, the Refinancing Agreement

provides an adequate framework for facilitating that renewal or concession by the financial creditors of the Group by extending the existing credit to the Companies. Specifically, the Refinancing Agreement regulates the terms that would be applicable in the event that the contingent Affected Debt arising from the lines of credit takes effect, drawing a distinction between those cases in which steps were taken to renew the lines of credit (extending the existing credit to the Companies) and those cases in which no steps were taken toward that renewal.

As stated above, it should be emphasized that pursuant to the terms of the Refinancing Agreement, participation in the lines of financing of new money is open to all creditors of financial liabilities. Similarly, financial entities also have the possibility of renewing or granting new lines of credit to the Group, with the implications set forth to this effect in the terms of the Refinancing Agreement.

### 2.2    *Refinancing of financial liabilities at GIC level*

On the basis of the explanation provided in section 2.1, **the refinancing of the financial liabilities of the Group by virtue of the Refinancing Agreement will be carried out at GIC level via the conversion of the Affected Debt into new financial instruments of a kind, priority, maturity and with features distinct from the original Affected Debt (as permitted in section 3. b) 4 of the Fourth Additional Provision to the Bankruptcy Law)** which place GIC as the debtor, thereby centralizing the financial indebtedness of the Group in the parent company, and according each creditor of the Affected Debt their proportional holding in the Companies on the date of the Auditor's Certificate. These new financing instruments contain the terms necessary to proceed to the refinancing of the Affected Debt in a manner consistent with the Viability Plan, endeavoring not to alter conditions such as the law or the currency of the original financial obligation now being converted, without prejudice to the various instruments containing essential terms common to all of them.

Therefore, in addition to a new syndicated debt instrument (the "**New GIC Loan**") provision has been made for the issue of new bond subject to the Law of the State of New York ("**New Bonds**"), submitted to each creditor proportion to the Affected Debt held by the latter on the date of the Auditor's Certificate. These New Bonds shall be such as can be delivered as a consequence of the conversion of the original Affected Debt to the Bondholders

and the creditors of Affected Debt denominated in US dollars ("**USD Creditors**") or whose debt instruments are governed by the Law of New York. Both the New GIC Loan and the New Bonds have substantially the same terms that are consequently applicable to all of the creditors, but retain the characteristics of the original Affected Debt with respect to the currency in which they are denominated or the applicable legislation.

In addition, with respect to those creditors of financial liabilities who for regulatory or legal reasons are unable to receive certain debt instruments (such as participation loans under article 20 of RDL 7/1996) or capital in GIC, the Refinancing Agreement provides certain alternatives that allow the regulatory limitations to be met without altering the terms of the agreement applicable to all of the creditors.

With no claim to exhaustiveness, the New GIC Loan and the New Bonds have been structured as follows:

(i)    **New GIC Loan**, structured in three tranches:

   (a)    Tranche A, to refinance the Rescue Financing Instruments and Financing of New Funds with respect to those creditors who anticipated or facilitated that financing.

   (b)    Tranche B in the amount of the original Affected Debt qualified as "sustainable debt" which shall be repaid via a one-time payment on maturity after 60 months and with a Euribor 6-month interest rate plus 225 basis points to the second anniversary, and Euribor 6 months plus 550 basis points thereafter.

   (c)    Tranche C in the amount of the original Affected Debt considered "unsustainable debt" that will take the form of a participation loan (pursuant to article 20 of RDL 7/1996 and as permitted in section 3. b) 4 of the Fourth Additional Provision to the Bankruptcy Law), with an interest rate of 0.25% if the consolidated EBITDA is in excess of 500,000,000 euros until the third anniversary, which shall be repaid via a one-time payment on maturity after 60 months, which may be extended for an additional period of five years if they have not been repaid by that date.

   As permitted in section 3. b) 3 of the Fourth Additional Provision to the Bankruptcy Law, one part of Tranche C shall be subject to mandatory conversion into GIC stock. Those creditors who do not adhere to the Refinancing Agreement or fail to state their decision to opt for the conversion in the event of the

17

homologation of the Refinancing Agreement during the period provided for that purpose shall suffer an equivalent debt cancellation pursuant to the provisions set forth in section 3. b) 3 of the Fourth Additional Provision to the Bankruptcy Law. All creditors of financial liabilities have had the opportunity to communicate their option during the period of adherence to the Refinancing Agreement, and those with contingent Affected Debt may do so subsequent to the Decree of homologation within the period provided for that purpose.

**(ii)     New Bonds**

New B Bonds and New C Bonds shall be issued (both convertible and nonconvertible in the latter case) with financial terms and features similar to those of Tranche B and C of the GIC New Loan, respectively.

New B Bonds shall be repaid via a one-time payment on maturity after 60 months; and (ii) with a fixed interest rate of 3% until the second anniversary, increasing to 6% thereafter.

New C Bonds shall accrue an interest rate of 0.25% if the consolidated EBITDA is in excess of 500,000,000 euros until the third anniversary, and a fixed interest rate of 1% plus 0.25% if the consolidated EBITDA is in excess of 500,000,000 euros thereafter; and all GIC creditors shall be subordinated (with the exception of those creditors under Tranche C of the GIC New Loan, with respect to which they shall have the same priority) together with such other features as are necessary for those instruments to be regarded as participation loans (pursuant to art. 20 of the RDL 7/1996). In addition, they shall be repaid via a one-time payment on maturity after 60 months, which may be extended for an additional period of five years if it has not been repaid by that date.

In the case of the Bondholders and the USD Creditors, pursuant to the provisions set forth in section 3. b) 3 of the Fourth Additional Provision to the Bankruptcy Law, only those who adhered to the Refinancing Agreement or who expressed their decision to opt for the conversion in the case of homologation of the Refinancing Agreement shall receive the New C Bonds subject to mandatory conversion. The other creditors would suffer an equivalent debt cancellation pursuant to the provisions set forth in section 3. b) 3 of the Fourth Additional Provision to the Bankruptcy Law, and shall consequently not receive the New C Bonds subject to mandatory conversion. For these purposes, as

18

already stated the information and mechanisms necessary for the Bondholders and USD Creditors to express their opinion within the period provided for that purpose have been made available.

GIC's obligations as personal guarantor under the Bonds, together with the obligations of the Companies with respect to the USD Creditors, shall be canceled concurrent with the issue of the New Bonds.

As indicated in section 15 of the Second Pleading, we have simultaneously filed a petition for suspension of payments before the competent Dutch court for GICBV with the aim of restructuring its liabilities, canceling the Bonds issued by it under the terms of the creditors' agreements which it is anticipated shall be approved in that proceeding with the support of those Bondholders who agree to release GICBV in exchange for the issue of the New Bonds issued by GIC pursuant to the Refinancing Agreement.

Finally, and without prejudice to the foregoing, in the event that the Group sells all of its assets, it is agreed that the amount of the Affected Debt that the creditors of financial liabilities may not collect shall be subject to equivalent cancellation in that amount under the Refinancing Agreement, pursuant to the provisions set forth in section 3. b) 2 of the Fourth Additional Provision to the Bankruptcy Law.

*2.3*     *Refinancing of the Affected Debt at the level of the other Companies*

*2.3.1*     *IISA, CCC, GICC, ICI and ICS*

As discussed in section 2.1 of this THIRD PLEADING with respect to the Viability Plan, the Refinancing Agreement provides for the streamlining of the structure of the Group by maintaining the financial debt at GIC level to the extent possible, thereby releasing the remaining Companies from their obligations in connection with the Affected Debt, with the aim of facilitating its operations, accessing those lines of credit that are indispensable for the development of the Group's business, and the sale of nonessential assets.

In this context, and as permitted in section 3. b) 2 of the Fourth Additional Provision to the Bankruptcy Law, the Refinancing Agreement provides for cancellation of 100% of the Affected Debt with respect to IISA, CCC, GICC, ICI and ICS, which shall be secured by GIC or for which GIC shall be jointly and severally responsible. As stated in the Third Pleading,

no anticipated eventual recovery shall significantly exceed the debt cancellation proposed herein, without prejudice to their ability to preserve their funds in the event of GIC being restructured under the terms of the Refinancing Agreement. As a consequence of this debt cancellation, after the restructuring GIC shall be the sole debtor of the Affected Debt which shall be refinanced under the terms set forth in the Refinancing Agreement and described in section 2.2 above.

Those creditors of IISA, CCC, GICC, ICI and ICS Affected Debt who were not secured by GIC or for which GIC is not the joint and several obligor, may choose from the following before a Notary Public in Madrid within the period of 15 working days of issue of the decree upholding the homologation of the Refinancing Agreement:

(i)     assumption by GIC of the Affected Debt (which may be refinanced under the terms set forth in the Refinancing Agreement as described in section 2.2 above) thereby releasing the Company as the original debtor, or

(ii)    cancellation of 95% of the Affected Debt (as permitted in section 3. b) 2 of the Fourth Additional Provision to the Bankruptcy Law), with the remaining 5% converted to participation loans (pursuant to the provisions set forth in art. 20 of the RDL 7/1996 and as permitted in section 3. b) 4 of the Fourth Additional Provision to the Bankruptcy Law), which shall be repaid over a period of ten years, with a grace period of five years and in accordance with the repayment schedule set forth below:

| Year | Percentage in excess of the remaining 5% of the Affected Debt subject to this alternative b), following debt cancellation |
| --- | --- |
| Year 1 | 0% |
| Year 2 | 0% |
| Year 3 | 0% |
| Year 4 | 0% |
| Year 5 | 0% |
| Year 6 | 10% |
| Year 7 | 15% |
| Year 8 | 20% |
| Year 9 | 25% |
| Year 10 | 30% |

The participation loans shall accrue an annual interest rate of 1% in the event that the annual profits of the Company in question exceed 50,000,000 euros, which amount shall be recapitalized in order to make payment on maturity.

Alternative (ii) shall be regarded as that applicable in the event that any creditor fails to make a selection.

As an exception to the terms set forth above, only in the case of IISA, CCC and GICC, the Refinancing Agreement establishes that the new lines of credit granted by a creditor to IISA, CCC or GICC after the Implementation Date, together with any other lines of credit granted, extended or replaced in favor of IISA, CCC or GICC by that creditor on October 1, 2015, or at any subsequent time, shall be regarded as "**New Line of Credit Funds**" granted to IISA or CCC by the aforementioned creditor in the context of the refinancing. Any Affected Debt that may be crystallized as a result of the maturity or enforcement of the New Line of Credit Funds at any time subsequent to the filing date of the present pleading shall be refinanced by IISA, CCC or GICC under the same terms as those established for Tranche B of the GIC New Loan. The same treatment shall be applicable to those creditors who have loaned New Line of Credit Funds in connection with the other guarantees issued prior to October 1, 2015, on a euro-for-euro basis and up to the limits of the New Line of Credit Funds granted to IISA or CCC by those creditors.

### 2.3.2 *Infinita*

Infinita is a project company having two biodiesel production plants in Spain as its principal assets. These projects have always been conceived as being for ultimate sale. However, they have been seriously affected by the regulatory and tariff changes to which the renewable energy sector has been subject during the last few years.

With respect to this Company, the Refinancing Agreement provides for a ten-year waiting period on the Affected Debt, which shall be repaid via a one-time payment on maturity, pursuant to the provisions set forth in section 3. b) 1 of the Fourth Additional Provision to the Bankruptcy Law. The purpose of this is so that the Company shall have a period to maximize the value of its assets and proceed to sell these under the best possible conditions.

In addition, the Refinancing Agreement provides that should Infinita sell its business or all of its assets before the end of the ten-year waiting period, and should the total amount of the sale (net of costs, taxes and expenses) prove insufficient to repay the entirety of the Affected Debt, the resulting deficit shall be subject to debt cancellation under the Refinancing

Agreement pursuant to the provisions set forth in section 3. b) 2 of the Fourth Additional Provision to the Bankruptcy Law.

### 2.3.3    *IEI*

In the case of IEI, the Refinancing Agreement does not provide any extension of the effects of the agreed refinancing to dissenting or nonparticipating creditors. Nonetheless, the homologation is also being applied for in connection with this Company given that, since the terms of the Refinancing Agreement and the Refinancing Documents have granted and shall grant certain guarantees to secure the new money that has been injected or that shall be injected into the Group as part of the Agreement, in consequence of which the homologation is required for the purposes of protecting against rescission proceedings and the application of sections 1 and 13 of the Fourth Additional Provision to the Bankruptcy Law, with provision at all events being made for the majorities set forth in the Fourth Additional Provision to the Bankruptcy Law for that purpose, as accredited via the Auditor's Certificate for IEI.

### 2.4    *Financial indebtedness owed to companies of the Group*

Without prejudice to the foregoing, the Refinancing Agreement also provides for the handling of financial indebtedness owed by the Companies to other companies of the Group. As has been explained, the Companies have hitherto been operating as an integrated unit both with respect to financing and with respect to cash and treasury (via a cash-pooling system). These operations have generated various inter-group financial liabilities that must consequently also be subject to refinancing as part of the Refinancing Agreement.

In this respect, the Refinancing Agreement provides for cancellation of 100% of all of the financial indebtedness owed by the Companies to any other company in the Group. The cancellation applied in connection with the financial debt owed to other companies in the Group takes into account that in the event of a declaration of bankruptcy those financial liabilities shall be regarded as subordinated debt to the debt held by the remaining ordinary creditors, pursuant to article 92.5 BL. As is evident, the possibility of recovering those loans is nonexistent given that, as explained in the Third Pleading, the recovery scenarios with respect to assets do not permit repayment of ordinary debt.

**FOUR. LEGALITY OF THE JUDICIAL HOMOLOGATION OF THE REFINANCING AGREEMENT AND THE EXTENSION OF EFFECTS. JOINDER OF APPLICATIONS**

Section 1 of the Fourth Additional Provision to the Bankruptcy Law establishes the requirements that must be complied with by refinancing agreements in order to be subject to judicial homologation:

"*that refinancing agreement may be judicially homologized which, having been* **signed by those creditors holding at least 51 percent of the financial liabilities**, *meets the conditions set forth in* **item a) and in numbers 2. and 3. of item b) of section 1 article 71 bis** *at the time it is adopted.*"

Following we make reference to each one of the requirements and the duly accredited compliance thereof:

**1.      Compliance of the majority required to apply for homologation of the Refinancing Agreement**

For judicial homologation, the Fourth Additional Provision to the Bankruptcy Law requires that the refinancing agreement be signed by those creditors representing at least 51% of the financial liabilities.

The Auditor's Certificates incorporated in the Refinancing Agreement demonstrate that this percentage has been exceeded.

Consequently, the majority requirement set forth in section 1 of the Fourth Additional Provision has been complied with, as well as the requirement contained in section 1. b) 2 of article 71 bis of the Bankruptcy Law given that the Auditor's Certificates have been issued.

**2.      The content of the Refinancing Agreement is in accordance with legal requirements**

Section 1. a) of article 71 bis of the Bankruptcy Law provides that:

"*No* **refinancing agreements** *reached by the debtor, nor any negotiations, acts and payments, in whatever manner or form they have been carried out, nor any guarantees constituted in enforcement of the latter, shall be rescindable when:* **(a) Provision is made** *by virtue of these* **for a significant extension to the available credit or to the modification or extinction of its obligations**, *either via extension of their term of maturity or the establishment of others contracted in substitution for the former, so long as they* **are in connection with a viability plan that permits the continuity of professional or corporate activities over the short and medium term.**"

In the instant case, based on the explanation provided in the THIRD PLEADING of this document, the Refinancing Agreement implies, among other things:

(i)    **Extension of the credit available to the Companies** given that it is agreed to make new revenue streams available to the Companies in a maximum amount of 372,000,000 euros (i.e. Rescue Financing Instruments and Financing of New Funds), which pursuant to the provisions set forth in the Refinancing Agreement may be increased to an approximate amount of up to 452,000,000 euros.

(ii)   **Amendment to the terms applicable to the Affected Debt via its conversion into new instruments that will allow the financial liability of the Companies to be adjusted to the situation and current prospects of the Group under the terms of the Viability Plan**, including, among others:

    **(a)**  Subordination of a substantial part of the Affected Debt that shall be converted into a participation loan subject to the terms set forth in article 20 of the RDL 7/1996 (Tranche C of the GIC New Loan and New C Bonds) and which shall also be partially subject to conversion to GIC stock capital under the terms set forth in the Refinancing Agreement.

    **(b)**  Amendment of the financial terms applicable to the Affected Debt under more favorable terms for the Companies applying for the homologation. In particular, the terms applicable to Tranche C of the GIC New Loan and New C Bonds involve a substantial reduction in the interest rates applicable to the Affected Debt.

    **(c)**  Deferment of the payment of the Affected Debt following the refinancing (fixed-term repayment over 60 months following the Implementation Date, extendable in the case of Tranche C of the GIC New Loan and of the New C Bonds for an additional period of five years).

In addition, as stated, the Refinancing Agreement has been structured on the basis of the Viability Plan of the Companies and the Group, having been prepared by the latter with the support of its financial advisors, the aim of which, consistent with the provisions set forth in the Bankruptcy Law is to secure the viability and continuity of the corporate activity of the Companies over the short and medium term. The Viability Plan is incorporated in the Refinancing Agreement which is enclosed as Document no. 3.

In view of the foregoing, the Refinancing Agreement meets the requirements set forth in section 1. a) of article 71 bis of the Bankruptcy Law.

**3.** **Formalization of the Refinancing Agreement as a notarized document**

Both the Refinancing Agreement and the documents justifying its content and accrediting compliance with the legal requirements set forth in item a) and in numbers 2 and 3 of item b) of section 1 article 71 bis of the Bankruptcy Law have been formalized as a notarized document. Specifically, and as stated, the Refinancing Agreement was notarized before Notary Public of Madrid Mr. Fernando Molina Stranz on July 13, 2016, under number 1,030 in his register.

The Refinancing Agreement, which incorporates the documents required in Law, duly formalized in a notarized document, is enclosed as Document no. 3.

Consequently, the requirement set forth in section 1. b) 3 of article 71 bis of the Bankruptcy Law has been complied with.

**4.** **Compliance with the specific requirements for the purposes of extending the effects of the Refinancing Agreement to nonparticipating creditors**

When by virtue of the homologation the debtor attempts to extend the effects of the refinancing agreement to those creditors holding financial liabilities who have not signed the refinancing agreement or who have expressed their disagreement, the majority liabilities referred to in section 3 of the Fourth Additional Provision to the Bankruptcy Law must also be met so long as the credits of the aforementioned creditors do not hold a security interest.

In the instant case, the Affected Debt held by the participating or dissenting creditors does not have a security interest, and the majorities provided for in section 3 of the Fourth Additional Provision are therefore applicable, which states as follows:

*"**Those creditors of financial liabilities who have not signed the refinancing agreement or have expressed their disagreement with the latter and whose credits do not enjoy a security interest** or part of whose credits exceed the value of the security interest, **shall be extended the following effects agreed to in the refinancing agreement, under the judicial homologation**:*

*a) If the agreement has been signed by creditors representing at least 60 percent of the financial liabilities, the waiting periods, whether of principal, interest or any other amount owed, shall have a term not in excess of five years, or conversion of the debt in participation loans during the same period.*

*b) **If the agreement has not been signed by creditors representing at least 75 percent of the financial liabilities**, the following measures shall apply:*

*1. Waiting periods with a term of five years or longer, but under no circumstances in excess of ten years.*

*2. Debt cancellations.*

*3. Conversion of the debt into stock or stakes in the debtor company. In that case:*

*i) Those creditors who have not signed the refinancing agreement or have expressed their disagreement with the latter may choose between conversion of the debt into capital or cancellation of the equivalent nominal amount of the shares or stakes they would be responsible for subscribing or assuming and, if applicable, the corresponding issue or assumption premium. Unless explicitly stated to the contrary, the aforementioned creditors shall be understood as having opted for the aforementioned debt cancellation.*

*ii) The debtor capital increase agreement required for capitalization of the credits must be adopted by the majority provided for limited liability and stock companies respectively in articles 198 and 201.1 of the Consolidated Text of the Ley de Sociedades de Capital [Law of Corporations], approved by Royal Legislative Decree 1/2010 of July 2. For the purposes of article 301.1 of the aforementioned Consolidated Text of the Law of Corporations, the financial liabilities shall be understood as being liquid, due and payable.*

*4. Debt conversion into participation loans for a period of five years or longer, but under no circumstances in excess of ten years, in convertible obligations or subordinated loans, and loans capable of capitalization or in any other financial instrument having a priority, expiration or features distinct from the original debt.*

*5. Assignment of assets or rights to creditors and payment of the entirety or part of the debt."*

In the instant case, as set forth in the THIRD PLEADING, the effects which it is intended to impose on dissenting or nonparticipating creditors include the waiting period and debt conversion into instruments of a type and having a priority, maturity and features distinct from the original Affected Debt. In addition, provision is made for conversion of the debt into shares and cancellations at the level of certain Companies. Consequently, these effects are among those provided in item b) of section three of the aforementioned Fourth Additional Provision to the Bankruptcy Law, with the 75% majority of the financial assets of the Companies being applicable.

The Auditor's Certificates enclosed with the Refinancing Agreement demonstrate that the aforementioned percentage has been exceeded. Consequently, the majority requirement set forth in section 3 of the Fourth Additional Provision for the purposes of extending the effects of the Refinancing Agreement to nonparticipating or dissenting creditors has been complied with.

26

Finally, it should be stated that no provision is made in the Refinancing Agreement for any effect whatsoever in connection with those creditors holding a security interest in the amount resulting from the value of their interest. To that end, with respect to those creditors with a mortgage security, the Companies have requested updated valuations for companies with valuations certified and registered with the Bank of Spain pursuant to the provisions set forth in section 2b) of the Fourth Additional Provision to the Bankruptcy Law and, with a few exceptions, the value of the guarantee is in all cases in excess of that of the secured debt. In the event that the value of the guarantee is less than the secured debt, for the purposes of calculating the majorities only the deficit resulting from the valuation and application of the provisions set forth in the Fourth Additional Provision to the Bankruptcy Law has been regarded as unsecured debt.

**FIVE.** EFFECTS OF THE JUDICIAL HOMOLOGATION. EXTENSION OF EFFECTS TO DISSENTING OR NONPARTICIPATING CREDITORS OF FINANCIAL LIABILITIES

As set forth in the Fourth Additional Provision to the Bankruptcy Law, the Judge shall grant the homologation so long as all of the aforementioned requirements are met, and shall declare the extension of its effects when the aforementioned majority takeup has occurred.

**1.        General effect: Nonrescindability of the Refinancing Agreement**

Section 13 of the Fourth Additional Provision provides that judicially homologized refinancing agreements may not be subject to rescission proceedings.

**2.        Additional effects: Extension of effects**

Although the Refinancing Agreement has been signed by a significant majority of the creditors of financial liabilities of the Companies, it has not been possible to obtain the consent of all of these during this period.

Given the existence of nonparticipating or dissenting creditors and bearing in mind the application of certain measures provided in the Refinancing Agreement to the former, it is necessary for the purposes of compliance with the Viability Plan that the Companies apply for homologation of the Refinancing Agreement and the extension of its effects to those creditors by virtue of the present pleading.

The judicial homologation of the Refinancing Agreement and the extension of its effects to nonparticipating or dissenting creditors will allow the development of the Viability

Plan and, consequently, the continuity of the corporate activity of the Companies with the obvious benefits to cash flow implied by this. As we have seen, the Companies comprise a group of international standing with involvement in significant EPC, concession and infrastructure management projects, which is viable to the extent to which its financial liabilities are restructured in order to align with the current situation and prospects of the Group.

### 3.   Paralysis of enforcement actions

Pursuant to section 5, paragraph three of the Fourth Additional Provision, once the Judge has examined the application for homologation, he or she shall issue a decision authorizing it and "*shall order the paralysis of singular enforcement actions until such time as the homologation has been agreed to.*"

It is in the interests of this party that the Court orders the paralysis of enforcement actions under the foregoing terms.

### SIX.   PROCEDURAL CONSIDERATIONS

### 1.   Capacity and legal standing

Pursuant to section five, paragraph two of the Fourth Additional Provision to the Bankruptcy Law, the Companies have legal standing to apply for the homologation of the Refinancing Agreement.

My principals enjoy this capacity by being party to the present proceeding pursuant to article 6.1.3 of Law 1/2000 on Civil Procedure ([Ley de Enjuiciamiento Civil] "**LCP**"), which is applicable to the present proceeding pursuant to the Fifth Final Provision of the Bankruptcy Law.

### 2.   Procedural representation and technical defense

The Companies are represented by the undersigned attorney and defended by the Counsel whose identification details are contained in the caption to the present pleading.

### 3.   Jurisdiction and competency

Section five of the Fourth Additional Provision to the Bankruptcy Law, paragraph one, provides that the competency to exercise jurisdiction over the homologation falls to that Commercial Court which, as applicable, were competent to hear the bankruptcy proceedings.

Article 10.1 BL assigns competency to adjudicate and hear the bankruptcy proceedings to the Judge in Commercial Law in whose territory the debtor has its "*principal place of business*". The same precept continues by stating that "*in the event that the debtor is an artificial person, it is assumed that its principal place of business is located at the corporate domicile*".

With the exception of Infinita, the corporate domicile of all of the Companies is in Madrid, where its principal place of business is located. The corporate domicile of Infinita is located in Vigo.

Without prejudice to the latter, as set forth in the FIRST PLEADING, the Companies form part of a corporate group whose parent company is GIC and whose domicile and principal place of business, like that of all of the other Companies with the exception of Infinita, is in Madrid.

Mindful of the foregoing, **given that the application for homologation has been filed jointly by the Companies including GIC (parent company), the competent Court to hear this joint application would, pursuant to the provisions set forth in article 25.4 BL, at all events be the Commercial Court of Madrid, being the competent court with respect to GIC in its capacity as the parent company of the group**.

## 4.    Types of proceeding in procedural regulations

The present application should initiate the proceeding regulated in sections five *et seq.* of the Fourth Additional Provision to the Bankruptcy Law. The procedural regulations under which the present application is governed are those set forth therein.

In view of the foregoing, I respectfully request the Court to

**HOLD** the present pleading as having been submitted for the behalf of each one of the following Companies: GRUPO ISOLUX CORSÁN, S.A., ISOLUX INGENIERÍA, S.A., CORSÁN CORVIAM CONSTRUCCIÓN, S.A., GRUPO ISOLUX CORSÁN CONCESIONES, S.A., ISOLUX CORSÁN INMOBILIARIA, S.A., ISOLUX CORSÁN SERVICIOS, S.A., ISOLUX ENERGY INVESTMENTS, S.L.U., and INFINITA RENOVABLES, S.A., application for judicial homologation of the Refinancing Agreement with respect to each one of these signed on July 13, 2016, together with the documents enclosed within it, and by virtue of which:

1. **Accept** the application for homologation of the Refinancing Agreement and **agree** to paralyze singular enforcement actions with respect to each one of the Companies until the homologation is agreed to, ex ap. 5 DA4 BL, paragraph three;

2. **Order** the publication in the Public Registry of Bankruptcy of the decision to uphold the application for homologation of the Refinancing Agreement via a notice containing the details required pursuant to ap. 5 DA4, paragraph three;

3. **Agree** to the homologation of the Refinancing Agreement via expedited proceedings within fifteen days, **declaring** that the Refinancing Agreement may not be subject to rescission proceedings ex ap. 1 and 13 DA4 BL.

4. **Agree** to the extension to the creditors of financial liabilities of ISOLUX CORSÁN GROUP, S.A. who have not signed or have opposed the Refinancing Agreement of the effects referred to below, ex ap. 3 DA4 BL b):

   4.1 **With respect to those creditors holding Affected Debt who are not Bondholders or USD Creditors**: conversion of the Affected Debt and that owned by GIC, either (i) directly; (ii) or via guarantees; or (iii) or by the assumption of debt under any of the remaining terms of the Refinancing Agreement in a new syndicated debt instrument pursuant to the principles set forth in Appendices 10 and 14 to the Refinancing Agreement, with GIC occupying the position of debtor under the latter, with the new terms and the new package of guarantees set forth in the Terms of the Refinancing enclosed with the Refinancing Agreement (the "**New GIC Loan**") ex ap. 3. b) 4 DA4 BL, structured in the following Tranches for each creditor under the New GIC Loan, and proportionally to each of the aforementioned Tranches in accordance with the Affected Debt held by each creditor calculated on the date of the Auditor's Certificate:

   (a) Tranche A, to refinance and regulate the Affected Debt resulting from the additional financing provided to GIC in order to meet the urgent liquidity needs of the Companies during the period of negotiation and implementation of the refinancing (i.e. Rescue Financing Instruments and Financing of New Funds), exclusively with respect to those creditors who facilitated or shall facilitate those Rescue Financing Instruments and Financing of New Funds, to a total

amount of 372,000,000 euros, which pursuant to the provisions set forth in the Refinancing Agreement may be increased to 452,000,000 euros.

(b) Tranche B in the amount corresponding to that agreed in the Refinancing Agreement, (i) which shall be repaid via a one-time payment on maturity 60 months after the Implementation Date; and (ii) with a Euribor 6-month interest rate plus 225 basis points to the second anniversary of the Implementation Date, and Euribor 6 months plus 550 basis points thereafter; to be shared proportionately between each one of the creditors of this Tranche B of the GIC New Loan in accordance with their respective share in the Affected Debt on the date of the Auditor's Certificates, and increased as applicable by the percentage corresponding to the Prompt Adherence Commission pursuant to the terms set forth in the Refinancing Agreement.

Proportionately increased as applicable for each creditor based on the proportion received by the remaining creditors (with the adjustment applicable in respect of the Prompt Adherence Commission) on the date of the Auditor's Certificate pursuant to the terms of the Refinancing Agreement, in such additional amount as is necessary to refinance any Affected Debt (i) arising from any Deficit Amount or Contingent Claim, Non-Extended BF or Extended Refinance Guarantee Claim (as these terms are defined in Appendix 10 to the Refinancing Agreement) that may be crystallized and owed in accordance with the Affected Debt Documents after the date on which the Refinancing Agreement comes into force (the "**Crystallized Debt**"); or (ii) that assumed by GIC with respect to the new/old lines of credit of IISA, CCC or the affiliates of the EPC business, up to the limits set forth for that purpose in the Refinancing Agreement (to the extent to which those companies are not capable of refinancing that Affected Debt).

(c) Tranche C in the amount corresponding to that agreed in the Refinancing Agreement, (i) in the form of a participation loan (pursuant to the provisions set forth in art. 20 of the RDL 7/1996), with an interest rate of 0.25% if the consolidated EBITDA is in excess of 500,000,000 euros until the third anniversary of the Implementation Date, and a fixed interest rate of 1% plus

0.25% if the consolidated EBITDA is in excess of 500,000,000 euros thereafter; and (ii) which shall be repaid by a one-time payment on maturity 60 months after the Implementation Date, which may be extended for an additional period of five years if it has not been repaid by that date (the "**C Period and Participation Interest Terms**"), proportionately for each creditor under the New GIC Loan in accordance with their respective share in the Affected Debt on the date of the Auditor's Certificates.

The Instituto de Crédito Oficial [Official Credit Institute] and the other creditors who cannot receive this participation loan or the GIC stock due to legal or regulatory restrictions, shall receive a subordinated loan under the same financial conditions and priority as the aforementioned participation loan (including interest, repayment and priority), under the conditions set forth in the Terms of the Refinancing.

This Tranche C shall also be increased in the additional amount necessary to refinance the Crystallized Debt that was not included in Tranche B, proportionately as applicable to each creditor in respect of the proportion received by the remaining creditors (with the adjustment applicable in respect of the Prompt Adherence Commission) on the date of the Auditor's Certificate pursuant to the terms of the Refinancing Agreement.

Part of Tranche C, in the amount agreed in the Refinancing Agreement, shall be subject to mandatory conversion into GIC stock, pursuant to the terms set forth in the Refinancing Agreement and the Terms of the Refinancing, meaning that the creditors (together with the Bondholders and the USD Creditors under the New C Bonds subject to mandatory conversion) who explicitly accept that conversion shall reach the GIC capital percentage agreed to in the Terms of the Refinancing.

Those creditors who do not enforce the Refinancing Agreement, and did not notify the Notary Public authorizing the Refinancing Agreement of their desire to convert before the end of the period granted for adherence to the latter pursuant to the Refinancing Agreement, shall be entitled to a debt cancellation on the Affected Debt equivalent to the specific commitment assigned to those

creditors in the convertible part of Tranche C, ex ap. 3. b) 3 DA4 BL ("**Debt Cancellation for Non-Conversion**").

Those creditors holding contingent Affected Debt must notify the Notary Public authorizing the Refinancing Agreement if they accept this conversion to GIC stock, in the manner indicated in the Refinancing Agreement, within the period of 15 working days of publication of the decree upholding the homologation of the Refinancing Agreement in the Official Gazette of the State. If the latter failed to express their desire to proceed with the aforementioned conversion pursuant to the Refinancing Agreement, they shall be applicable for the Debt Cancellation for Non-Conversion.

4.2   **With respect to those creditors holding Affected Debt who are Bondholders or USD Creditors:** conversion of their Affected Debt in various bond instruments subject to the Laws of New York issued by GIC under ap. 3. b) 4 DA4 BL, in the amount corresponding to that agreed in the Refinancing Agreement in euros (or the equivalent in US dollars, at the exchange rate indicated in the Refinancing Agreement, in order to cover the subscriptions of the USD Creditors), respectively, with the new features, regime and guarantee package set forth in the Terms of the Refinancing enclosed in the Refinancing Agreement (the "**New Bonds**"). As a result of the presentation of the New Bonds, GIC's obligations with respect to the Bondholders in respect of personal security for the Bonds, as well as with respect to the USD Creditors (as distinct from the Bondholders who held debt denominated in dollars), shall be canceled.

The New Bonds shall be structured as follows, each proportionately in accordance with the Affected Debt of each creditor calculated on the date of the Auditor's Certificate:

(a)   Two New B Bonds:

(a)1.   one in US dollars for the USD Creditors, in the amount necessary to cover the requests for subscription by the USD Creditors;

(a)2.   another in euros for the Bondholders, in the amount corresponding to that agreed in the Refinancing Agreement;

both (i) shall be repaid by a one-time payment on maturity 60 months after the Implementation Date; and (ii) with a fixed interest rate of 3% until the second anniversary of the Implementation Date, which shall thereafter increase to 6%.

(b) Two New C Bonds, non-convertible into GIC stock:

(b)1.    one in US dollars for the USD Creditors, in the amount necessary to cover the requests for subscription by the USD Creditors;

(b)2.    another in euros for the Bondholders, in the amount corresponding to that agreed in the Refinancing Agreement.

(c) Two New C Bonds, subject to mandatory conversion to GIC stock pursuant to the Refinancing Agreement and the Terms of the Refinancing, which shall be presented exclusively with respect to those USD Creditors and Bondholders who have signed the Refinancing Agreement without any restriction whatsoever with respect to the conversion to stock, or who did not sign it but notified GIC via the Notary Public of their intention to receive those instruments before the end of the period granted for adherence to the Refinancing Agreement and in the manner stated therein:

(c)1.    one in US dollars in the amount necessary to cover the requests for subscription by the USD Creditors;

(c)2.    another in euros for the Bondholders, in the amount corresponding to that agreed in the Refinancing Agreement;

The Bondholders and the USD Creditors under those New C Bonds, which are subject to mandatory conversion into GIC stock, together with those creditors under the New GIC Loan who explicitly accepted that conversion, shall assume the percentage of GIC capital agreed in the Terms of the Refinancing.

All of the New C Bonds shall be issued in the C Period and Participation Interest Terms.

The New Bonds in euros shall be represented via one or more global registered instruments registered in the name of the entity that acts as legal owner of the latter (the "**Legal Owner of the Bonds**"), all without prejudice to the acknowledgment of

a financial interest held by the Bondholders in the New Bonds in euros, as applicable in accordance with the foregoing.

The New Bonds in US dollars shall also be represented via one or more global registered instruments and shall also be registered in the name of the Legal Owner of the Bonds, all without prejudice to the acknowledgment of a financial interest held by the Bondholders in the New Bonds in US dollars, as applicable in accordance with the foregoing.

4.3  Should the Group sell all of its assets after the Implementation Date, and the total aggregate sale price (net of costs, taxes and expenses) be insufficient to repay the entirety of the Affected Debt under the New GIC Loan and the New Bonds, the amount of the Affected Debt that the creditors holding financial liabilities are unable to collect shall be subject to debt cancellation equivalent to that amount under the Refinancing Agreement DA 43. b) 2 BL.

4.4  A 100% cancellation with respect to all of the financial indebtedness owed by GIC to any other company in the Group.

4.5  Regardless of whether the creditors are signatories or not of the Refinancing Agreement, they shall retain all of their rights and recourse against any companies of the Group that are signatories to the Refinancing Agreement other than the Companies (that is, Isolux de México, S.A. de C.V., Isolux Projetos e Instalaçoes, Ltda, Isolux Projetos Investimentos e Participaçoes, Ltda, Isolux Corsan LLC and Isolux Corsan India Engineering and Construction Pvt. Ltd.) under any guarantee or under any joint and several liability instrument, granted or assumed by the aforementioned companies in accordance with the Affected Debt Documents.

5. **Agree the extension to the creditors of financial liabilities of ISOLUX INGENIERÍA, S.A. who have not signed or have opposed the Refinancing Agreement of the effects referred to below,** ex ap. 3 DA4 BL b).

A 100% cancellation of the Affected Debt held by the creditors vis-à-vis IISA (i) guaranteed by GIC (including, for the purposes of clarity, the Affected Debt under the joint and several guarantee of the Bonds granted by IISA); or (ii) that for which GIC is jointly and severally responsible together with IISA.

With respect to those creditors who are holders of the Affected Debt and who are not encompassed in the preceding paragraph, these may select one of two alternatives before the Notary Public, which they must select within the period of 15 working days of issue of the decree upholding the homologation of the Refinancing Agreement:

(a)    assumption by GIC of the Affected Debt held by those creditors, who shall (i) receive the same treatment as the remaining creditors of GIC; and (ii) who shall consequently waive and forgive their Affected Debt vis-à-vis IISA (*releasing assumption*); or

(b)    cancellation of 95% of the Affected Debt held by those creditors vis-à-vis IISA, ex ap. 3. b) 2 DA4 BL. The remaining 5% shall be converted to participation loans (art. 20 of the RDL 7/1996), ex ap. 3. b) DA4 BL, which shall be repaid by IISA over a period of ten years, with a grace period of five years and in accordance with the repayment schedule set forth below, beginning on the date of the decree upholding the homologation of the Refinancing Agreement:

| Year | Percentage in excess of the remaining 5% of the Affected Debt subject to this alternative b), following debt cancellation |
|---|---|
| Year 1 | 0% |
| Year 2 | 0% |
| Year 3 | 0% |
| Year 4 | 0% |
| Year 5 | 0% |
| Year 6 | 10% |
| Year 7 | 15% |
| Year 8 | 20% |
| Year 9 | 25% |
| Year 10 | 30% |

The participation loans shall accrue an annual interest rate of 1% in the event that the annual profits of IISA exceed 50,000,000 euros, which amount shall be recapitalized until maturity.

Alternative (b) shall be regarded as that applicable in the event that any creditor fails to make a selection.

The provisions set forth herein apply to any contingent Affected Debt that, in accordance with the corresponding Affected Debt Documents, may be crystallized and owed at any time after the filing date of the present pleading.

As an exception, any new line of credit granted by a creditor to IISA after the Implementation Date, together with any other lines of credit granted, extended or substituted in favor of IISA by that creditor on October 1, 2015, or at any subsequent time, shall be regarded as "New Line of Credit Funds" granted to IISA by the aforementioned creditor in the context of the refinancing. Any Affected Debt that could arise as the result of the maturity or enforcement of these lines of credit at any time subsequent to the filing date of the present pleading shall be refinanced by IISA under the same terms as those established for Tranche B of the GIC New Loan. The same treatment shall be applicable to those creditors in connection with other guarantees issued prior to October 1, 2015, on a euro-for-euro basis and up to the limits of the New Line of Credit Funds granted to IISA by those creditors.

Finally, a 100% cancellation with respect to all of the financial indebtedness owed by IISA to any other company in the Group.

6. **Agree** the extension of the effects referred to below to the creditors of financial liabilities of CORSÁN CORVIAM CONSTRUCCIÓN, S.A. who have not signed or have opposed the Refinancing Agreement, ex ap. 3 DA4 BL b).

A 100% cancellation of the Affected Debt held by the creditors vis-à-vis CCC (i) guaranteed by GIC (including, for the purposes of clarity, the Affected Debt under the joint and several guarantee of the Bonds granted by CCC); or (ii) that for which GIC is jointly and severally responsible together with CCC.

With respect to those creditors who are holders of the Affected Debt and who are not encompassed in the preceding paragraph, these may select one of two alternatives which they must select in Madrid within the period of 15 working days of issue of the decree upholding the homologation of the Refinancing Agreement:

(a) assumption by GIC of the Affected Debt held by those creditors, who shall (i) receive the same treatment as the remaining creditors of GIC; and (ii) who shall consequently waive and forgive their Affected Debt vis-à-vis CCC (*releasing assumption*); or

(b) cancellation of 95% of the Affected Debt held by those creditors vis-à-vis CCC, ex ap. 3. b) 2 DA4 BL. The remaining 5% shall be converted to participation loans (art. 20 of the RDL 7/1996), ex ap. 3. b) DA4 BL, which shall be repaid by

CCC over a period of ten years, with a grace period of five years and in accordance with the repayment schedule set forth below, beginning on the date of the decree upholding the homologation of the Refinancing Agreement:

| Year | Percentage in excess of the remaining 5% of the Affected Debt subject to this alternative b), following debt cancellation |
|------|------|
| Year 1 | 0% |
| Year 2 | 0% |
| Year 3 | 0% |
| Year 4 | 0% |
| Year 5 | 0% |
| Year 6 | 10% |
| Year 7 | 15% |
| Year 8 | 20% |
| Year 9 | 25% |
| Year 10 | 30% |

The participation loans shall accrue an annual interest rate of 1% in the event that the annual profits of CCC exceed 50,000,000 euros, which amount shall be recapitalized until maturity.

Alternative (b) shall be regarded as that applicable in the event that any creditor fails to make a selection.

The provisions set forth herein apply to any contingent Affected Debt that, in accordance with the corresponding Affected Debt Documents, may be crystallized and owed at any time after the filing date of the present pleading.

As an exception, any new line of credit granted by a creditor to CCC after the Implementation Date, together with any other lines of credit granted, extended or substituted in favor of CCC by that creditor on October 1, 2015, or at any subsequent time, shall be regarded as "New Line of Credit Funds" granted to CCC by the aforementioned creditor in the context of the refinancing. Any Affected Debt that could arise as the result of the maturity or enforcement of these lines of credit at any time subsequent to the filing date of the present pleading shall be refinanced by CCC under the same terms as those established for Tranche B of the GIC New Loan. The same treatment shall be applicable to those creditors in connection with other guarantees issued prior to October 1, 2015, on a euro-for-euro basis and up to the limits of the New Line of Credit Funds granted to CCC by those creditors.

Finally, a 100% cancellation with respect to all of the financial indebtedness owed by CCC to any other company in the Group.

**7.**   **Agree** the extension of the effects referred to below to the creditors of financial liabilities of GRUPO ISOLUX CORSÁN CONCESIONES, S.A. who have not signed or have opposed the Refinancing Agreement, ex ap. 3 DA4 BL b).

A 100% cancellation of the Affected Debt held by the creditors vis-à-vis GICC (i) guaranteed by GIC (including, for the purposes of clarity, the Affected Debt under the joint and several guarantee of the Bonds granted by GICC); or (ii) that for which GIC is jointly and severally responsible together with GICC.

With respect to those creditors who are holders of the Affected Debt and who are not encompassed in the preceding paragraph, these may select one of two alternatives which they must select in Madrid within the period of 15 working days of issue of the decree upholding the homologation of the Refinancing Agreement:

(a)   assumption by GIC of the Affected Debt held by those creditors, who shall (i) receive the same treatment as the remaining creditors of GIC; and (ii) who shall consequently waive and forgive their Affected Debt vis-à-vis GICC (*releasing assumption*); or

(b)   cancellation of 95% of the Affected Debt held by those creditors vis-à-vis GICC, ex ap. 3. b) 2 DA4 BL. The remaining 5% shall be converted to participation loans (art. 20 of the RDL 7/1996), ex ap. 3. b) DA4 BL, which shall be repaid by GICC over a period of ten years, with a grace period of five years and in accordance with the repayment schedule set forth below, beginning on the date of the decree upholding the homologation of the Refinancing Agreement:

| Year | Percentage in excess of the remaining 5% of the Affected Debt subject to this alternative b), following debt cancellation |
|---|---|
| Year 1 | 0% |
| Year 2 | 0% |
| Year 3 | 0% |
| Year 4 | 0% |
| Year 5 | 0% |
| Year 6 | 10% |
| Year 7 | 15% |
| Year 8 | 20% |
| Year 9 | 25% |
| Year 10 | 30% |

The participation loans shall accrue an annual interest rate of 1% in the event that the annual profits of GICC exceed 50,000,000 euros, which amount shall be recapitalized until maturity.

Alternative (b) shall be regarded as that applicable in the event that any creditor fails to make a selection.

The provisions set forth herein apply to any contingent Affected Debt that, in accordance with the corresponding Affected Debt Documents, may be crystallized and owed at any time after the filing date of the present pleading.

Finally, a 100% cancellation with respect to all of the financial indebtedness owed by GICC to any other company in the Group.

8.  **Agree** the extension of the effects referred to below to the creditors of financial liabilities of ISOLUX CORSÁN INMOBILIARIA, S.A. who have not signed or have opposed the Refinancing Agreement, ex ap. 3 DA4 BL b).

A 100% cancellation of the Affected Debt held by the creditors vis-à-vis ICI (i) guaranteed by GIC; or (ii) that for which GIC is jointly and severally responsible together with ICI.

With respect to those creditors who are holders of the Affected Debt and who are not encompassed in the preceding paragraph, these may select one of two alternatives which they must select in Madrid within the period of 15 working days of issue of the decree upholding the homologation of the Refinancing Agreement:

(a)  assumption by GIC of the Affected Debt held by those creditors, who shall (i) receive the same treatment as the remaining creditors of GIC; and (ii) who shall consequently waive and forgive their Affected Debt vis-à-vis ICI (*releasing assumption*); or

(b)  cancellation of 95% of the Affected Debt held by those creditors vis-à-vis ICI, ex ap. 3. b) 2 DA4 BL. The remaining 5% shall be converted to participation loans (art. 20 of the RDL 7/1996), ex ap. 3. b) DA4 BL, which shall be repaid by ICI over a period of ten years, with a grace period of five years and in accordance with the repayment schedule set forth below, beginning on the date of the decree upholding the homologation of the Refinancing Agreement:

40

| Year | Percentage in excess of the remaining 5% of the Affected Debt subject to this alternative b), following debt cancellation |
|---|---|
| Year 1 | 0% |
| Year 2 | 0% |
| Year 3 | 0% |
| Year 4 | 0% |
| Year 5 | 0% |
| Year 6 | 10% |
| Year 7 | 15% |
| Year 8 | 20% |
| Year 9 | 25% |
| Year 10 | 30% |

The participation loans shall accrue an annual interest rate of 1% in the event that the annual profits of ICI exceed 50,000,000 euros, which amount shall be recapitalized until maturity.

Alternative (b) shall be regarded as that applicable in the event that any creditor fails to make a selection.

The provisions set forth herein apply to any contingent Affected Debt that, in accordance with the corresponding Affected Debt Documents, may be crystallized and owed at any time after the filing date of the present pleading.

Finally, a 100% cancellation with respect to all of the financial indebtedness owed by ICI to any other company in the Group.

**9.** **Agree** the extension of the effects referred to below to the creditors of financial liabilities of ISOLUX CORSÁN SERVICIOS, S.A. who have not signed or have opposed the Refinancing Agreement, ex ap. 3 DA4 BL b).

A 100% cancellation of the Affected Debt held by the creditors vis-à-vis ICS (i) guaranteed by GIC; or (ii) that for which GIC is jointly and severally responsible together with ICS.

With respect to those creditors who are holders of the Affected Debt and who are not encompassed in the preceding paragraph, these may select one of two alternatives which they must select in Madrid within the period of 15 working days of issue of the decree upholding the homologation of the Refinancing Agreement:

(a)     assumption by GIC of the Affected Debt held by those creditors, who shall (i) receive the same treatment as the remaining creditors of GIC; and (ii) who shall

consequently waive and forgive their Affected Debt vis-à-vis ICS (*releasing assumption*); or

(b)    cancellation of 95% of the Affected Debt held by those creditors vis-à-vis ICS, ex ap. 3. b) 2 DA4 BL. The remaining 5% shall be converted to participation loans (art. 20 of the RDL 7/1996), ex ap. 3. b) DA4 BL, which shall be repaid by ICS over a period of ten years, with a grace period of five years and in accordance with the repayment schedule set forth below, beginning on the date of the decree upholding the homologation of the Refinancing Agreement:

| Year | Percentage in excess of the remaining 5% of the Affected Debt subject to this alternative b), following debt cancellation |
|---|---|
| Year 1 | 0% |
| Year 2 | 0% |
| Year 3 | 0% |
| Year 4 | 0% |
| Year 5 | 0% |
| Year 6 | 10% |
| Year 7 | 15% |
| Year 8 | 20% |
| Year 9 | 25% |
| Year 10 | 30% |

The participation loans shall accrue an annual interest rate of 1% in the event that the annual profits of ICS exceed 50,000,000 euros, which amount shall be recapitalized until maturity.

Alternative (b) shall be regarded as that applicable in the event that any creditor fails to make a selection.

The provisions set forth herein apply to any contingent Affected Debt that, in accordance with the corresponding Affected Debt Documents, may be crystallized and owed at any time after the filing date of the present pleading.

Finally, a 100% cancellation with respect to all of the financial indebtedness owed by ICS to any other company in the Group.

**10.    Agree** the extension of the effects referred to below to the creditors of financial liabilities of INFINITA RENOVABLES, S.A. who have not signed or have opposed the Refinancing Agreement, ex ap. 3 DA4 BL b).

42

A waiting period of ten years shall be applied to the Affected Debt, which shall be repaid via a one-time payment on maturity ex ap. 3. b) 1 DA4 BL.

Should Infinita sell its business or all of its assets prior to the end of the waiting period referred to in the preceding point, and the total sale price (net of costs, taxes and expenses) is insufficient to repay the entirety of the Affected Debt, the resulting deficit shall be subject to debt cancellation in that amount under the Refinancing Agreement ex ap. 3. b) 2 DA4 BL.

Finally, a 100% cancellation with respect to all of the financial indebtedness owed by Infinita to any other company in the Group.

11. **Agree**, via expedited proceedings within fifteen days, **to the homologation of the Refinancing Agreement** signed by ISOLUX ENERGY INVESTMENTS, S.L.U. and a majority of its creditors holding financial liabilities, for the purposes set forth in DA4 BL, **declaring that the Refinancing Agreement may not be subject to rescission proceedings** ex ap. 1 and 13 DA4 BL.

12. **Agree** to order Citivic Nominees Limited, in its capacity as legal owner of the Bonds, to take note of the cancellation of the personal guarantees or any other obligation assumed by Isolux Corsán Group, S.A., Isolux Ingeniería, S.A., Corsán Corviam, Construcción, S.A. and Isolux Corsán Group Concesiones, S.A. under the Bonds as a result of the extension of the effects of the Refinancing Agreement agreed to under the terms requested in sections 4 to 7 above, both inclusive.

13. **Decree** the cancellation of all of the attachments that may in future be filed in the debt enforcement proceedings of the Companies affected by the Refinancing Agreement; and

14. **Publish** the decision upholding the homologation of the Refinancing Agreement via a notice inserted in the Public Registry of Bankruptcy and in the Official Gazette of the State via an extract containing the contents of section six of the Fourth Additional Provision to the Bankruptcy Law, paragraph two.

Let Justice be done, in Madrid, July 28, 2016.

\*       \*       \*

**FIRST ADDITIONAL STATEMENT**, this legal representation has attempted to comply minutely and faithfully with such requirements set forth in the BL and in the LCP as may be applicable, both in substance and in form, this party hereby declaring and explicitly expressing its will to address any defect it may have incurred, including the submission of any additional document that this Court may deem necessary for that purpose, pursuant to the provisions set forth in article 243.3 and 4 of the LOPJ, article 231 LCP and other applicable precepts.

By virtue of which I hereby **REQUEST** the Court to

Hold the aforementioned declaration as having been made for the purposes of the provisions set forth in articles 243.3 and 4 of the LOPJ, 231 LCP and such others as may be applicable, and that a period to address these, if any, be granted.

**SECOND ADDITIONAL STATEMENT** without prejudice to the fact that, pursuant to the provisions set forth in article 5 of Royal Decree 1065/2015 of November 27, this pleading to request voluntary bankruptcy has been submitted by electronic means, it is placed on record that my principal shall (a) also deposit the document enclosed herein in electronic form via CD, which shall be deposited before this Court on the same filing date as this pleading; and (b) a printed copy of the latter together with all its enclosures shall be provided to the Office of the President of the Court; all this in the event of it being of use to the Court appointed to hear this pleading, and in the event that not all of the documentation can be submitted via the LexNet platform owing to its size, as stipulated in the aforementioned regulations.

By virtue of which I hereby **REQUEST** the Court to

Hold the aforementioned declaration as having been made to all applicable effects.

I respectfully reiterate that Justice be done at the place and date indicated *ut supra*.

**THIRD ADDITIONAL STATEMENT** my principal undertakes to provide the original documents enclosed with this pleading within three (3) working days of this pleading having been assigned to the corresponding Commercial Court of Madrid.

By virtue of which I hereby **REQUEST** the Court to

Hold the aforementioned declaration as having been made to all applicable effects.

I respectfully reiterate that Justice be done at the place and date indicated *ut supra*.


_____                _____
Counsel: Angel Alonso Hernández                Attorney: Ramón Rodríguez Nogueira
Bar Association of Madrid no. 61,047
URÍA MENÉNDEZ ABOGADOS, S.L.P.


_____
Counsel: Javier Rubio Sanz
Bar Association of Madrid no. 81,665
URÍA MENÉNDEZ ABOGADOS, S.L.P.



www.newtypecommunications.com

445 Fifth Avenue
New York, New York 10016
Phone  212-686-5555
Fax  212-686-5414

## DECLARATION CERTIFYING ACCURACY OF TRANSLATION

Newtype Communications, Inc., pursuant to 28 U.S.C. § 1746, does hereby declare under penalty of perjury under the laws of the United States of America, as follows:

1. That our translator is thoroughly familiar with both the Spanish and English languages, with a Bachelor's degree and more than twenty years of translation experience.

2. That from July 27, 2016, through July 28, 2016, our translator translated into English from Spanish the Application for Homologation, dated July 27, 2016.

3. That on July 28, 2016, our translator translated into English from Spanish the stamp on the top of the page, which is otherwise identical to the first page of the Application for Homologation.

4. That the attached documents that our translator translated and reviewed are, to the best of our knowledge and belief, true and accurate English versions of what was drafted in Spanish.

5. That Newtype Communications, Inc. of 445 5th Avenue, New York, NY 10016 declares under penalty of perjury under the laws of the United States of America that, based upon our knowledge, information, and belief as set forth herein, the foregoing is true and correct.

Dated:  July 28, 2016

Respectfully submitted,

M. J. Lew, President
Newtype Communications, Inc.

CZ1533490

05/2016

**ESCRITURA DE ELEVACIÓN A PÚBLICO DE ACUERDOS SOCIALES DE LA COMPAÑÍA "GRUPO ISOLUX CORSÁN, S.A."** NÚMERO: MIL TRECE.-----------------------------------

En Madrid, mi residencia, a **trece de julio de dos mil dieciséis.** -----------------------------------

Ante mí, **FERNANDO MOLINA STRANZ**, Notario del Ilustre Colegio Notarial de Madrid, con residencia en la Capital, ----------------------- -----------

--------------------COMPARECE ----------------------

**DON JUAN FRANCISCO FALCÓN RAVELO**, mayor de edad, casado, de nacionalidad española, Abogado, con domicilio a estos efectos en Madrid, calle Caballero Andante número 8, Edificio Isolux Corsán, con DNI número 42.806.815-C. ----------------------

-----------------------INTERVIENE ------------------

En nombre y representación de "GRUPO ISOLUX CORSÁN, S.A.", sociedad de nacionalidad española, con domicilio social en Madrid, calle Caballero Andante número 8, Edificio Isolux Corsán, con C.I.F. A-84173947.--------------

1

Constituida como Sociedad de Responsabilidad Limitada, con la denominación de "GLOBAL KURGAN S.L.", mediante escritura otorgada ante el Notario de Madrid Don Emilio Recoder de Casso, el día trece de diciembre de dos mil cuatro, bajo el número 1.554 de orden de protocolo.-- --------------------

Cambiada su denominación por la de "ICC GRUPO ISOLUX CORSÁN, S.L." en virtud de escritura otorgada ante el Notario de Madrid D. Carlos del Moral Carro, el día quince de abril de dos mil cinco bajo el número 2.194 de su protocolo. -------

Transformada en Sociedad Anónima mediante escritura otorgada ante el Notario de Madrid Don Carlos del Moral Carro, el día ocho de Junio de dos mil cinco, bajo el número 3.446 de su orden de protocolo. ----

Está inscrita en el Registro Mercantil de Madrid, al tomo 20.745, al libro 0, folio 114, sección 8, hoja M-367466, inscripción 1ª. --------------------

Cambiada su denominación social por la actual mediante escritura autorizada por mí, el día seis de octubre de dos mil cinco, bajo el número 1.843 de orden de protocolo. ---------------------------

Cambiando su domicilio al actual mediante escritura autorizada por el Notario de Madrid, don Carlos del

CZ1533491

05/2016

Moral Carro, el día 12 de mayo de 2006, bajo el
número 2842 de su protocolo. ----------------------
Sus facultades para el presente otorgamiento
resultan de su cargo de Secretario no consejero
para el que fue designado por tiempo indefinido en
escritura otorgada ante el Notario de Madrid don
Carlos del Moral Carro, el día quince de abril de
dos mil cinco bajo el número 2194 de su protocolo
que causó la inscripción 2ª en la hoja abierta a la
sociedad en el Registro Mercantil. ----------------
Copia autorizada de la citada escritura me ha sido
exhibida y a mi juicio son suficientes las
facultades con ella acreditadas para el presente
otorgamiento. -------------------------------------



Hacen constar dichos representantes, a mi
requerimiento, que la entidad por ellos
representada tiene por objeto o actividad, entre
otros: "los estudios de ingeniería, montajes
industriales y fabricación de los elementos
necesarios para los mismos, instalaciones

3

integrales y edificación. La fabricación, comercialización y representación de toda clase de material, instalaciones y productos eléctricos, electrónicos, electromecánicos, informáticos, industriales, maquinaria y aparellaje". ---------- -
Yo, el Notario, hago constar expresamente que he cumplido con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, cuyo resultado consta en acta autorizada por el Notario de Madrid Don Carlos del Moral Carro el día 18 de septiembre de dos mil trece con el número 2625 de su protocolo, cuya copia autorizada me exhiben los comparecientes manifestando no haberse modificado el contenido de la misma. --------------
Identifico al señor compareciente por sus Documento Nacional de Identidad reseñado en la comparecencia. Según intervienen, le juzgo con la capacidad legal y la legitimación necesarias para el otorgamiento de la presente escritura de elevación a público de acuerdos sociales y, al efecto, tal y como interviene, ------------------ -------------------
---------------------**EXPONE** ---------------------

Que en la reunión del Consejo de Administración de la sociedad de la Sociedad celebrada el día 12

CZ1533492

05/2016





de julio de 2016, según consta en la certificación incorporada a la presente, con la firma del compareciente como Secretario no consejero con el Visto Bueno del Presidente Don Luis Delso Heras que legitimo la del primero por comparecer y manifestar que la firma le pertenece y la del segundo por cotejo con otras indubitadas adoptaron por unanimidad, entre otras, los acuerdos que resultan de la certificación que me entrega extendida a doble columna en español e inglés, idioma que conozco y entiendo en lo pertinente. -------------

En virtud de lo expuesto, el compareciente, tal y como interviene, --------------------- ---------
----------------------**OTORGA** --------------------

**PRIMERO.-**Eleva a público y deja formalizadas los acuerdos adoptados por el consejo de Administración de la Sociedad el día 12 de julio de 2016, que constan en la certificación incorporada a la presente, y cuyo contenido se da por íntegramente reproducido en este lugar a todos los efectos

legales, a fin de evitar repeticiones innecesarias.

----------**OTORGAMIENTO Y AUTORIZACIÓN**--------------

De acuerdo con lo establecido en la Ley Orgánica 15/1999, el compareciente queda informado y acepta la incorporación de sus datos a los ficheros automatizados existentes en la Notaría, que se conservarán en la misma con carácter confidencial, sin perjuicio de las remisiones de obligado cumplimiento a las Administraciones Públicas que estipula la Ley y, en su caso, al Notario que suceda al actual en la plaza. Su finalidad es realizar la formalización de la presente escritura, su facturación y seguimiento posterior y las funciones propias de la actividad notarial. ------

Hago al compareciente las reservas y advertencias legales, entre ellas, las de carácter fiscal y registral. ---------------------------------------

--------------------------------------------------

Yo, el notario, doy fe de haber permitido al compareciente la lectura íntegra de esta escritura porque así lo solicitan después de advertidos de la opción del artículo 193 del Reglamento Notarial. Enterado, según dice, por la lectura que ha practicado y por mis explicaciones verbales, el

CZ1533493

05/2016

compareciente hace constar su consentimiento al contenido de la escritura y la firma conmigo. -----
Del contenido de esta escritura, de que, a mi juicio, el compareciente tiene capacidad y legitimación para el presente otorgamiento, de que el consentimiento ha sido libremente prestado, de que el otorgamiento se adecua a la legalidad, de que, después de la lectura, el compareciente ha hecho constar haber quedado debidamente informado del contenido del instrumento, de identificar a los comparecientes por sus Documentos de Identidad reseñados en la comparecencia, y de quedar extendido en cuatro folios de papel de uso exclusivo notarial todos ellos de la misma serie y números que son los del presente firmado y los tres anteriores en orden correlativo.-------------------
SIGUE LA FIRMA DEL COMPARECIENTE.- SIGNADO.-
FERNANDO MOLINA STRANZ.- RUBRICADO Y SELLADO.------
--------------------------------------------------



D. Juan Francisco Falcón Ravelo, Secretario no miembro del Consejo de Administración de **GRUPO ISOLUX CORSÁN, S.A.**, (la "Sociedad"),

Mr. Juan Francisco Falcón Ravelo, Secretary non-member of the Board of Directors of **GRUPO ISOLUX CORSÁN, S.A.**, (the "Company"),

### CERTIFICA

### CERTIFIES

Que el Consejo de Administración de la Sociedad, en votación por escrito y sin sesión de todos sus miembros, esto es, D. Luis Delso Heras (Presidente), CONSTRUCTION INVESTMENTS, S.à r.l. (representada por un representante persona física, D. José Gomis Cañete), D. Serafín González Morcillo, D. Francisco Moure Bourio, D. Ángel Serrano Martínez-Estéllez, INVERSIONES CORPORATIVAS, S.A. (representada por su representante persona física, D. Lorenzo José Martínez Márquez), D. Antonio Portela Álvarez, CARTERA PERSEIDAS, S.L. (representada por su representante persona física D. Alessandro Malerba), D. Javier Gómez-Navarro Navarrete, D. Luis Ros Maroad, SERCAPGU, S.L. (representada por su representante persona física D. Jordi Casas Bedós), Hiscan Patrimonio, S.A.U. (representada por su representante persona física D. Jorge Mercader Miró), e INVERSIONES COPORATIVAS DIGITALES, S.L.U. (representada por su representante persona física D. Francesc Bellavista Auladell), siguiendo el procedimiento previsto en el artículo 248.2 de la Ley de Sociedades de Capital, al no haberse opuesto a dicho procedimiento ningún miembro del Consejo de Administración, adoptó por unanimidad, entre otros, los siguientes acuerdos, con efectos al 11 de julio de 2016, y que dichos acuerdos no han sido en modo alguno revocados o enmendados:

That the Company's Board of Directors, through a written vote without a meeting of all its members, that is, Mr. Luis Delso Heras (Chairman), CONSTRUCTION INVESTMENTS, S.à.r.l. (through its representative Mr. José Gomis Cañete) Mr. Serafín González Morcillo, Mr. Francisco Moure Bourio, Mr. Ángel Serrano Martínez-Estéllez, INVERSIONES CORPORATIVAS, S.A. (through its representative Mr. Lorenzo José Martínez Márquez), Mr. Antonio Portela Álvarez, CARTERA PERSEIDAS, S.L. (through its representative Mr. Alessandro Malerba), Mr. Javier Gómez-Navarro Navarrete, Mr. Luis Ros Maroad, SERCAPGU, S.L. (through its representative Mr. Jordi Casas Bedós), Hiscan Patrimonio, S.A.U. (through its representative Mr. Jorge Mercader Miró), e INVERSIONES COPORATIVAS DIGITALES, S.I.U. (through its representative Mr. Francesc Bellavista Auladell) following the procedure established in article 248.2 of the Corporate Companies Law, without any objection by any member of the Board of Directors, unanimously adopted, among others, the following resolutions, with effects as at 11 July 2016. The resolutions have not been revoked or amended:

" [...]

" [...]

#### *CUARTO.- OTORGAMIENTO DE PODERES EN LOS ESTADOS UNIDOS*

#### *FOURTH.- GRANTING OF POWER OF ATTORNEY IN THE UNITED STATES*

*En el contexto de la Refinanciación, se acuerda otorgar poder especial tan amplio como se requiera en derecho a favor de:*

*Under the scope of the Restructuring Transaction, it was agreed to grant power of attorney as broad as legally permitted in favor of the persons listed below:*

- *D. Antonio Portela Álvarez, mayor de edad, de nacionalidad española, casado, con domicilio a estos efectos en Madrid,*

- *Mr. Antonio Portela Álvarez, of legal age, of Spanish Nationality, with professional domicile at Calle*

1/3



CZ1533494

05/2016



calle Caballero Andante 8, y titular de D.N.I. número 35998351-Q, en vigor; y

- D. Ignacio Alcaraz García, mayor de edad, de nacionalidad española, casado, con domicilio a estos efectos en Madrid, calle Caballero Andante 8, y titular de D.N.I. número 00812462-X, en vigor;

para que, cualquiera de ellos, individualmente, pueda en nombre y representación de la Sociedad realizar las siguientes facultades:

i.   suscribir y otorgar cualquier documento necesario o conveniente con el objeto de solicitar y tramitar cualquier procedimiento bajo el Título 11 del Código de los Estados Unidos incluyendo, pero no exclusivamente, cualquier procedimiento del Capítulo 15 del Título 11 del Código de los Estados Unidos al objeto de reconocer en los Estados Unidos el Auto de homologación judicial del Acuerdo de Refinanciación; y

ii.   nombrar a un representante extranjero con con poderes de delegación y sustitución (el "Representante Extranjero") de la Sociedad y de sus bienes y derechos situados en cualquier jurisdicción (incluyendo los Estados Unidos) para que pueda (i) presentar una solitud de amparo bajo el Título 11 del Código de los Estados Unidos, (ii) presentar una solicitud de reconocimiento del Auto de homologación judicial del Acuerdo de Refinanciación en lo permitido por el Capítulo 15 del Título 11 del Código de los Estados Unidos; y (iii) llevar a cabo cualquier actuación en nombre y representación de la Sociedad que sea necesaria o conveniente de acuerdo con el Título 11 de los Código de los Estados Unidos, incluyendo la facultar de presentar testimonio; hacer declaraciones; y presentar cualquier solicitud, formulario, listado y cualquier otra moción, documentación y tomar cualquier medida que consideren necesaria o apropiada para obtener el mencionado reconocimiento.

Caballero Andante 8, Madrid, Spain and holder of national identity card number 35998351-Q, in force; and

- Mr. Ignacio Alcaraz García, of legal age, of Spanish Nationality, with professional domicile at Calle Caballero Andante 8, Madrid, Spain and holder of national identity card number 00812462-X, in force;

so that they may severally exercise the faculties listed below on behalf of the Company:

i.   signing and execution by the Company of any document necessary or convenient for the purposes of applying for and processing, as the case may be, any proceedings under Title 11 of the United States Code, including, but not limited to, proceedings under Chapter 15 of Title 11 of the United States Code to recognize the Spanish Court Approval of Homologation of the Restructuring Agreement; and

ii.   appointing a foreign representative with powers of delegation and substitution (the "Foreign Representative") of the Company and of its property and rights located in any jurisdiction (including the United States) for the purpose of representing the Company to: (i) petition for relief under Title 11 of the United States Code, (ii) petition for recognition of the Spanish Court Approval of the Homologation of the Restructuring Agreement as permitted under Chapter 15 of Title 11 of the United States Code, and (iii) carry out any actions necessary or convenient on behalf of the Company in accordance with Title 11 of the United States Code, including giving testimony; making declarations; and filing all petitions, schedules, lists and other motions, papers, or documents, and taking any and all actions that they deem necessary or proper to obtain such relief.



2/3

9

[...]

**SEXTO.- AUTORIZACIÓN PARA OTORGAMIENTO DE ESCRITURA PÚBLICA**

*El Consejo de Administración acuerda autorizar, apoderar y facultar, tan ampliamente como en derecho hubiera lugar y de forma expresa, al Presidente del Consejo de Administración y al Secretario no miembro del Consejo de Administración para que cualquiera de ellos, indistintamente, en nombre y representación de la Sociedad, puedan comparecer ante Notario y otorgar la o las escrituras públicas que fueran necesarias y que recojan los anteriores acuerdos, así como para otorgar cuantos documentos bien públicos, bien privados, fueran necesarios, incluso aquellos de rectificación, aclaración o subsanación y realicen todas las gestiones, incluyendo la petición de inscripción parcial si ésta resultara posible, todo ello de acuerdo con los artículos 62 y 63 del Reglamento del Registro Mercantil, que se precisen para su completa inscripción en el Registro Mercantil."*

Los acuerdos anteriores son certificados por el Secretario no miembro del Consejo de Administración de la Sociedad, D. Juan Francisco Falcón Ravelo, con el Visto Bueno del Presidente del Consejo de Administración, D. Luis Delso Heras.

En Madrid, a 11 de julio de 2016

Visto Bueno / With my approval

D./Mr. Luis Delso Heras.

Presidente del Consejo de Administración/ Chairman of the Board of Directors

---

[...]

**SIXTH.- AUTHORIZATION FOR THE GRANTING OF PUBLIC DEED**

*The Board of Directors agreed to grant powers of attorney to the Chairman of the Company's Board of Directors and to the Secretary non-member of the Board of Directors so that either of them may, individually and in the name and on behalf of the Company, appear before notaries and execute as many public deed(s) as may be necessary containing the abovementioned resolutions, and to formalize any other public or private document that may be necessary, including acts for clarifying, rectifying, and complementing the resolutions, as well as the request for partial registration, if applicable, in accordance with articles 62 and 63 of the Commercial Register Regulation, to complete the registration with the Commercial Register."*

These resolutions are certified by the Secretary non-member of the Board of Directors of the Company, Mr. Juan Francisco Falcón Ravelo, with the approval of the Chairman of the Board of Directors, Mr. Luis Delso Heras.

Madrid, 11 July 2016

Approved and signed

D./Mr. Juan Francisco Falcón Ravelo

Secretario no miembro del Consejo de Administración/Secretary non-member of the Board of Directors

3/3



CZ1533495

05/2016

**ES COPIA DE SU MATRIZ**, con la que concuerda fielmente y donde queda anotada. Y para LA SOCIEDAD OTORGANTE, la libro en seis folios de papel timbrado, de serie CZ números 1533490, cuatro siguientes en orden correlativo y el del presente. En Madrid, el mismo día de su otorgamiento.-DOY FE.-



0217013453



**ESCRITURA DE NOMBRAMIENTO DE REPRESENTANTE EXTRANJERO OTORGADA POR LA COMPAÑÍA "GRUPO ISOLUX CORSÁN, S.A.".** ------------------------------------

NÚMERO MIL CIENTO SESENTA Y SIETE. ------------------

En MADRID, mi residencia, a **veintiocho de julio de dos mil dieciséis.** --------------------------------

Ante mí, **FERNANDO MOLINA STRANZ**, Notario del Ilustre Colegio Notarial de MADRID, con residencia en la Capital,------------------------------------

--------------------**COMPARECE**--------------------

**Don Antonio Portela Álvarez**, mayor de edad, de nacionalidad española, con domicilio a estos efectos en calle Caballero Andante 8, Madrid, España y titular de D.N.I. número 35998351-Q. -----

Sus circunstancias personales resultan de sus propias manifestaciones.----------------------------

--------------------**INTERVIENE**--------------------

En nombre y representación, como apoderado, de la sociedad "GRUPO ISOLUX CORSÁN, S.A.", sociedad de nacionalidad española, con domicilio social en

1

Madrid, calle Caballero Andante número 8, Edificio
Isolux Corsán, con C.I.F. A-84173947.--------------
Constituida como Sociedad de Responsabilidad
Limitada, con la denominación de "GLOBAL KURGAN
S.L.", mediante escritura otorgada ante el Notario
de Madrid Don Emilio Recoder de Casso, el día trece
de diciembre de dos mil cuatro, bajo el número
1.554 de orden de protocolo.----------------------
Cambiada su denominación por la de "ICC GRUPO
ISOLUX CORSÁN, S.L." en virtud de escritura
otorgada ante el Notario de Madrid D. Carlos del
Moral Carro, el día quince de abril de dos mil
cinco bajo el número 2.194 de su protocolo.-------
Transformada en Sociedad Anónima mediante escritura
otorgada ante el Notario de Madrid Don Carlos del
Moral Carro, el día ocho de Junio de dos mil cinco,
bajo el número 3.446 de su orden de protocolo.----
Está inscrita en el Registro Mercantil de Madrid,
al tomo 20.745, al libro 0, folio 114, sección 8,
hoja M-367466, inscripción 1ª.--------------------
Cambiada su denominación social por la actual
mediante escritura autorizada por mí, el día seis
de octubre de dos mil cinco, bajo el número 1.843
de orden de protocolo.----------------------------

2



Cambiando su domicilio al actual mediante escritura autorizada por el Notario de Madrid, don Carlos del Moral Carro, el día 12 de mayo de 2006, bajo el número 2842 de su protocolo. ----------------------

Hace constar dicho representante, a mi requerimiento, que la entidad por el representada tiene por objeto o actividad, entre otros: "los estudios de ingeniería, montajes industriales y fabricación de los elementos necesarios para los mismos, instalaciones integrales y edificación. La fabricación, comercialización y representación de toda clase de material, instalaciones y productos eléctricos, electrónicos, electromecánicos, informáticos, industriales, maquinaria y aparellaje". ------------------------------------- -

Sus facultades para el presente otorgamiento resultan del poder especial conferido a su favor por la Sociedad el día 13 de julio de 2016 mediante escritura de elevación a público de acuerdo del Consejo de Administración de la Sociedad otorgado

ante mí, bajo el número 1013 de orden de mi protocolo.----------------------------------------
Copia autorizada de la citada escritura me ha sido exhibida y a mi juicio son suficientes las facultades con ella acreditadas para el presente otorgamiento por cuanto que está expresamente facultado para ello en el poder indicado.---------
Hace constar dicho representante, a mi requerimiento, que la entidad por el representada tiene por objeto o actividad, entre otros: "los estudios de ingeniería, montajes industriales y fabricación de los elementos necesarios para los mismos, instalaciones integrales y edificación. La fabricación, comercialización y representación de toda clase de material, instalaciones y productos eléctricos, electrónicos, electromecánicos, informáticos, industriales, maquinaria y aparellaje".-------------------------------------- -
Yo, el Notario, hago constar expresamente que he cumplido con la obligación de identificación del titular real que impone la Ley 10/2010, de 28 de abril, cuyo resultado consta en acta autorizada por el Notario de Madrid Don Carlos del Moral Carro el día 18 de septiembre de dos mil trece con el número

4



2625 de su protocolo, cuya copia autorizada me exhiben los comparecientes manifestando no haberse modificado el contenido de la misma. --------------
Me aseguro de su **identidad** por su reseñado documento que me ha exhibido. Sus circunstancias personales resultan de sus propias manifestaciones. La juzgo con la **capacidad** legal y legitimación necesarias para el otorgamiento de esta escritura de designación de representante persona física y a tal efecto, tal y como interviene, ----------------
----------------**DICE Y OTORGA**---------------------
Que en nombre y representación **"GRUPO ISOLUX CORSÁN, S.A."**, NOMBRA individualmente a cada una de las siguientes personas: --------------------------
**-D. José Antonio Álvarez Dorero**, mayor de edad, de nacionalidad española, con domicilio profesional en 1701, Director Blvd, Austin, Texas 78744, Estados Unidos, y titular de pasaporte número XDB048749; --
**-Dña. Karla Pascarella**, mayor de edad, de nacionalidad norteamericana, con domicilio

5

profesional en 1701, Director Blvd, Austin, Texas 78744, Estados Unidos, y titular de pasaporte número070-873-781; --------------------------------

-D. **Cristian Gómez Martínez**, mayor de edad, de nacionalidad española, con domicilio a estos efectos en Madrid, calle Caballero Andante 8, y titular de D.N.I. número 01182571-A; --------------

-D. **Juan Carlos Reina Pinto**, mayor de edad, de nacionalidad española, con domicilio a estos efectos en Madrid, calle Caballero Andante 8, y titular de D.N.I. número 02856751-J; --------------

-D. **Ignacio Alcaraz García**, mayor de edad, de nacionalidad española, con domicilio a estos efectos en Madrid, calle Caballero Andante 8, y titular de D.N.I. número 00812462-X; --------------

-D. **Enrique Barreiro Nogaledo**, mayor de edad, de nacionalidad española, con domicilio profesional en Madrid, calle Caballero Andante 8, España y titular de D.N.I. 36105392-S; ----------------------------

como representante con poderes de delegación y sustitución de la Sociedad y de sus bienes y derechos situados en cualquier jurisdicción (incluyendo los Estados Unidos) para que pueda (i) presentar una solitud de amparo bajo el Título 11



del Código de los Estados Unidos (el "US Bankruptcy Code"), incluyendo la solicitud, como representante extranjero, del reconocimiento del Auto de homologación judicial del Acuerdo de Refinanciación bajo el Capítulo 15 del US Bankruptcy Code; y (ii) llevar a cabo cualquier actuación en nombre y representación de la Sociedad que sea necesaria o conveniente para el seguimiento de un procedimiento comenzado bajo el US Bankruptcy Code, incluyendo la facultar de presentar testimonio; hacer declaraciones; y presentar cualquier solicitud, formulario, listado y cualquier otra moción, documentación y tomar cualquier medida que consideren necesaria o apropiada para obtener el mencionado reconocimiento.   --------------------

El otorgante, tal y como interviene, me entrega un documento a doble columna en español y en lengua inglesa y ésta última según declara contiene la traducción a dicho idioma de la presente escritura en lo que se refiere a disposición. En caso de

7

contradicción, prevalecerá el texto en español.----

**Redacto esta escritura según minuta facilitada por el otorgante.**------------------------------------

--------------**OTORGAMIENTO Y AUTORIZACIÓN**---------

Hago al compareciente las reservas y advertencias legales, entre ellas, las de carácter fiscal y registral. Advierto expresamente de la obligatoriedad de inscripción en el Registro Mercantil. De acuerdo con lo establecido en la Ley Orgánica 15/1999, el compareciente queda informado y acepta la incorporación de sus datos a los ficheros automatizados existentes en la Notaría, que se conservarán en la misma con carácter confidencial, sin perjuicio de las remisiones de obligado cumplimiento a las Administraciones Públicas que estipula la Ley y, en su caso, al Notario que suceda al actual en la plaza. Su finalidad es realizar la formalización de la presente escritura, su facturación y seguimiento posterior y las funciones propias de la actividad notarial. -----------------------------------------

Permito al compareciente la lectura de esta escritura, porque así lo solicita después de advertida de la opción del artículo 193 del



Reglamento Notarial. Enterado, según dice, por la lectura que ha practicado y por mis explicaciones verbales, el compareciente hace constar su consentimiento al contenido de la escritura y la firma conmigo. ----------------------------------

Yo, el Notario, doy fe, de haber identificado al compareciente por su documento de identidad antes reseñado; de que el consentimiento ha sido libremente prestado así como de que el otorgamiento se adecua a la legalidad y a la voluntad debidamente informada de los otorgantes e intervinientes; y de todo lo contenido en este instrumento público, extendido en cinco folios de papel timbrado del Estado, exclusivo para documentos notariales, de la misma serie y números que son el del presente y los cuatro anteriores en orden correlativo. --------------------------------

SIGUE LA FIRMA DEL COMPARECIENTE. Signado: FERNANDO MOLINA STRANZ. Rubricado y sellado. ---------------

APLICACIÓN ARANCEL, DISPO. ADICIONAL 3ª ley 8/89.-

DOCUMENTO SIN CUANTIA.-----------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------

--------------------------------------------------



| NOMBRAMIENTO DE REPRESENTANTE EXTRANJERO | APPOINTMENT OF FOREIGN REPRESENTATIVE |
|---|---|

**Grupo Isolux Corsán, S.A.,** una sociedad de nacionalidad española, con domicilio social en Madrid, calle Caballero Andante, 8, 28021, con C.I.F. A84173947 e inscrita en el Registro Mercantil de Madrid al tomo 20745, folio 114, sección 8ª, hoja M-367466, (la "**Sociedad**") debidamente representada por **D. Antonio Portela Álvarez,** mayor de edad, de nacionalidad española, con domicilio profesional en Madrid, calle Caballero Andante, 8, 28021, y titular de D.N.I. número 35998351-Q, en virtud de poder conferido a su favor por la Sociedad el día 13 de julio de 2016 mediante escritura de elevación a público de acuerdo del Consejo de Administración de la Sociedad otorgado ante el notario de Madrid, D. Fernando Molina Stranz, bajo el número 1013 de orden de su protocolo, **NOMBRA** individualmente a cada una de las siguientes personas:

**Grupo Isolux Corsán, S.A.,** a Spanish company, with registered office at Madrid, calle Caballero Andante, 8, 28020, holding of Spanish Tax Identification number A84173947 and registered with the Companies Register of Madrid in Volume 20745 , Page 114, Section 8, Sheet M-367466 (the "**Company**") duly represented by **Mr. Antonio Portela Álvarez,** of legal age, of Spanish Nationality, with professional domicile at Madrid, calle Caballero Andante, 8, 28021, and holding Spanish ID 35998351-Q by virtue of a power of attorney granted in his favor by the Company on 13 July 2016 by way of public deed of board of director/s resolution granted by the Notary of Madrid, D. Fernando Molina Stranz under number 1013 of its files, **APPOINTS** each of the following persons:

- **D. José Antonio Álvarez Dorero,** mayor de edad, de nacionalidad española, con domicilio profesional en 1701, Director Blvd, Austin, Texas 78744, Estados Unidos, y titular de pasaporte número XDB048749;
- **Dña. Karla Pascarella,** mayor de edad, de nacionalidad norteamericana, con domicilio profesional en 1701, Director Blvd, Austin, Texas 78744, Estados Unidos, y titular de pasaporte número 070-873-781;
- **D. Cristian Gómez Martínez,** mayor de edad, de nacionalidad española, con domicilio a estos efectos en Madrid, calle Caballero Andante 8, y titular de D.N.I. número 01182571-A;
- **D. Juan Carlos Reina Pinto,** mayor de edad, de nacionalidad española, con domicilio a estos efectos en Madrid, calle Caballero Andante 8, y titular de D.N.I. número 02856751-J;
- **D. Ignacio Alcaraz García,** mayor de edad, de nacionalidad española, con

- **Mr. José Antonio Álvarez Dorero,** of legal age, of Spanish Nationality, with professional domicile at 1701, Director Blvd in Austin, Texas 78744, United States, and holder of passport number XDB048749;
- **Ms. Karla Pascarella,** of legal age, of American Nationality, with professional office at 1701, Director Blvd in Austin, Texas 78744, United States, and holder of passport number 070-873-781;
- **Mr. Cristian Gómez Martínez,** of legal age, of Spanish Nationality, with professional domicile at Calle Caballero Andante 8, Madrid, and holder of national identity card number 01182571-A;
- **Mr. Juan Carlos Reina Pinto,** of legal age, of Spanish Nationality, with professional domicile at Calle Caballero Andante 8, Madrid, and holder of national identity card number 02856751-J;
- **Mr. Ignacio Alcaraz García,** of legal age, of Spanish Nationality, with

1/2

domicilio a estos efectos en Madrid, calle Caballero Andante 8, y titular de D.N.I. número 00812462-X;

- **D. Enrique Barreiro Nogaledo,** mayor de edad, de nacionalidad española, con domicilio profesional en Madrid, calle Caballero Andante 8, España y titular de D.N.I. 36105392-S;

como representante con poderes de delegación y sustitución de la Sociedad y de sus bienes y derechos situados en cualquier jurisdicción (incluyendo los Estados Unidos) para que pueda (i) presentar una solitud de amparo bajo el Título 11 del Código de los Estados Unidos (el "US Bankruptcy Code"), incluyendo la solicitud, como representante extranjero, del reconocimiento del Auto de homologación judicial del Acuerdo de Refinanciación bajo el Capítulo 15 del US Bankruptcy Code; y (ii) llevar a cabo cualquier actuación en nombre y representación de la Sociedad que sea necesaria o conveniente para el seguimiento de un procedimiento comenzado bajo el US Bankruptcy Code, incluyendo la facultar de presentar testimonio; hacer declaraciones; y presentar cualquier solicitud, formulario, listado y cualquier otra moción, documentación o tomar cualquier medida que consideren necesaria o apropiada para obtener el mencionado reconocimiento.

En testimonio de lo cual, firmo este documento en Madrid, el 28 de julio de 2016.

**GRUPO ISOLUX CORSÁN, S.A.**
p.p.

D./Mr. Antonio Portela Álvarez

professional domicile at Calle Caballero Andante 8, Madrid, and holder of national identity card number 00812462-X, in force;

- **Mr. Enrique Barreiro Nogaledo,** of legal age, of Spanish Nationality, with professional domicile at Calle Caballero Andante 8, Madrid, Spain and holder of national identity card number 36105392-S, in force;

as a representative, with powers of delegation and substitution, of the Company and of its property and rights located in any jurisdiction (including the United States) for the purpose of representing the Company to: (i) petition for relief under Title 11 of the United States Code (the "U.S. Bankruptcy Code"), including, as foreign representative, for recognition and enforcement of the Spanish Court Approval of the Homologation of the Restructuring Agreement under Chapter 15 of the U.S. Bankruptcy Code and (ii) carry out any actions necessary or convenient on behalf of the Company in accordance with the prosecution of a case commenced under the U.S. Bankruptcy Code, including giving testimony; making declarations; and approving, executing, and filing all petitions, schedules, lists and other motions, papers, or documents.

In witness whereof, I hereby duly execute this document in Madrid on 28 July 2016.

2/2

[Stamp of Notary Fernando Molina Stranz – MADRID]

**NOTARIZED APPOINTMENT OF FOREIGN REPRESENTATIVE BY "GRUPO ISOLUX CORSÁN, S.A."**

**NUMBER** ONE THOUSAND ONE HUNDRED AND SIXTY-SEVEN

In MADRID, my place of residence, **on July twenty-eighth, two thousand and sixteen,**

Before me, **FERNANDO MOLINA STRANZ,** Notary with the Notarial Association of MADRID, residing in this Capital City,

<u>**PERSONALLY APPEARED**</u>

**Mr. Antonio Portela Álvarez**, of legal age, a Spanish citizen, legally addressed for these purposes at Calle Caballero Andante 8, Madrid, Spain, holder of ID No. 35998351-Q.

His personal data are made known through his own personal statements.

<u>**AND ACTS ON THE PREMISES**</u>

As representative for and on behalf of "GRUPO ISOLUX CORSÁN, S.A.", a Spanish corporation, with registered office in Madrid, Calle Caballero Andante 8, Edificio Isolux Corsán, with Tax Identification No. A-84173947.

It was organized as a limited liability company under the name of "GLOBAL KURGAN S.L.", under a notarized instrument executed in the presence of Madrid Notary Emilio Recoder de Casso, on December 13, 2004, under entry number 1554 in his notarial records.

It changed its name to "ICC-GRUPO ISOLUX CORSÁN, S.L." under a notarized instrument executed in the presence of Madrid Notary Carlos del Moral Carro, on April 15, 2005, under entry number 2194 in his notarial records.

It was converted into a Corporation under a notarized instrument executed in the presence of Madrid Notary Carlos del Moral Carro, on June 8, 2005, under entry number 3446 in his notarial records.

It appears registered in the Commerce Registry of Madrid, in tome 20475, book 0, sheet 114, section 8, page M-367466, 1st registration.

It changed its corporate name to its current denomination under a notarial instrument certified by the undersigned,

on October 6, 2005, under number 1843 in my notarial records.

It changed its registered office to its current location, under a notarized instrument executed in the presence of Madrid Notary Carlos del Moral Carro, on May 12, 2006, under entry number 2842 in his notarial records.

The above representative has stated, at my request, that the business purpose of the entity represented by him includes but is not limited to the following activities: "Engineering studies, industrial assemblies and manufacture of the elements necessary therefor, comprehensive facilities and building; the manufacture, sales and representation of all kinds of materials, facilities and electrical, electronical, electromechanical, information technology, industrial materials, facilities and products, machinery and switchgear."

His authority to act on the premises originates in the limited power-of-attorney granted by the Company on July 13, 2016, by means of a notarially-recorded instrument memorializing the Resolution of the Board of Directors of the Company, executed in my presence, under entry number 1013 in my notarial records.

A certified copy of the aforementioned instrument has been shown to me, and I am satisfied that the authority evidenced thereby is sufficient to act on the premises, as the representative is expressly authorized therefor in the aforementioned power-of-attorney.

At my request, said representative notes that the business purpose of the entity represented by him includes but is not limited to the following activities: "Engineering studies, industrial assemblies and manufacture of the elements necessary therefor, comprehensive facilities and building; the manufacture, sales and representation of all kinds of materials, facilities and electrical, electronical, electromechanical, information technology, industrial materials, facilities and products, machinery and switchgear."

I, the undersigned Notary, hereby expressly note that I have met the obligation to identify the beneficial owner as required by Law 10/2010, of April 28th, the outcome of which is evidenced in the minutes certified by Madrid Notary Carlos del Moral Carro, on September 18, 2013, under entry number 2625 in his notarial records, a certified

copy of which the persons appearing produce, representing
that the contents thereof have not been modified.

I am satisfied as to his **identity** on the basis of the
document he has produced. His personal data are made known
through his own personal statements.

In my opinion, the person appearing has the necessary legal
**capacity** and standing to act on the premises and designate
an individual representative, and to that effect, in his
purported capacity,

<u>HE DECLARES AND SETS FORTH</u>

That, for and on behalf of "**GRUPO ISOLUX CORSÁN, S.A.**" HE
HEREBY APPOINTS, in individual capacities, each of the
following persons:

**Mr. José Antonio Álvarez Dorero**, of legal age, a Spanish
citizen, professionally residing at 1701 Director Blvd.,
Austin, Texas 78744, United States of America, holder of
passport number XDB048749;

**Ms. Karla Pascarella**, of legal age, a United States
citizen, professionally residing at 1701 Director Blvd.,
Austin, Texas 8744, United States of America, holder of
passport number 070-873-781;

**Mr. Cristián Gómez Martínez**, of legal age, a Spanish
citizen, legally addressed for these purposes at Calle
Caballero Andante 8, Madrid, Spain, holder of ID No.
01182571-A;

**Mr. Juan Carlos Reina Pinto**, of legal age, a Spanish
citizen, legally addressed for these purposes at Calle
Caballero Andante 8, Madrid, Spain, holder of ID No.
02856751-J;

**Mr. Ignacio Alcaraz García**, of legal age, a Spanish
citizen, legally addressed for these purposes at Calle
Caballero Andante 8, Madrid, Spain, holder of ID No.
00812462-X;

**Mr. Enrique Barreiro Nogaledo**, of legal age, a Spanish
citizen, professionally residing for these purposes at
Calle Caballero Andante 8, Madrid, Spain, holder of ID No.
36105392-S;

as a representative with powers of delegation and
substitution of the Company and its property and rights
located in any jurisdiction (including the United States)
in order to (i) petition for relief under Title 11 of the

United States Code (the "US Bankruptcy Code"), including, as a foreign representative, for recognition of the Spanish Court Approval of the Restructuring Agreement under Chapter 15 of the US Bankruptcy Code; and (ii) engage in any acts for and on behalf of the Company as deemed necessary or convenient for the furthering of proceedings instituted under the US Bankruptcy Code, including giving testimony; making declarations; and filing any petition, form, listing and any other motions and papers, and adopt any measure deemed necessary or appropriate to secure said recognition.

The person appearing, in his purported capacity, submits a double-column document in Spanish and English, which latter column purports to contain the translation of this instrument into said language, as regards its provisions. In case of any inconsistency, the Spanish text shall govern.

**I draw up this instrument on the basis of a draft submitted by the person appearing.**

### EXECUTION AND CERTIFICATION

I hereby advise the person appearing on the requisite statutory caveats and warnings, including those of a tax- and registration-related nature. I expressly forewarn him on the obligation to record this instrument in the Commerce Registry as provided in Organic Law 15/1999, the person appearing stands advised and accepts the inclusion of his data in the automated file kept at the Notarial Office, which are held as confidential, notwithstanding the mandatory referrals to the Public Administrations stipulated by law and, if need be, to the Notary who succeeds the undersigned in this location. Its purpose is to formalize this instrument, and procure its invoicing and subsequent monitoring, and the duties inherent to the notarial function.

I allow the person appearing to read this instrument upon request, upon being advised on the option under article 193 of the Notarial Regulations. Upon learning of the contents hereof on the basis of his reading and my oral clarifications, the person appearing manifests his consent to the contents hereof and sets his hand hereunto together with the notary.

I, the undersigned Notary, hereby attest to having identified the person appearing on the basis of his above-mentioned identification document; to the fact that

consent has been freely given and that execution hereof is in accordance with the law and the duly-advised volition of the parties appearing; and to all the contents of this public instrument, executed in five sheets of State-stamped paper, to be used exclusively for notarial documents, of the same series and numbers, i.e. of this sheet and of the previous four, in correlative order.

THE SIGNATURE OF THE PERSON APPEARING FOLLOWS: Signed: FERNANDO MOLINA STRANZ. Initialed and stamped.

FEE CHARGED AS PER ADDITIONAL PROVISION 3 of law 8/89.

DOCUMENT WITHOUT SPECIFIED AMOUNTS.

## DECLARATION CERTIFYING ACCURACY OF TRANSLATION

Jose Mendoza, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America, as follows:

1.      That he is thoroughly familiar with both the Spanish and English languages, fully bilingual at a highly technical level and working as a legal translator for the past 25 years.

2.      That on July 28, 2016, he translated into English from Spanish the Lex Net cover pages, dated July 28, 2016.

3.      That on July 28, 2016, he translated into English from Spanish the document titled *Notarized Appointment of Foreign Representative by Grupo Isolux Corsán, S.A.,* dated July 28, 2016.

4.      That on July 28, 2016, he translated into English from Spanish the document titled *Notarized Appointment of Foreign Representative by Corsán-Corviam Construcción, S.A.,* dated July 28, 2016.

5.      That on July 28, 2016, he translated into English from Spanish the document titled *Notarized Appointment of Foreign Representative by Grupo Isolux Corsán Concesiones S.A.,* dated July 28, 2016.

6.      That on July 28, 2016, he translated into English from Spanish the document titled *Notarized Appointment of Foreign Representative by Isolux Ingeniería, S.A.,* dated July 28, 2016.

7.      That the attached documents that he translated and reviewed are, to the best of his/her knowledge and belief, true and accurate English versions of what was drafted in Spanish.

8.      That he resides at Bernard Shaw 44-101, Mexico City, CP 11560, Mexico.

Jose Mendoza declares under penalty of perjury under the laws of the United States of America that, based upon his/her knowledge, information, and belief as set forth herein, the foregoing is true and correct.

Dated:  July 28, 2016                              Respectfully submitted,

_____
Jose Mendoza

## <u>VERIFICATION OF CHAPTER 15 PETITION</u>

Pursuant to 28 U.S.C. § 1746, Karla Pascarella declares as follows:

I am the authorized foreign representative of Grupo Isolux Corsán, S.A. (the

"**Debtor**").  I have full authority to verify the foregoing chapter 15 petition for recognition of a

foreign main proceeding, including each of the attachments and appendices thereto, and I am

informed and believe that the statements contained therein are true and accurate to the best of my

knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


Executed this 29th day of July 2016.


By: /s/ <u>Karla Pascarella_____</u>
As:     Authorized Foreign Representative
         of the Debtor